UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY LEE, ) | |
| ) | |
| Petitioner, ) | Case No. 11 C 00183 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| NICHOLAS LAMB, ) | |
| Warden, Lawrence Correctional Center, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION AND ORDER**

Anthony Lee has filed a petition for a writ of habeas corpus, challenging his 1996 state-court convictions for rape and kidnapping. He argues that his lawyer did not provide effective assistance, in violation of the Sixth Amendment right to counsel.[1] R. 96, Am. Pet.[2] The state responds that Lee cannot obtain relief because the Illinois Appellate Court rejected Lee's claim on the merits, and did not unreasonably apply federal law. R. 107, Answer at 15. The Court agrees: the Illinois Appellate Court's decision on Lee's ineffective-assistance claim was not unreasonable, so Lee's habeas petition must be denied. But because it is a close enough question, a certificate of appealability will issue.

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 2241. The previous caption referenced Tarry Williams as Respondent because he was the warden of the facility where Lee was incarcerated when he originally filed his federal habeas petition. Lee is now incarcerated at Lawrence Correctional Center. Under Federal Rule of Civil Procedure 25(d), the Clerk's Office shall substitute Nicholas Lamb, the current warden of Lawrence Correctional Center, as Respondent. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

## I. Background

Anthony Lee was convicted in a bench trial of kidnapping and raping a woman, whom the parties refer to as L.M. At trial, the only defense witness was Lee himself. Defense counsel did not call five witnesses who Lee says would have corroborated his version of the events (or at least parts of Lee's version). Counsel's failure to call—and, Lee asserts, to even investigate—the five witnesses is the basis of this habeas petition. To understand how those witnesses might have fit into the case, it is necessary to learn about the prosecution's evidence.

### A. Trial Court Proceedings

#### 1. The State's Case

The state's first witness, Teresa Baragas, testified that, at around 3 o'clock in the morning on April 15, 1995, she awoke to hear a young woman banging on her door. Am. Pet. Exh. 5, Trial Tr. Vol. B at 13:22-14:14:8. The young woman, whom Baragas identified as L.M., was screaming and saying that she had been raped. *Id*. at 14:21-24. Baragas testified that L.M. was completely naked and that she had black eyes and her face was "marked up and scarred." *Id*. at 14:10-20.

Next, the state called L.M. She testified that, in the early morning hours of April 15, 1995, she argued with a friend at the Sweet Water Lounge in Calumet City. Am. Pet. Exh. 5, Trial Tr. Vol. B at 18:5-19:2. L.M. left the lounge around 1:00 a.m. and began to walk down State Street toward her sister's house. *Id*. at 18:13-18. As she was walking, she was approached by two men in a Cadillac, who asked whether she needed a ride. L.M. declined. *Id*. at 19:6-12. The car pulled away, but it

soon turned around and pulled over. *Id*. at 19:19-24. The passenger, Burlmon Manley, got out of the car and grabbed L.M. from behind. L.M. testified that she kicked and screamed, but that Manley bound her hands and dragged her into the back seat of the Cadillac. *Id*. at 20:6-24. L.M. identified Lee as the driver of the Cadillac. *Id*. at 21:24.

L.M. testified that the two men took her to a liquor store or lounge in Hammond, Indiana. Am. Pet. Exh. 5 Trial Tr. Vol. B at 22:6-7. She stated that Lee went into the store to get drinks while Manley remained in the back seat with her and kissed and fondled her without consent. *Id*. at 22:14-23:24. Lee then drove the car back to Chicago. *Id*. at 25:1-18. During the drive, Manley and L.M. had a conversation about Manley's job and their birthdays. *Id*. at 26:7-12. Manley also asked whether L.M. had ever been with a black man, and continued to stroke and kiss her despite her protests. *Id*. at 26:7-27:5.

Lee eventually parked the car in an unfamiliar place. Lee got out of the driver's seat and into the back seat next to L.M. Am. Pet. Exh. 5 Trial Tr. Vol. B at 28:16-29:17. Lee began to pull off L.M.'s clothing, hitting her in the head with his fists when she told him to stop. *Id*. at 29:19-30:22. Lee then forced L.M.'s head down into Manley's lap and forced her to perform oral sex on Manley. *Id*. at 31:18-32:11. At some point, Lee left the car and went into a nearby "crack house." *Id*. at 32:22-23. After several minutes of oral sex, Manley pushed L.M. onto her back in the back seat and vaginally raped her. *Id*. at 33:12-34:14. About five minutes later, Lee came back to the car and beat L.M. again with his fist, swearing at her and striking her

in the head and face ten to fifteen times. *Id.* at 34:17-36:6. Lee threatened to take L.M. into the crack house and sell her to the men inside, who, according to Lee, would rape and kill her. *Id.* at 36:10-13.

L.M. further testified that Lee became more and more angry that L.M. was "hysterical," and told Manley "fuck this bitch, go in the trunk and get the nine." Am. Pet. Exh. 5 Trial Tr. Vol. B at 38:21-39:4. Manley got out of the car and got a handgun from the trunk. *Id.* at 39:6-7. Manley gave the gun to Lee, who held it to L.M.'s forehead as he raped her vaginally and anally. *Id.* at 39:6-42:4. L.M. testified that she had bruises on her back and sides from Lee forcing her down in the back seat. *Id.* at 42:22-24. At some point, Manley, who had been driving, stopped the car and had an argument with Lee. *Id.* at 43:11-44:17. Lee got back in the driver's seat and Manley left the car and went into a building. *Id.* at 45:4-10. Lee drove another few blocks, then stopped the car again. *Id.* at 45:24-46:2. Lee reclined the driver's seat, and, still holding the gun, told L.M. "okay, bitch, you are going to suck me off now." *Id.* at 46:4-23. Lee pushed L.M.'s head down and forced her to perform oral sex until he ejaculated. *Id.* at 47:1-48:3. At this point, L.M. realized that Lee had dropped the gun. *Id.* at 48:10-11. Seeing her chance, L.M. started striking Lee in the face. *Id.* at 48:18-23. During the scuffle, L.M. was able to open the door and tumble out of the car. *Id.* at 49:5-10. Lee "took off like a maniac," and L.M. ran to a nearby house and started beating on the door, naked and screaming for help. *Id.* at 49:19-50:9. Teresa Baragas answered the door and called the police. *Id.* at 50:10-16.

The state introduced photographs of L.M. taken in the days after the attack. The photographs showed evidence of a severe beating: L.M.'s eyes were blackened, and her nose and mouth were swollen. Am. Pet. Exh. 5 Trial Tr. Vol. B at 51:19-22. Another photograph showed bite marks on L.M.'s left hand, which resulted in a permanent scar. *Id.* at 53:16-21. Other photographs showed bruising on L.M.'s back and arms from being restrained and forced down. *Id.* at 55:8-17.

Next, the state called Detective Robert Morrison, who read a written statement given by Lee during police interrogation. Am. Pet. Exh. 6, Trial Tr. Vol. C at 8:18-20. In the statement, Lee related that Manley had consensual sex with L.M. in Lee's car, and that L.M. had performed oral sex on Lee in exchange for an offer of drugs. *Id.* at 14:4-15:17. Finally, the state presented evidence of Lee's prior felony stalking conviction. *Id.* at 37:11-38:2

### 2. Lee's Case

Lee's trial counsel called only Lee himself as a witness. Lee testified that L.M. got into the car voluntarily after she spoke with Manley for a few minutes. Am. Pet. Exh. 7, Trial Tr. Vol. D at 59:19-24. L.M. directed them to Dad's liquor store in Hammond, Indiana. *Id.* at 60:13-61:9. At the liquor store, Manley and Lee both got out of the car and went inside, leaving L.M. alone in the car for about 20 minutes. *Id.* at 61:18-62:17. Lee testified that he left his keys in the car with L.M. *Id.* at 62:2-5. The group then drove to L.M.'s house in Hammond so that L.M. could drop something off. *Id.* at 63:13-18.

5

The three returned to Chicago, where they stopped to let L.M. buy marijuana from a street dealer. Am. Pet. Exh. 7, Trial Tr. Vol. D at 64:4-6. They continued to Merrill Park, where they sat around drinking and talking. *Id*. at 64:7-17. At the park, L.M. and Lee got into a fight because L.M. put out a cigarette on the carpet of Lee's car. *Id*. at 64:19-6. Lee swore at L.M. and hit her on the head. *Id* at. 66:6-67:10. The two fought, and Lee punched L.M. and bit her. *Id*. at 67:17-22.

Lee got out of the car and sat on a nearby stump drinking beer for about 30 minutes. Am. Pet. Exh. 7, Trial Tr. Vol. D at 68:5-14. Manley got out of the car and asked if Lee had condoms, and Lee gave Manley two condoms from the trunk. *Id*. at 69:20-70:1. Lee waited on the stump another 20 or 30 minutes. *Id*. at 70:13-14. When he came back to the car, he saw Manley lying on top of L.M. *Id*. at 70:21-24. Lee got into the car and drove to 84th and Buffalo, where Manley got out. *Id*. at 71:13-20.

After Manley left the car, L.M., who was naked, got into the front passenger seat. Am. Pet. Exh. 7, Trial Tr. Vol. D at 72:2-9. According to Lee, L.M. abruptly hit him in the eye, jumped out of the car, and said "you bastards are going to pay for this." *Id*. at 72:11-15. Lee testified that he never had intercourse or oral sex with L.M. *Id*. at 72:19-23. On redirect, Lee's counsel asked about Lee's statement to police (in which he stated that he asked L.M. to perform oral sex on him). Lee explained that he was not in the room during the entire time the statement was typed, and that he did not read all of the typed statement before signing it. *Id*. at 125:6-12.

6

### 3. Verdict and Sentencing

After closing arguments, the trial judge found Lee guilty of aggravated sexual assault and aggravated kidnapping. Am. Pet. Exh. 7 at 172:8-17. The judge stated that "[t]he case does come down to credibility. The Court finds [L.M.] very credible." *Id.* at 166:11-13. He also noted that the picture showing L.M. with black eyes and a split lip "itself shows the sex was not consensual." *Id.* at 166:13-23. Lee was sentenced to 100 years' imprisonment in the Illinois Department of Corrections. Am. Pet. Exh. 8, Sentencing Tr. at 26:2-14. At the same hearing, the trial court denied Lee's motion for a new trial based on his counsel's failure to interview witnesses. *Id.* at 29:3-12.

### B. Witnesses Not Called at Trial

Lee's sole claim for habeas relief is based on his trial counsel's failure to call five particular witnesses. *See* Am. Pet. at 1-3. According to Lee, these witnesses would have backed up his version of events or cast doubt on L.M.'s credibility. Lee claims that his counsel failed to even investigate these witnesses, despite receiving affidavits from the five witnesses describing their likely testimony.[3] The affidavits submitted by the witnesses are summarized below.

---

[3]Around five months before the trial, Lee's trial counsel stated, at a pretrial conference, that he had been contacted by several witnesses, but that he had not yet had time to meet with them. Am. Pet. Exh. 3 at 2:19-3:4. There is no evidence that Lee's counsel ever followed up with these witnesses: he did not respond when Lee accused him of failing to investigate the witnesses, *see* Am. Pet. Exh. 8, Sentencing Tr. at 28:14-30:4, and one of the witnesses, Phillip Elston, submitted an affidavit saying he was never contacted. Am. Pet. Exh. 2, 2008 Elston Aff. But, because Lee's petition fails on the prejudice element, it ultimately does not matter what steps (if any) counsel took to investigate these witnesses.

7

### 1 and 2. Brian and Gayland Massenburg

Brian and Gayland Massenburg submitted affidavits stating that "on or about" April 16, 1995 at approximately 12:30-1:30 a.m., Gayland's car broke down in Calumet City. As they were pushing the car down State Street, two men approached in a blue Cadillac and asked if they needed help. The Massenburgs declined. The two men turned the car around and started talking to a white woman. The woman "got into the rear of the car," and they drove off going east on State Street. Am. Pet. Exh. 2, Brian Massenburg Aff., Gayland Massenburg Aff.

### 3. Charlene Parker

Charlene Parker's affidavit states that she was in Dad's Lounge and Package Goods in Hammond, Indiana on April 15, 1995. She reported that she took a photo of Anthony Lee and Burlmon Manley together at Dad's between approximately 1:00 and 1:30 a.m. She also mentions that the photo is attached to the affidavit, but no photo was part of the record submitted to the Illinois Appellate Court. Am. Pet. Exh. 2, Parker Aff.; Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 29-30.

### 4. Phillip Elston

Phillip Elston's 1995 affidavit attests that he was driving past Merrill Park between 3:30 and 4:00 a.m. when he noticed Anthony Lee's car. Lee was sitting on a curb near his car drinking beer. Elston noticed a man and a woman entering Lee's car via the rear door. Lee walked up to Elston's car. Elston asked what was going on and Lee said "His friend Jr.[4] pulled this female." Lee got in Elston's car and the two

---

[4] Manley apparently went by "Junior." *See* Am. Pet. Exh. 5, Trial Tr. Vol. B at 26:11.

went to get cigarettes. Elston drove Lee back to his car, and Lee got in and drove north. Am. Pet. Exh. 2, 1995 Elston Aff.

Elston provided a second affidavit in 2008. In this affidavit, Elston states that the incident described in his first affidavit took place on "April 15/16, 1995." He further averred that he sent copies of his affidavit to Lee's trial counsel and sent him a letter saying that he was willing to testify on Lee's behalf, but that counsel never contacted him. Am. Pet. Exh. 2, 2008 Elston Aff.

### 5. Gail Pinkston

Gail Pinkston's affidavit states that on August 4, 1995, she received a call from "Burrell Manny," who was then in jail. "Burrell" told her about an incident in April 1995 with a "white female." Specifically, he told Pinkston that he had sex with the white woman in the back seat of Lee's car, and that Lee was "no where around during that sexual encounter." He further stated that "if he (Burrell) goes down on this case that he would take Anthony down with him." Am. Pet. Exh. 2, Pinkston Aff.

## C. Postconviction Review

Lee's quest to overturn his conviction spanned decades and numerous claims for relief in Illinois and federal court. *See* Am. Pet. Exh. 12, Am. Successive Pet. for Postconviction Relief at 11-16 (describing the state court procedural history); Am. Pet. ¶¶ 28-42 (describing the federal habeas petition). The details of Lee's trek through the labyrinth of state and federal postconviction review are mostly

9

irrelevant here.[5] The only procedural steps that are important for purposes of the current Amended Petition are as follows: After several denials of relief in the lower Illinois courts, the Illinois Supreme Court exercised its supervisory authority to instruct the Appellate Court to instruct the Circuit Court to permit Lee to file a successive petition for postconviction relief on his ineffective assistance of counsel theory. R. 108, State Court Record Exh. E, Denial of Pet. Leave App. On remand, the Cook County Circuit Court denied Lee's successive petition on the merits, holding that he had not established the "prejudice" element of the *Strickland* test. Am. Pet. Exh. 14, Circuit Ct. Hearing Tr. at 13:9-12. The Illinois Appellate Court heard the appeal and affirmed the Circuit Court's denial on the merits, likewise holding that Lee could not establish that he was prejudiced by his counsel's allegedly defective performance. Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 32. Lee petitioned for leave to appeal the decision to the Illinois Supreme Court and was denied in a summary order. Am. Pet. Exh. 18. Lee timely filed this Amended Petition for federal habeas corpus under 28 U.S.C. § 2254. R. 95-96.

## II. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, sets up a "formidable barrier" for prisoners seeking habeas relief. *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). If a state court has adjudicated the prisoner's claim on the merits, a federal court may not grant habeas

---

[5]The state (rightly) does not argue that Lee's petition is barred by the doctrines of exhaustion or procedural default, so the details of when he presented his claim and why it was rejected do not matter, except when it comes to the last state court adjudication on the merits, which is the state-court decision relevant for § 2254(d) purposes.

10

relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Alternatively, under the "unreasonable application" part of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 413. A merely erroneous decision is not necessarily an "unreasonable application" of federal law under the meaning of § 2254(d). *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

In this case, Lee argues that he was denied effective assistance of counsel in violation of the Sixth Amendment. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a trial lawyer is ineffective if the performance was deficient and if prejudice resulted. *Id.* at 687. For the performance element, the question is whether "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. On prejudice, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In making the prejudice determination, a court must consider

11

"the totality of the evidence before the judge or jury." *Id*. at 695. Lee must satisfy both prongs to make out an ineffective assistance claim. *Id*. at 687.

### III. Analysis

Under 28 U.S.C. § 2254(d), the relevant decision for review is the decision of the last state court to decide the merits of the petitioner's claims. *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). In this case, the relevant decision is the Illinois Appellate Court's June 30, 2016 opinion upholding the circuit court's dismissal of Lee's successive petition for postconviction relief. *See* Am. Pet. Exh. 16.

### A. Reasonableness of the Illinois Appellate Court Decision

The Illinois Appellate Court correctly identified the governing legal standard for the prejudice element of the *Strickland* analysis, noting that Lee must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 26. The Illinois Appellate Court's decision cannot be disturbed if its application of the *Strickland* standard was "minimally consistent with the facts and circumstances of the case." *Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002).

The Appellate Court's decision—although perhaps not the result this Court would reach on a blank slate—is not so deficient as to be unreasonable. The Appellate Court considered each affidavit in some detail, and considered how those affidavits fit into the evidentiary picture of the trial as a whole. As the Appellate Court pointed out, each affidavit has problems that would tend to undermine the evidentiary value of the proposed witness testimony. Considered against the

12

backdrop of the state's relatively strong evidence at trial, it was not unreasonable for the Appellate Court to conclude that Lee was not prejudiced by counsel's failure to call the affiants.

First, the Massenburg affidavits. The possible value of the Massenburgs' testimony is obvious: the Massenburgs stated that they witnessed a white woman get into a blue Cadillac. If the woman was indeed L.M., this testimony would have contradicted L.M.'s assertion that she was dragged kicking and screaming into the car, and would have supported Lee's testimony that L.M. willingly joined him and Manley.[6] But, as the Appellate Court noted, there are some problems with the proposed testimony. First, the Massenburgs identified the wrong date in their affidavits, stating that the event they witnessed was on April 16, when the crime in fact happened on April 15. Even without the date mix-up, the Illinois Appellate Court reasoned that still the Massenburg's testimony would not have affected the outcome because their affidavits do not clearly identify L.M., Lee, or Manley. *See* Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 29. The affidavits state only that the Massenburgs saw a white woman get into a blue Cadillac with two men, but did not provide names or detailed descriptions. Of course, if defense counsel had called these witnesses at trial, then he might have been able to elicit more detail to establish the likelihood that the individuals the Massenburgs saw were the victim and the defendants. But this testimony was not developed (and still has not been

---

[6]The Appellate Court suggests that it is unclear from the affidavits whether the woman was coerced into the vehicle. Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 29. But the affidavits state that the woman "got into the car." To read this phrase as being inconsistent with the coercion L.M. described—she testified that she was dragged kicking and screaming into the car—is not reasonable.

13

developed), and the Appellate Court was limited to the affidavits alone. It was not unreasonable for the Appellate Court to conclude, on the limited record available, that the Massenburg's testimony had ambiguities that would diminish its exculpatory value.

The Parker affidavit also had a weakness that would tend to lower its value. Parker testified that she saw Manley and Lee together in Dad's Lounge in Hammond, Indiana around 1:00-1:30 a.m. on April 15. This testimony might have undermined L.M.'s credibility and supported Lee's story: L.M. testified that Manley stayed in the back seat of the car with her while Lee went into a liquor store in Hammond, whereas Lee testified that he and Manley went into the liquor store together, leaving L.M. alone in the car. Parker's testimony that she saw Lee and Manley together in Dad's would support Lee's version. But the affidavit was not a slam dunk for Lee, because Parker's testimony was not necessarily inconsistent with L.M.'s version of events. L.M. testified that she was abducted at "approximately" 1:00 a.m., but the timeline was not firm. *See* Am. Pet. Exh. 5, Trial Tr. Vol. B at 18:5-10. She also testified that Manley told her he had "just left a club in Hammond" before he grabbed her. *Id.* at 26:9-10. The Appellate Court reasoned that Parker might have seen Lee and Manley together in Dad's *before* they abducted L.M., and that would not undermine L.M.'s version that the three later returned to Dad's and only Lee went inside. *See* Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 29-30. This sequence of events is perfectly possible given the uncertain timing of the events described by L.M. and Parker. The Appellate Court was not

14

unreasonable to decide that Parker's testimony was consistent with L.M.'s testimony.

Elston's affidavits also suffer from unclarity about timing. Elston stated that he saw Lee sitting near his car drinking beer around 3:30 or 4:00 a.m., and that he saw a man and a woman enter Lee's backseat while Lee was sitting outside. Elston also said that he spoke to Lee, who said "His friend Jr. pulled this female,"[7] and that Elston and Lee went on a cigarette run together. There is a problem with the timeline: Elston stated that he saw Lee around 3:30 or 4:00 a.m., but Teresa Baragas testified at trial that L.M. knocked on her door around 3:00 a.m. Am. Pet. Exh. 5, Trial Tr. Vol. B at 13:22-14:3. Of course, either Baragas or Elston might have been mistaken about the time, but there was no evidence to tip the scale in Elston's favor before the Appellate Court. And as between the two, the state could have argued that Baragas was the more reliable witness, both because she did not know Lee (so had no bias one way or the other) and because she described a harrowing experience that would be more likely impressed on her memory. Most importantly, at a minimum, it was reasonable for the Illinois Appellate Court to conclude that Elston's uncertainty on timing might undercut the value of his testimony.[8]

---

[7]The Appellate Court thought that "pulled" might mean "coerced," but gave Lee the benefit of the doubt and assumed that it did not mean coerced. Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 30-31.

[8]The state points out in its brief that, even aside from the timing issue, Elston's account may actually have undermined Lee's testimony, because Lee never mentioned the cigarette run. *See* Answer at 23. But this reasoning does not appear to have played a role in the Appellate Court's decision, which focuses entirely on the timing issue. When a state

15

Finally, the Appellate Court dismissed the Pinkston affidavit as unhelpful. Pinkston averred that she received a call from "Burrell Manny" (clearly referring to Burlmon Manley), and that Manley stated that he "had sex with that white female in the back seat of Anthony's car, and that Anthony was no where around." Am. Pet. Exh. 2, Pinkston Aff. The Appellate Court reasoned that this proposed testimony actually contradicted Lee's trial testimony, because Lee testified that he was driving his car while Manley and L.M. had sex in the back seat.[9] See Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 31-32. Again, this detail might not have been fatal to Pinkston's testimony—Manley, after all, might have been referring to the time when Lee was sitting outside on the stump while Manley and L.M. were in the back seat—but the uncertainty does detract from the probative value of the proposed testimony.

The Appellate Court concluded that, even assuming that the affiants would testify consistent with their affidavits and that they would be found completely credible, there was no reasonable probability that their testimony would have changed the outcome at trial. Am. Pet. Exh. 16 at 32. Although it is a close call, the Appellate Court's conclusion was not unreasonable in light of the strength of the state's case against Lee. This point is crucial: the trial did *not* just boil down to a

---

court's last adjudication on the merits is a reasoned decision, the issue is the reasonableness of the state court's analysis, not the reasonableness of the overall result on a blank slate untethered from the state court's reasoning. *See Williams*, 529 U.S. at 413. The same can be said of the state's arguments about the other affidavits: the focus must be on the state court's reasoned decision.

[9]Lee actually testified that he started driving while Manley was lying on top of L.M., Am. Pet. Exh. 7, Trial Tr. Vol. D at 70:21-23, but did not state outright that they were having sex. But it would not be unreasonable to infer from this comment that Manley and L.M. were having sex.

16

"swearing contest" between Lee and L.M., despite Lee's argument to the contrary. *See* Am. Pet. at 1. L.M.'s story was backed up by strong circumstantial evidence, as the Illinois Appellate Court explained in the opinion affirming the postconviction petition's denial. Am. Pet. Exh. 16, Appellate Ct. Postconviction Op. at 9. Teresa Baragas, a disinterested witness with no motive to lie, testified that L.M. banged on her door at three in the morning, naked, bloody, bruised, and screaming that she had been raped. *See* Am. Pet. Exh. 5, Trial Tr. Vol. B at 14:2-24. This behavior is utterly inconsistent with Lee's tale of a consensual encounter. L.M.'s testimony was also backed up by extensive evidence of her injuries, including photographs showing bruises to her face, head, back, and arms. These injuries are not at all likely to have been caused by consensual sex, and are too extensive to be explained by the scuffles that Lee described. Considering the strength of the circumstantial evidence in L.M.'s favor and the assorted inconsistencies and ambiguities in the testimony of the five proposed witnesses, the Appellate Court's conclusion that Lee was not prejudiced was reasonable. This means that the Court cannot grant Lee relief. To be entitled to relief, Lee must show that the Illinois Appellate Court unreasonably held that he failed to meet the prejudice element of the *Strickland* test. This he has not done.[10]

### B. Certificate of Appealability

Under Rule 11(a) of the Rules Governing § 2254 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a

---

[10]In light of the conclusion on the prejudice element, like the Illinois Appellate Court, this Court need not reach the deficient-performance element.

17

petitioner. To obtain a certificate of appealability, "the applicant [must] ma[ke] a substantial showing of the denial of a constitutional right." § 2253(c)(2). A "substantial showing" has been made when "reasonable jurists could debate whether ... the petition should have been resolved in a different manner." *Slack v. McDaniel*, 529 U.S. 473, 475 (2000). As discussed, this case is a close call. Ultimately, the § 2254(d) deference mandate tipped the balance, along with the strength of the evidence supporting the state's case. But reasonable minds could disagree. Accordingly, a certificate of appealability shall issue on whether the Illinois Appellate Court reasonably held that Lee's trial counsel failed to provide ineffective assistance of counsel under the Sixth Amendment.

## IV. Conclusion

The Court is bound by § 2254(d) to defer to the Illinois Appellate Court's decision. The habeas petition is denied, but because reasonable minds could differ, the Court issues a certificate of appealability.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 4, 2017