# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTHONY LEE,

              Petitioner,

              v.

DARREN GALLOWAY, Warden,
Shawnee Correctional Center,

              Respondent.

Case No. 11-cv-00183

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

Petitioner Anthony Lee, a prisoner incarcerated at Shawnee Correctional Center, seeks a writ of habeas corpus under 28 U.S.C. § 2254. For the following reasons, the petition (the amended petition, [96]) is denied but the court issues a certificate of appealability.

## Introduction

Anthony Lee seeks a writ of habeas corpus in connection with his 1996 convictions for kidnapping and rape and corresponding total sentence of one hundred years' imprisonment. Am. Petition, [96].[1] Lee contends that his trial counsel was constitutionally ineffective for failing to investigate five potentially exculpatory witnesses. The district court previously denied the petition. *Lee v. Lamb*, No. 11-cv-00183, 2017 WL 5989775 (N.D. Ill. Dec. 4, 2017). The Seventh Circuit vacated that decision and remanded for an evidentiary hearing under 28 U.S.C. § 2254(e)(2). *See Lee v. Kink*, 922 F.3d 772 (7th Cir. 2019). The case was reassigned to this judge. Having held the evidentiary hearing, the court sets forth the following findings of fact and conclusions of law, Fed. R. Civ. P. 52(a), and denies the petition but issues a certificate of appealability.

## Background

The court assumes familiarity with the previous rulings on Lee's amended habeas petition. *See Lee v. Lamb*, No. 11-cv-00183, 2017 WL 5989775, at *1 (N.D.

---

[1] Bracketed numbers refer to entries on the district court docket and are followed by the page and / or paragraph number. Page number citations refer to the CM/ECF page number unless otherwise noted.

Ill. Dec. 4, 2017), *vacated and remanded sub nom. Lee v. Kink*, 922 F.3d 772 (7th Cir. 2019). Nonetheless, the court reviews the facts and procedural history—first Lee's trial, then the potential witnesses relevant to Lee's claim, and then post-trial proceedings.

## I. Lee's Trial

In July 1996, Lee and codefendant Burlmon Manley stood trial in the Circuit Court of Cook County for the kidnapping and rape of a woman, L.M., during the early morning hours of April 15, 1995. (Lee had been arrested on July 27, 1995— several months after April 15, 1995 and about a year before the July 1996 trial, Resp. Ex. 17, [231-17] at 3; he was detained pending trial.)[2]

Lee and Manley were tried in simultaneous severed bench trials. The parties presented the testimony of witnesses, including L.M., Lee, and Manley.

That Lee's and Manley's bench trials were both severed and simultaneous meant the following:

(1) Because the trials had been severed (on Lee's motion), the judge declined to consider Lee's or Manley's testimony against the other. *E.g.*, [96-6] at 3, [96-8] at 5–7, 165.[3] Lee and Manley each testified, each for purposes of his own trial only.

(2) However, because the trials were simultaneous, each witness (other than Lee and Manley, each of whom, as noted above, testified for purposes of his own trial only) testified only once for both trials, and at the conclusion of the proceedings, the judge made findings of guilt as to both Lee and Manley. [96-8] at 163–72.

(3) Both Lee and Manley attended all of the testimony except that, at Manley's request, Lee did not attend Manley's testimony. [96-8] at 3–7. Lee did not make a similar request that Manley not attend Lee's testimony, so Manley remained in the courtroom during Lee's testimony. [96-8] at 56.

The proceedings took place over three days in July 1996 (July 10, 17, and 22, 1996). [96-6], [96-7], [96-8] (trial transcripts).

---

[2] Petitioner's and respondent's amended exhibit lists from the evidentiary hearing were filed at district court docket entries [202] and [203]. Petitioner's and respondent's exhibits were filed at district court docket entries [231]–[234].

[3] The trial transcripts are Petitioner's Exhibits 14, 15, and 16, beginning at these CM/ECF pages: [232-1] at 38, [232-2] at 1, and [232-2] at 89. Copies of the trial transcripts also appear as separate files at [96-6], [96-7], and [96-8]; for ease of reference, the court cites the latter.

Following is a review of Lee's trial.

## A.    The State's Case

The state first called Teresa Baragas, who testified that around 3:00 a.m. on April 15, 1995, she was sleeping when she heard a young woman—whom she identified as L.M.—banging on the front door screaming and saying she had been raped. [96-6] at 16. Baragas testified that L.M. was completely naked, "was beaten up," and that she had black eyes and her face was marked up and scarred. [96-6] at 16–18. Baragas and her aunt let L.M. in, got clothes for L.M., and called the police. [96-6] at 16–17. The state introduced photos of L.M.'s face and Baragas testified that those were the injuries she (Baragas) saw at the time. [96-6] at 17–18. (The photos are not in the record.)

The state then called L.M. She testified as follows:

Around 1:00 a.m. on April 15, L.M. left the Sweet Water Lounge in Calumet City, Illinois, and started walking down State Street. [96-6] at 20. L.M. testified that she had had an argument with a friend at the Sweet Water Lounge and had decided to walk to her sister's home. [96-6] at 20–21. Two men in a Cadillac pulled up and asked whether she needed a ride. [96-6] at 21. She said no; the car pulled away. [96-6] at 21. L.M. said she was nervous and since she was in a residential area, "stayed up close to the houses" and "continued walking." [96-6] at 21. The car then "came back headed in the opposite direction and pulled over," although L.M. "was not aware when they pulled over" and "didn't know they had pulled over from behind." [96-6] at 21–22. L.M. was grabbed from behind, she had her hands bound, and she was picked up off the ground and put in the back seat as she struggled, kicked, and screamed. [96-6] at 22–23. L.M. identified the person who put her in the car as Manley. [96-6] at 22. She identified Lee as the driver. [96-6] at 23.

According to L.M., Lee then drove to "some liquor store or lounge" in Hammond, Indiana. [96-6] at 24. (Although the precise locations in Calumet City and Hammond are not clear, Hammond is directly east of Calumet City, across the state border.) Lee went into the store, while Manley stayed in the back seat with L.M. and groped and kissed her without her consent. [96-6] at 24–25. Lee returned with alcohol, poured L.M. a drink, and began driving to Chicago. [96-6] at 26–27. (Although the precise locations in Hammond and Chicago are not clear, Chicago is northwest of Hammond.) While they were driving, Manley continued to kiss L.M. without consent. [96-6] at 28–29.

Eventually (continuing with L.M.'s testimony), the car stopped. [96-6] at 30. Lee got out of the car, opened the back door on the driver's side, and entered the back seat such that L.M. was between Lee and Manley. [96-6] at 31. Lee tore off her clothing, such that she was completely naked, and hit her in the face five or ten

times while L.M. pleaded with Lee to stop striking her and was bleeding from her ear and nose. [96-6] at 31–33. Lee then forced her to perform oral sex on Manley as she sobbed. [96-6] at 33–34. Lee "left the car and went into what we call a crack house" (L.M.'s testimony). [96-6] at 34. At that point, Manley forced her onto her back and raped her. [96-6] at 35–36. Lee returned and struck her head with his fist ten or fifteen more times, and told her that they would sell her to the guys in the crack house, who would assault and kill her. [96-6] at 37–38. She told them she needed to urinate; Lee was angry and hit her a few more times, and eventually Manley accompanied her to a tree in a "vacant lot" so she could do so. [96-6] at 38–40.

Next (still describing L.M.'s testimony), Manley took her back to the car. [96-6] at 40. L.M. was bleeding and hysterical and Lee kept getting angrier. [96-6] at 40. Lee told Manley, "f--- this b----, go in the trunk and get the nine." [96-6] at 41. Manley got out of the car, removed a handgun from the trunk, came back, and handed the gun to Lee; at this point, Lee, L.M., and Manley were in the back seat, with Lee to L.M.'s left and Manley to L.M.'s right. [96-6] at 41. After Manley handed the gun to Lee, Lee held the gun to L.M.'s forehead and threatened her. [96-6] at 41–42. Lee took the gun down from L.M.'s forehead, and Manley got into the driver's seat, leaving L.M. in the back seat with Lee. [96-6] at 42. Lee forced L.M. onto her back, [96-6] at 43, causing (in addition to the prior injuries to her head) bruises to her back and side, [96-6] at 44. The car began to move. [96-6] at 43. While Manley drove, Lee raped L.M. [96-6] at 43–44.

L.M. further testified that the car stopped, Lee and Manley were arguing, Manley got out of the car, and ultimately Lee (who still had the gun) got into the front driver's seat and had L.M. climb through into the front passenger seat. [96-6] at 45–47. Manley went into a building, while Lee drove the car for a few blocks. [96-6] at 47–48. Lee pulled over in front of an apartment building, reclined the seat, was still holding the gun, and forced L.M. to perform oral sex on him. [96-6] at 48–49.

After that, L.M. testified, Lee got angry and yelled at L.M.; L.M. noticed Lee had released the gun onto the console and she began striking him in the face and screaming. [96-6] at 50. During the ensuing fight, Lee bit her hand, causing a scar. [96-6] at 51. L.M. was able to open the "driver's side, passenger door" and tumble out. [96-6] at 51. Lee "took off like a maniac," slamming the door shut as he sped away. [96-6] at 51.

L.M. ran to the house in front of her. [96-6] at 52. She banged on the door, screamed and cried for help. [96-6] at 52. An older woman came to the door and let her in. [96-6] at 52. Another woman (L.M. believed it was the sister of the woman who had let L.M. in) came from another apartment. [96-6] at 52. Eventually the

Chicago Police arrived and L.M. was transported to Trinity Hospital by ambulance. [96-6] at 52. L.M. spent the night at the hospital. [96-6] at 53.

During L.M.'s testimony, the state introduced photos of L.M.'s injuries taken within days of the incident. [96-6] at 53–59. Those photos are not in the record, but L.M. was shown them and testified about them at trial; according to L.M.'s testimony, the photos showed that L.M. had bruises on the side of her head where she was beaten severely, she had bruises around her jaw bone and cheek bones, her ear and both eyes were blackened, her nose and mouth were swollen, she had bite marks on her left hand that left a scar, she had another wound to the same hand that she got in the struggle to get out of the car, and her back and arms were bruised. [96-6] at 53–59. L.M. testified that the hospital personnel thought that she had suffered a broken nose or cheek bones, but x-rays revealed that there was no crack; they were just badly bruised. [96-6] at 54–55. She testified that she had a cyst on the side of her face for a year after the beating. [96-6] at 55.

The state next called a Calumet City police detective who read into evidence Lee's written statement from his police interrogation. [96-7] at 11–17. The statement was taken after Lee's July 27, 1995 arrest, during the early morning of July 28, 1995 (several months after April 15, 1995). The detective testified that he (the detective) had a conversation with Lee about the April 15, 1995 assault, reduced the conversation to writing by typing the written statement, and gave Lee the opportunity to make any changes, and that Lee signed the statement. [96-7] at 8–9. The detective then read the statement into the record.

According to Lee's statement to the police (again, given to the detective around the time of Lee's arrest several months after April 15, 1995, offered by the state in its case at trial, and read into the record at trial by the detective):

L.M. entered Lee's car voluntarily. [96-7] at 14. They went to "Pop's Liquor Store" in Hammond, Indiana. [96-7] at 14. "J.R." (Manley) went into the liquor store, while Lee stayed in the car with L.M. [96-7] at 14. After purchasing alcohol, they drove to Chicago, to Merrill Park in Jeffrey Manor. [96-7] at 15. Lee drank while L.M. and J.R. kissed in the back seat. [96-7] at 15. The three of them left to buy crack at 100th Street in Jeffrey Manor and then returned to the park. [96-7] at 15. L.M. and J.R. started kissing in the back seat; Lee was still in the front seat. [96-7] at 15. Lee got out of the car, went to the trunk, got two condoms, and gave them to J.R. [96-7] at 15. While L.M. and J.R. had consensual sex in the back seat, Lee sat on the curb outside drinking beer. [96-7] at 15–16. Lee "got back in the car and drove while they were still having sex"; Lee drove to his mother's block at 96th and Bremen, where he "ran into a girl that I know" and "J.R. said that he [k]new the girl, also, so I kept on driving." [96-7] at 16. Lee drove to "South Chicago, 89th and Buffalo, close to where J.R. was living with this girl by the name of Cynthia." [96-7] at 16. Lee let J.R. out of the car and he (J.R.) went home. [96-7] at 16. Lee

drove off, stopped on the corner, and L.M. performed consensual oral sex on Lee in exchange for drugs. [96-7] at 16. Lee urinated in L.M.'s mouth, causing L.M. to get angry, hit Lee, and exit the car, leaving all of her clothes behind in the car. [96-7] at 16–17. Lee drove off and "tossed her purse out," but "[h]er clothes were still in the car." [96-7] at 17. When Lee got to his mother's house, he put L.M.'s clothes in the garage and the next morning, showed them to another person, Ron Kelsey. [96-7] at 17.

The state also presented evidence of Lee's prior felony stalking conviction. [96-7] at 38–39.

### B.     Lee's Case

The only defense witness was Lee himself.[4] Lee testified that in the early morning hours of April 15, 1995, he was at his girlfriend's house in East Chicago, Indiana. [96-8] at 57. (Although the precise location in East Chicago is unclear, East Chicago, Indiana, adjoins and is directly northeast of Hammond, Indiana.) From there, Lee and Manley left and headed for Chicago. [96-8] at 58. On the way, they stopped on State Street in Calumet City after seeing L.M. walking. [96-8] at 58. Lee (the driver) stopped the car and Manley began talking to L.M. [96-8] at 59. They turned the car around so that the passenger side of the car faced the side of the street L.M. was on. [96-8] at 59. L.M. began talking to Manley and eventually got into the car after telling them about a liquor store in Hammond close to her house. [96-8] at 59.

The three of them headed to Dad's—a liquor store in Hammond, Indiana. [96-8] at 61. Lee and Manley went inside, while L.M. remained in the car alone with the keys. [96-8] at 61–62. Lee talked to "a guy that was sitting at the bar," who he later (on cross-examination) said was named "Simon something"; Lee was in the liquor store for about 20-25 minutes, including about 10-15 minutes in the lounge part of the store. [96-8] at 62, 81–82. Meanwhile, Manley talked to "some guy." [96-8] at 62. Then the two of them went over to the carry out side of the store and purchased alcohol, Manley went back out to the car (with the alcohol), and Lee went back over to the bar (the lounge side). [96-8] at 62.

At some point, Lee left the lounge and got back into the car. [96-8] at 62–63. Manley had already brought the alcohol to the car. [96-8] at 63. Lee got himself a beer and asked Manley what was up; Manley said that L.M. "wanted to get some grass, but she had to take her car radio CD player or something to her house." [96-8] at 63. So, from Dad's, they drove to L.M.'s house in Hammond. [96-8] at 63.

---

[4] Manley testified in his (Manley's) own defense in Manley's trial. Manley's testimony occurred immediately before Lee's testimony. But as discussed above, the judge conducted simultaneous severed bench trials and did not consider Manley's testimony against Lee or Lee's testimony against Manley.

They next drove to Merrill Park in Chicago (at 95th and Merrill), stopping along the way at 100th Street to buy drugs; L.M. bought a bag of marijuana. [96-8] at 63–64. When they got to Merrill Park, the three of them "sat there" and were "drinking and talking," and Manley got into the back seat with L.M.; at L.M.'s request, Manley "rolled two joints." [96-8] at 64.

L.M. lit a cigarette and when she had finished smoking it, squashed it into the carpet floor (of the car) instead of putting it in the ashtray. [96-8] at 64. Until this point, there had been no physical contact between Lee and L.M. or Manley and L.M. [96-8] at 64–65.

L.M.'s putting the cigarette out on the carpet floor caused an argument between Lee and L.M. [96-8] at 65–66. Lee was in the front seat (in the driver's seat) and L.M. was behind Lee in the back seat on the driver's side; Manley was in the back seat on the passenger's side. [96-8] at 66. According to Lee, the argument between Lee and L.M. began with a verbal exchange, then escalated into a physical altercation in which L.M. pushed Lee's arm and made him spill his drink, Lee hit L.M.'s head with his open hand, L.M. swung at Lee, Lee blocked the swing, L.M. spat in Lee's face, Lee hit L.M. again, the two started throwing punches at each other, L.M. tried to scratch Lee, her hand went in his mouth, and he bit her hand. [96-8] at 65–67, 97–101. Lee denied getting into the back seat to hit L.M. [96-8] at 98–99.

L.M. then "leaned back on Burlmon and said why is he doing this to me, and he put his arm around her and said just hang with me and everything will be all right." [96-8] at 67–68.

Lee grabbed three beers, got out of the car, and sat on a cement stump by the curb in the park, around 20 feet from the car. [96-8] at 68. Lee sat there for around 30 minutes and could not see into the car. [96-8] at 68.

At one point, Manley and L.M. exited the car. [96-8] at 68–69. L.M. went over to the playground area to go to the bathroom and Manley asked Lee if he had any condoms. [96-8] at 69, 102, 104. Lee retrieved two condoms from his trunk; Manley and L.M. got back into the car. [96-8] at 70.

A while later, Lee returned to the car and started the car; Manley was lying on top of L.M. and Lee told Manley he wanted to drop them off somewhere. [96-8] at 70–71. Lee drove to 84th and Buffalo and dropped Manley off at Manley's girlfriend's house, and, L.M., who was naked, moved up to the front seat (without getting out of the car). [96-8] at 71–72, 117–18. At that point, L.M. "hit [Lee] in the eye and jumped out of the car and said you bastards are going to pay for this."

7

[96-8] at 72. Lee "drove off and when [he] got to the corner, [he] threw all her stuff out that was in the car." [96-8] at 72.

Lee denied having intercourse with L.M., having or seeing a gun, or pointing a gun at L.M. [96-8] at 72–73, 106–07, 122. At some point, Lee saw bruises on the sides of L.M.'s face, [96-8] at 103–104; he saw when she got out of the car that her nose was bleeding, [96-8] at 120–121; and as noted above he admitted to hitting her and biting her hand during the altercation over the cigarette; but he denied punching her in the eye, [96-8] at 104.

As to his written statement (which the detective had read into the record during the state's case), Lee testified that he remembered the detective typing his statement up, but he only read "about four lines." [96-8] at 120. The police told him he "was going home, all [he] had to do is sign the statement, that's what [he] did." [96-8] at 120.

## C.    Findings, Conviction, and Sentence

The trial judge found Lee guilty of five counts of aggravated criminal sexual assault (three as the actual perpetrator, two on a theory of accountability for Manley's actions), as well as one count of aggravated kidnapping. [96-8] at 167–72.

The judge summarized the evidence and the charges and then said:

The case does come down to credibility. The Court finds . . . the victim, [L.M.], very credible. The prosecution's Exhibit Number 1, the photograph taken right after the incident, the two black eyes, a split lip. She testified how she suffered those injuries at the hands of Mr. Lee . . . .

The picture itself shows that this was not a consensual act. The defendants' statements[5] implicate themselves in having sex with [L.M.] but again the picture itself shows the sex was not consensual.

I have considered the prior convictions only so far as defendants' credibility, not only does defendant have two prior, each defendant has a prior felony convictions but their own testimony in court shows that their testimony is incredible.

---

5 Here, the judge appears to have been referring to defendants' statements to the police. The judge said: "The trial was severed. I'll consider the statements as they apply to themselves alone, and both the defendants in their statements more or less indicated that it was consensual sex. . . ." [96-8] at 165. But the judge noted that Lee then testified at trial that "there was no sex at all and contradicted any statement and that he implied that the officer changed the statement." [96-8] at 166. That is, the judge noted that Lee contradicted his statement to the police.

[96-8] at 166–67. The judge then made findings of guilt as to each of the six counts. [96-8] at 167–72. During the finding on aggravated kidnapping, the judge again cited both L.M.'s credibility and the picture of L.M.'s injuries:

> Again, they snatched this lady off the streets of Calumet City, drove her to Hammond, Indiana, and then drove to Chicago, and did severely beat the lady, the young lady victim testified as to her numerous injuries, the photographs show her black eyes and how she had this cyst on her face for a year and the prosecution exhibit one speaks for itself and the victim's testimony speaks for itself. I found her very credible.

[96-8] at 171.

At sentencing, on August 23, 1996, the judge heard from L.M. [96-9] at 5–12.[6] Lee apologized for "jumping on her" and said "[t]hat's all I'm guilty of, your Honor." [96-9] at 13. After hearing argument from counsel, the judge sentenced Lee to 100 years imprisonment (an extended term sentence of 60 years on the three counts of aggravated criminal sexual assault on which Lee had been convicted as the perpetrator, an extended term sentence of 40 years (consecutive to the 60 years) on the two counts of aggravated criminal sexual assault on which Lee had been convicted on the theory of accountability for Manley's actions, and 15 years (concurrent with the 60 years) on the count of aggravated kidnapping). [96-9] at 27.

At the end of the August 23, 1996 sentencing, Lee filed a *pro se* motion for new trial alleging ineffective assistance because his trial counsel failed to interview witnesses—the claim in his current federal habeas petition. Resp. Ex. 16, [231-16] at 1–7 (motion with attachments); Pet'r Ex. 18, [232-2] at 266–73 (motion with attachments); [96-9] at 29–30 (sentencing transcript). Lee attached to the motion at least some of the witness affidavits currently at issue, discussed below. Resp. Ex. 16, [231-16] at 1–7 (motion with attachments); Pet'r Ex. 18, [232-2] at 266–73 (motion with attachments).[7] The judge denied the motion at the sentencing in a very brief discussion. [96-9] at 29–30 (sentencing transcript).

---

[6] The sentencing transcript is Petitioner's Exhibit 20, beginning at this page: [232-2] at 276. A copy of the sentencing transcript also appears as a separate file at [96-9]; for ease of reference, the court cites the latter.

[7] The copy of the motion that is Respondent's Exhibit 16 and Petitioner's Exhibit 18 has various attachments: a phone bill (that Lee argues corroborates the Pinkston affidavit), the Gail Pinkston affidavit, the Gayland Massenburg affidavit, the Brian Massenburg affidavit, and a second copy of the Pinkston affidavit (with a handwritten phone number under the signature). [232-2] at 269-73. (Another copy of the motion, photographed from Markham Courthouse records, has all the same attachments except the last. Pet'r Ex. 46, [232-4] at 227–33.) The Charlene Parker and 1995 Phillip Elston affidavits (also at issue here) are not among the attachments. But Lee testified at the evidentiary hearing in this case that

Lee's post-hearing brief, [220] at 12, explains that by operation of Illinois law, Lee's sentence will be reduced from 100 years to 50 years, assuming he maintains good conduct. Lee has now served approximately 28 years. He will not be eligible for release on parole until 2045.

In Manley's simultaneous severed bench trial before the same judge, Manley was convicted of sexual assault and kidnapping. Manley was sentenced to 50 years, and by operation of Illinois law was released on parole after 25 years. According to the Illinois Department of Corrections website,[8] Manley was released on parole on August 28, 2020.

## II. The Potential Witnesses

Lee contends that trial counsel was ineffective by failing to investigate and call to testify at trial five potential witnesses: Byron ("Brian") Massenburg, Gayland Massenburg, Charlene Parker, Gaila ("Gail") Pinkston, and Phillip Elston.

Lee contends that each of these witnesses would have supported Lee's trial testimony and undermined L.M.'s trial testimony—and that evidence going to Lee's and L.M.'s credibility would have been especially critical, given the importance of credibility and lack of physical evidence (such as a gun) or medical or DNA evidence. Lee argues that testimony from any or all of the five witnesses would have created a reasonable probability of acquittal on all counts, or at least on the two accountability counts (the two counts based on a theory of accountability for Manley's actions, which resulted in 40 years of the 100-year sentence).

Key to Lee's claim are affidavits from these five witnesses. As noted below, five affidavits (one from each witness, including Elston) are dated in either October or December 1995. That is, these five affidavits are dated during the pretrial period between Lee's July 1995 arrest and July 1996 trial; Lee was in pretrial detention during this time. In addition, there is a second Elston affidavit, dated in 2008, well after trial, so there are six affidavits in total.

Lee testified at the evidentiary hearing that his counsel, Richard Friedman, did not advise him to have affidavits created; instead, when Lee was in jail, other inmates had mentioned that affidavits could be helpful, and Lee discussed with the witnesses the idea of creating affidavits. [208] at 283–85.[9]

---

all five affidavits were attached to the version of the motion that he filed at sentencing. [208] at 281.

[8] https://www.idoc.state.il.us/subsections/search/ISdefault2.asp.

[9] For the evidentiary hearing transcript ([207], [208], and [210]), page numbers refer to the transcript page number rather than the CM/ECF page number.

Lee contends that before trial the five potential witnesses sent the affidavits to Friedman, that Friedman failed to investigate the witnesses, and that Friedman instead told Lee not to mention the witnesses during Lee's trial testimony.

Lee also contends that the affidavits are simply a preview of some of the testimony that the witnesses would have offered, and that they would have testified to further details of their respective encounters with Lee on the night in question. *See* [123] at 4; *Lee v. Kink*, 922 F.3d at 774 ("The state judiciary's conclusion that the Massenburgs' testimony would not have helped Lee depends on an unstated belief that, if called at trial, they would have parroted their affidavits and refused to say another word. That's unlikely. They might have provided exculpatory testimony, and then, if counsel neglected to contact them (another issue on which the record is short of evidence), a finding of ineffective assistance could follow.").

The parties offered additional evidence beyond the affidavits at the evidentiary hearing on this habeas petition, including Lee's own testimony as to what he saw (and thus what he contends the witnesses also saw and would have testified to), the testimony of two of the witnesses (Byron Massenburg and Gaila Pinkston), and the testimony of notaries and private investigators, as well as exhibits. Later, the court discusses the affidavits in the context of all the evidence the parties have now presented. But since the affidavits provide important context for the procedural history and the current petition, following is an introductory discussion of the affidavits.

## A.      Byron ("Brian") Massenburg[10]

The December 28, 1995 "Affidavit of Brian Massenburg" states:

Brian Massenburg, being first duly sworn on oath, deposes and states as follows:

I remember the incident on or about April 16, 1995, at approximately 12:30 A.M. - 1:00 A.M., my brother's car broke down on us three blocks from my brother Greg's house at 425 East Garfield, in Calumet City.

We were pushing the car on State Street, when two men in a blue cadillac asked if we needed some help; we said no.

---

[10] As discussed below, at the evidentiary hearing in this case, Byron Massenburg testified that although he has been called "Brian" in the past, "Byron" is his legal name. [210] at 499. He testified that in 1995, he would have had a state ID that would have listed the name "Byron." [210] at 499. Moreover, he called himself "Byron," not "Brian," and signed his name as "Byron" on documents. [210] at 499–500. However, his brother Gayland called him "Brian." [210] at 500.

They turned the car around and started talking to a white woman and she then got into the rear of the car, and they drove off going east on State Street.

Pet'r Ex. 9, [232-1] at 24–25.

Lee contends that Byron Massenburg would have corroborated that Byron and his twin brother, Gayland Massenburg, saw Lee and Manley on State Street in Calumet City, and that Lee and Manley "started talking to" L.M. and L.M. then "got into" the car (without mentioning a struggle). Lee contends that this would have supported Lee's defense that L.M. voluntarily got into Lee's car (with Lee and Manley), without being physically forced (contrary to L.M.'s testimony). [96] at 12–13, 15; [220] at 17.

## B.    Gayland Massenburg

The December 28, 1995 Gayland Massenburg affidavit is quite similar to the Brian Massenburg affidavit; it is dated the same day and contains similar content. It states:

GAYLAND MASSENBURG, being first duly sworn on oath, deposes and states as follows:

I recall the incident that happened on or about April 16, 1995, at approximately 12:30 A.M. - 1:00 A.M.; me (Gayland) and Brian were pushing my vehicle on State Street going to 425 East Garfield, in Calumet City.

Two men in a blue cadillac stopped to see if we needed help; we told them no.

They then stopped and talked to a white woman that was walking on east on State Street.

The lady got into the rear of the car and they drove off going east on State Street.

Pet'r Ex. 10, [232-1] at 26–27.

Lee contends that Gayland Massenburg's testimony would have been helpful to Lee's case for the same reasons as Byron Massenburg's. That is, according to Lee, Gayland Massenburg, like Byron Massenburg, would have corroborated that

he saw Lee and Manley on State Street in Calumet City at the time and that L.M. entered Lee's car voluntarily. [96] at 12–13, 15.

## C. Charlene Parker

The December 12, 1995 Parker affidavit states:

Charlene D. Parker, being first duly sworn on oath, deposes and states as follows:

I was at Dad's Lounge and Package Goods in Hammond, Indiana on April 15, 1995- and that I took the photo attached to this affidavit on that night.

The attached picture show's Anthony Lee, Berlman Manley, and Keith Adams, I took this picture of the three of them around 1:00 a.m.-1:30 a.m. in the lounge part of Dad's Lounge.

I will testify in open court under oath that all three of these gentlemen were in Dad's Lounge at the same time on the night of April 15, 1995.

Pet'r Ex. 8, [232-1] at 22–23.[11]

Lee contends that Parker would have corroborated his testimony that he and Manley were in Dad's at the same time, leaving L.M. alone in the car with the keys and free to leave. Thus, according to Lee, Parker would have supported Lee's testimony to that effect and undermined L.M.'s testimony that Manley remained in

---

[11] The picture referenced in the Parker affidavit is not in the record. At the evidentiary hearing, Lee testified that Parker was taking and selling Polaroid photos at Dad's; he bought the picture for $5, took the picture with him from Dad's to the car, showed it to Manley and L.M., put it in his glove compartment, and took the picture to his mother's house, where he was living at the time; he had the picture in his room for a few days, and then a few days later it went into a frame on the mantel, where it remained until Lee's arrest and pretrial detention in July 1995; and once Lee found out that Parker was willing to make an affidavit, Lee had his mother or a family member send Parker the picture. [208] at 252–59. Lee further testified that Parker told Lee that she (Parker) had sent Lee's counsel, Friedman, a copy of the affidavit along with the original Polaroid picture (there were no other copies of the picture). [208] at 301–02. At the hearing, Friedman testified that he had searched for the case file when contacted about this case, but the file no longer existed. [207] at 60. Thus, it was not feasible to check whether the case file contained the picture (or the Parker affidavit or any of the affidavits). In any event, Lee argues that regardless of the availability of the picture, the Parker affidavit and Lee's testimony at the evidentiary hearing (as to the same events for which Lee testified Parker was present) show that Parker would have testified that Lee and Manley were both in Dad's, leaving L.M. alone in the car.

the car with her (such that she could not leave); according to Lee, Parker's testimony, like the Massenburgs' testimony, would have been inconsistent with a kidnapping. [96] at 14–15.

### D.     Gaila ("Gail") Pinkston[12]

The October 2, 1995 Pinkston affidavit states:

Gail Pinkston, being first duly sworn on oath, deposes and states as follows:

On August 4, 1995, I received and accepted a collect call from Burrell Manny, who was in a jail in Memphis, Tenn.;

Burrell stated in that conversation to me about the incident that happened in April, 1995 regarding some white female;

Burrell stated further that he had sex with that white female in the back seat of Anthony's car, and that Anthony was no where around during that sexual encounter with that white female;

Burrell made the statement to me, "that if he (Burrell) goes down on this case that he would take Anthony down with him."

I make this affidavit of my personal knowledge and conversation with Burrell Manny.

Pet'r Ex. 6, [232-1] at 18–19. Lee also testified that a phone bill—the page before the Pinkston affidavit in the attachments to Lee's *pro se* motion for new trial, [231-16] at 3–4, [232-2] at 269–70, [232-4] at 230–31—was attached to the Pinkston affidavit. [208] at 287. Lee contends, and Respondent disputes, that the phone bill corroborates the call described in the Pinkston affidavit.

Lee contends that Pinkston would have testified that Manley admitted that Lee was "no where around" during Manley's assaults. Lee argues that Pinkston's testimony would have supported Lee's testimony that he was not in the car, was not present for, and did not participate in or contribute to, Manley's assaults on L.M. Lee argues that Pinkston's testimony would have supported Lee's testimony that he did not hold a gun to L.M.'s head during Manley's assaults, but rather sat outside the car drinking beer while L.M. and Manley had consensual sex; and Lee argues

---

[12] As discussed below, at the evidentiary hearing in this case, Pinkston testified that she currently goes by "Gaila," that "Gaila" is her legal name, that she has previously been known by the abbreviated version "Gail," and that her legal name, "Gaila," would have been on her identification in 1995. [207] at 145, 153.

that Pinkston's testimony would have undermined L.M.'s testimony that Lee was present and held a gun to L.M.'s head while Manley raped L.M. [96] at 15–16. Lee argues that Pinkston's testimony would have created a reasonable probability that the trial court would have credited Lee's testimony over L.M.'s (and acquitted Lee on all counts), or at least would have concluded that Lee was not responsible for Manley's crimes (and acquitted Lee on the two counts based on accountability for Manley's crimes, which resulted in 40 years of the 100-year sentence).

### E.   Phillip Elston

Lee presented two affidavits from Phillip Elston, one dated October 2, 1995 (the same date as the Pinkston affidavit—between Lee's July 1995 arrest and July 1996 trial) and the other dated August 23, 2008 (approximately 12-13 years after the 1995 incident and the 1996 trial).

### 1.   1995 Elston Affidavit

The October 2, 1995 Elston affidavit states:

Phillip Elston, being first duly sworn on oath, deposes and states as follows:

I was driving pass Merrill Park when I notice Anthony Lee's car between 3:30-4:00 a.m.;

Anthony Lee was sitting on a curb, 3'-4' away from his car, drinking beer;

I noticed a man and a woman entering the rear door of Anthony Lee's car;

Anthony then walked up to my car with three (3) beers and got in;

I asked him what was going on, and he replied, "His friend Jr. pulled this female.";

I then asked Anthony to ride with me to get a pack of cigarettes, and we proceeded to a store;

When we returned to Anthony's car, Anthony got into his car and drove north, and I drove south;

I make this affidavit of my personal knowledge.

Pet'r Ex. 5, [232-1] at 16–17.

Lee contends that Elston would have testified that Elston saw Lee, Manley, and L.M. at Merrill Park—undercutting L.M.'s testimony that after stopping at Dad's, they drove to a location outside a "crack house" where Lee threatened to sell her to the guys inside, and supporting Lee's testimony that after stopping at Dad's, they drove to Merrill Park, and that Lee never made that threat. [96] at 14–16. Lee also contends that Elston would have testified that he saw L.M. and Manley enter the car (and saw no force, crying, or screaming)—undercutting L.M.'s testimony that she was held forcibly in the car and was sobbing and screaming, even when she went to urinate outside the car, and supporting Lee's testimony that L.M. was there voluntarily and was not crying or screaming. *Id.* Lee further contends that Elston would have testified that he saw Lee sitting by himself drinking beer, and saw Manley and L.M. entering the car without Lee. *Id.* According to Lee, like Pinkston's testimony, this would have supported Lee's testimony that he was not in the car, was not present for, and did not participate in or contribute to, Manley's assaults on L.M.; supported Lee's testimony that he did not hold a gun to L.M.'s head during Manley's assaults, but rather sat outside the car drinking beer while L.M. and Manley had consensual sex; and undermined L.M.'s testimony that Lee was present and held a gun to L.M.'s head while Manley raped L.M. *Id.* Lee concludes that Elston's testimony (alone or in combination with that of the other witnesses) would have created a reasonable probability of acquittal on all counts, or at least on the two accountability counts (on which 40 years of the sentence were based).

### 2. 2008 Elston Affidavit

The August 23, 2008 Elston affidavit states as follows (again, this affidavit postdates the 1995 incident and the 1996 trial by approximately 12-13 years):

Phillip Elston, being first duly sworn on oath, deposes and states as follows:

That on October 2, 1995, I prepared and signed a affidavit concerning a incident that I witnessed at Merrill Park on April 15/16, 1995. When I was preparing that affidavit I was in a rush to get the affidavit out and forgot to put the date of the incident on the affidavit. I put the 15/16 because of the time change and that it was after 12am on the 15th which would have made it the 16th day of April because it was 3:30 to 4am in the morning.

Also copies of my affidavit was sent to Anthony Lee Sr. and his attorney Mr. Richard B. Friedman, at 820 W. Jackson, suite #310, and I also wrote him a letter stating that I would not have a problem testifying on

Mr. Lee's behalf. I was never contacted by attorney Richard Friedman after I sent him the affidavit & letter.

I hope that this second affidavit will clear up any concerns that may have arised from my first affidavit and the fact that I forgot to put the date of the incident on that affidavit. If needed I am willing to testify at any trial or hearing concerning the incident that Anthony Lee Sr., was involved in back on April 15/16, 1995.

I make this affidavit of my own personal knowledge.

Pet'r Ex. 26, [232-3] at 78–79. Lee contends that this affidavit (along with other evidence) reinforces that Friedman did not contact or investigate the five witnesses. [96] at 16.

## III. Post-trial Proceedings

Lee has now spent decades seeking postconviction relief from state and federal courts. The procedural history is long and complex. *See* [107] at 8–14 (respondent's answer to amended petition, summarizing prior state and federal court proceedings). Extensive discussion of the procedural history before 2013 is not necessary for purposes of this opinion, except to note that besides raising the ineffective assistance claim in the *pro se* motion for new trial at the August 23, 1996 sentencing (as noted above), Lee raised the claim in a December 23, 1998 *pro se* postconviction petition, [25-18] at 6–31, but did not obtain review of the claim on the merits until 2013, [107] at 8–14.

Most relevant here, on May 29, 2013, the Illinois Supreme Court exercised its supervisory authority to direct the Illinois Appellate Court to remand the matter to the Circuit Court to permit Lee to file a successive petition for postconviction relief alleging the ineffective assistance of trial counsel. [96-12]; *People v. Lee*, 992 N.E.2d 1 (Ill. 2013). Lee filed that successive petition, and the Circuit Court of Cook County denied the petition on the merits in a ruling from the bench. [96-15].

The Illinois Appellate Court affirmed in an opinion. [96-17]; *People v. Lee*, 2016 IL App (1st) 152425, 57 N.E.3d 686. The Appellate Court discussed the affidavits and ultimately held that there was no prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984): "Even assuming that the affiants would testify at an evidentiary hearing and that they would testify to what is stated in their affidavits, we cannot find a reasonable probability that the result would have been different." *People v. Lee*, 2016 IL App (1st) 152425, ¶ 61.

The Illinois Supreme Court denied Lee's petition for leave to appeal in a summary order. [96-19]; *see also People v. Lee*, 65 N.E.3d 845 (Ill. 2016).

17

In February 2017, Lee timely filed the present amended petition for federal habeas corpus, seeking relief under 28 U.S.C. § 2254. [96]. On December 4, 2017, the prior district judge denied the petition. [114]; *Lee v. Lamb*, 2017 WL 5989775. The court held that the Illinois Appellate Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). The court noted that the Illinois Appellate Court applied the correct legal standard for the prejudice prong of *Strickland*: Lee must show a "reasonable probability that, but for counsel's error, the result of the proceeding would have been different." [114] at 12; *Lee v. Lamb*, 2017 WL 5989775, at *5. As for the Appellate Court's application of that standard, the court held that the "Appellate Court's decision—although perhaps not the result this Court would reach on a blank slate—is not so deficient as to be unreasonable. The Appellate Court considered each affidavit in some detail, and considered how those affidavits fit into the evidentiary picture of the trial as a whole. As the Appellate Court pointed out, each affidavit has problems that would tend to undermine the evidentiary value of the proposed witness testimony. Considered against the backdrop of the state's relatively strong evidence at trial, it was not unreasonable for the Appellate Court to conclude that Lee was not prejudiced by counsel's failure to call the affiants."[13] [114] at 12–13; *Lee v. Lamb*, 2017 WL 5989775, at *5. But since the case was a "close call"—"the § 2254(d) deference mandate tipped the balance, along with the strength of the evidence supporting the state's case," but "reasonable minds could disagree"—the court issued a certificate of appealability. [114] at 18; *Lee v. Lamb*, 2017 WL 5989775, at *7.

The Seventh Circuit vacated and remanded for an evidentiary hearing, explaining: "The state judiciary's conclusion that the Massenburgs' testimony would not have helped Lee depends on an unstated belief that, if called at trial, they would have parroted their affidavits and refused to say another word. That's unlikely. They might have provided exculpatory testimony, and then, if counsel neglected to contact them (another issue on which the record is short of evidence), a finding of ineffective assistance could follow." [123] at 4; *Lee v. Kink*, 922 F.3d at 774. Noting that 28 U.S.C. § 2254(e)(2) allows a federal court to "hold an evidentiary hearing if, through no fault of petitioner's, the state-court record lacks essential facts," the Seventh Circuit ruled that Lee was entitled to an evidentiary hearing. Lee submitted the affidavits and filed more than a dozen express requests for evidentiary hearings in state court; Lee "did what he could" to develop the facts in state court, and "the absence of evidence about what the trial would have been like, had these affiants testified, must be attributed to the state judiciary's failure to afford him a hearing." [123] at 3–5; *Lee v. Kink*, 922 F.3d at 773–74.

---

[13] The prior district judge, like the Illinois Appellate Court, did not reach *Strickland*'s deficient performance prong.

The Seventh Circuit remanded the case "so that [an evidentiary hearing] can be held and we can learn what his attorney did (or omitted) and what the affiants would have said on the stand at trial. Only once that information has been gathered can the district court make a reliable decision about the ineffective-assistance claim." [123] at 5–6; *Lee v. Kink*, 922 F.3d at 774–75. In doing so, the Seventh Circuit also held that the Illinois Appellate Court's determination of the facts was unreasonable under Section 2254(d)(2), meaning that its decision "lacks the shelter of § 2254(d) as a whole." [123] at 6; *Lee v. Kink*, 922 F.3d at 775.

The case proceeded with discovery in preparation for the evidentiary hearing. The case was reassigned to this judge. [160].

Pursuant to the Seventh Circuit's ruling, the court held an evidentiary hearing on January 21, January 22, and February 3, 2020. The court heard testimony from both Lee and his state court trial counsel, Richard Friedman. The court also heard testimony from Gaila Pinkston and Byron Massenburg, two of the five witnesses at the core of Lee's ineffective assistance claim. Phillip Elston was unavailable, as discussed below, and Charlene Parker and Gayland Massenburg were deceased. Finally, the court heard additional testimony from three notaries—Melody Jefferson, Diana Myles, and Michal Sykes—and three private investigators—Mort Smith, John Byrne, and John Rea. In addition to the testimony, the parties offered exhibits. The court discusses the evidence presented by the parties as part of the analysis below.

After the hearing, the parties filed extensive post-hearing briefs addressing the merits of the habeas petition in light of the evidence presented, as well as evidentiary issues. [220], [222], [223], [224]. The parties also filed exhibit lists and electronic versions of the exhibits, [202], [203], [231], [232], [233], [234].

## Discussion

## I.    Legal Framework

The court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Lee seeks habeas relief from state custody on the basis of a federal claim, ineffective assistance of counsel in violation of the Sixth Amendment.

"A state court's decision on a prisoner's federal claim ordinarily is entitled to substantial deference on federal habeas review" under § 2254(d). *Adorno v. Melvin*, 876 F.3d 917, 920 (7th Cir. 2017). "Under AEDPA, a federal court can grant a petition for writ of habeas corpus after a state-court adjudication of the merits only

if that adjudication '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Winfield v. Dorethy*, 956 F.3d 442, 451 (7th Cir. 2020) (quoting 28 U.S.C. § 2254(d)(1)–(2)). Lee's ineffective assistance claim was "adjudicated on the merits in State court proceedings" within the meaning of § 2254(d).

However, the Seventh Circuit ruled that the Illinois Appellate Court's June 30, 2016 opinion—the last state court decision on the merits—was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [123] at 6; *Lee v. Kink*, 922 F.3d at 775 (quoting 28 U.S.C. § 2254(d)(2)). That means the decision "lacks the shelter of § 2254(d) as a whole." *Id.*

Accordingly, the court evaluates Lee's ineffective assistance claim without deference to the state court's reasoning under § 2254(d). In an analogous situation, when a claim was not actually adjudicated on the merits in state court proceedings, deferential review under AEDPA likewise does not apply; rather, the court "appl[ies] the pre-AEDPA standard of 28 U.S.C. § 2243 and review[s] *de novo.*" *Adorno*, 876 F.3d at 921; *see* § 2243 (as relevant: "The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."); *Harris v. Thompson*, 698 F.3d 609, 624–26 (7th Cir. 2012) (when a state court does not address a federal constitutional issue, *de novo* review applies). Thus, the court evaluates Lee's ineffective assistance claim *de novo.*

To establish ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), Lee "must show both deficient performance and prejudice." *Fayemi v. Ruskin*, 966 F.3d 591, 593 (7th Cir. 2020).

As to deficient performance, Lee must show that his counsel's performance "fell below an objective standard of reasonableness." *Blackmon v. Williams*, 823 F.3d 1088, 1102–03 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688). "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citations and internal quotation marks omitted).

As to prejudice, Lee must show "a reasonable probability that, but for [his counsel's] errors, the result of the proceeding would have been different." *Blackmon*, 823 F.3d at 1103 (citing *Strickland*, 466 U.S. at 694). "A reasonable

probability is a probability sufficient to undermine confidence in the outcome. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104 (citations and internal quotation marks omitted).

"Surmounting *Strickland*'s high bar is never an easy task. . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105 (citations and internal quotation marks omitted).

The parties agree that the standard of proof by which Lee must prove the facts underlying his claim is preponderance of the evidence. [220] at 40 ¶ 95 (Petitioner); [222] at 33 ¶ 65 (Respondent). *Strickland* does not cite the preponderance standard, except to reject the preponderance standard as to prejudice, which need only be shown by a reasonable probability. *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Many cases applying *Strickland* do not cite the preponderance standard either. At the same time, *Holland v. Jackson*, 542 U.S. 649 (2004), cited by Lee, noted while discussing *Strickland* (in particular, discussing a state court's reasoning applying *Strickland* in postconviction proceedings) that the preponderance standard is "the general burden of proof in postconviction proceedings with regard to factual contentions—for example, those relating to whether defense counsel's performance was deficient." *Holland*, 542 U.S. at 654; *see also Conley v. United States*, 5 F.4th 781, 795 (7th Cir. 2021) ("[T]he Supreme Court has agreed at least in one context that a petitioner's claim for habeas relief from a federal conviction can be proven by a preponderance of the evidence. *See Walker v. Johnston*, 312 U.S. 275, 286, 61 S. Ct. 574, 85 L. Ed. 830 (1941) (petitioner alleging deprivation of constitutional right to counsel 'would have the burden of sustaining his allegations by a preponderance of evidence')."). Thus, the parties are correct that Lee must show the facts underlying the deficient performance prong of *Strickland*, such as what defense counsel did or did not do, by a preponderance.

As noted above, under *Strickland*, Lee need not show prejudice by a preponderance. Rather, the "reasonable probability" standard of *Strickland* applies to the prejudice inquiry. As *Strickland* itself explained, reasonable probability is lower than a preponderance. *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

21

Separately, the parties have objected to the admission of various pieces of evidence—both testimony at the evidentiary hearing and exhibits. For example, respondent raises a hearsay objection to the admission of any of the affidavits for the truth of the matters asserted, and objected to various lines of questioning and testimony at the hearing.

The Federal Rules of Evidence apply here. They apply to proceedings before federal district courts, *see* Fed. R. Evid. 1101(a), and in civil cases and proceedings, *see* Rule 1101(b). None of the exceptions in Rule 1101(d) applies. *See* Advisory Committee Notes to 1972 Proposed Rules ("The rule does not exempt habeas corpus proceedings"; the rules apply "to habeas corpus proceedings to the extent not inconsistent with the statute"). Thus, the court discusses the admissibility of particular exhibits and testimony as necessary during the analysis below.

However, it is important that the habeas claim be considered on the merits to the extent feasible. That is consistent with the purpose of the hearing as directed by the Seventh Circuit: to "learn what [Lee's] attorney did (or omitted) and what the affiants would have said on the stand at trial," 922 F.3d at 774—i.e., to attempt to get to the bottom of what occurred, as much as feasible. Lee has spent decades seeking relief in court and is approximately 64 years old. Also, in a bench trial (like the evidentiary hearing in this case, a proceeding held without a jury), "the trial judge has flexibility to provisionally admit testimony or evidence and then discount or disregard it if upon further reflection it is entitled to little weight or should not have been admitted at all." *Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, No. 08-CV-1083, 2010 WL 3894444, at *1 (N.D. Ill. Sept. 30, 2010), *order clarified sub nom. Bone Care v. Pentech*, No. 08 C 1083, 2010 WL 3909509 (N.D. Ill. Oct. 4, 2010). The court is capable of giving the evidence appropriate weight. Thus, unless specifically noted, the court has admitted all testimony and exhibits submitted by the parties and given the evidence appropriate weight.

With that, the court turns to the evidence.

## II.  Trial Counsel's Performance

The court begins with *Strickland*'s first prong: deficient performance. In addition to evidence about what the affiants would have said at trial, the Seventh Circuit ordered an evidentiary hearing in order to "learn what [Lee's] attorney did (or omitted)." 922 F.3d at 774. In particular, the Seventh Circuit noted that the record was "short of evidence" on the issue of whether Lee's trial counsel, Richard Friedman, "neglected to contact" the witnesses. *Id.* At the hearing, the parties presented testimony and evidence relevant to that issue and others surrounding Friedman's representation of Lee.

The prior district judge held that Lee failed to establish prejudice (*Strickland*'s second prong), and did not reach the issue of deficient performance (*Strickland*'s first prong). While, as discussed below, the court reaches the same conclusion on prejudice as the prior judge, the court now addresses the deficient performance prong as well. Before making findings with respect to the deficient performance prong, the court summarizes the pertinent testimony and evidence on that issue.

### A.  Anthony Lee

At the evidentiary hearing in this case, Lee testified as follows about his interactions with Friedman before trial: Lee met Friedman after he was arrested. [208] at 307.[14] (Between Lee's July 27, 1995 arrest and July 1996 trial, Lee was in pretrial detention.) However, Friedman "only came and saw [Lee] that one time," i.e., the initial meeting, and never visited Lee after that or scheduled a legal call. [208] at 307. Lee "tried to reach Friedman" via phone, but never did. He also sent Friedman a "few" letters but received no responses. [208] at 308. Lee and Friedman generally conversed "in the bullpen outside the courtroom" for ten to fifteen minutes. [208] at 308. Friedman filed motions on Lee's behalf but did not discuss them at any length. [208] at 308. Friedman never discussed defense strategy. [208] at 308. Lee was "not aware of any investigator that [Friedman] used" and had never heard the name Mort Smith. [208] at 318–19.

Lee testified that it was his idea to have individuals create affidavits on his behalf. [208] at 284. "[D]uring [his] time being in the County jail and going back and forth to court, people had mentioned things about affidavits that could help a person." [208] at 283–84. He agreed that he "discussed the idea of creating affidavits" with "Pinkston and with the other witnesses." [208] at 284.[15] Friedman never advised Lee to create affidavits. [208] at 284.

Lee testified that each of the affiants (with the exception of Byron Massenburg, as discussed below) sent Lee a copy of their affidavit, told Lee that they sent Friedman a copy of the affidavit (and any attachments—in Pinkston's case, the phone bill, and in Parker's case, the original and only copy of the photo),

---

[14] As noted above, for the evidentiary hearing transcript ([207], [208], and [210]), page numbers refer to the transcript page number rather than the CM/ECF page number.

[15] On cross-examination, Respondent's counsel read deposition testimony where Lee testified that he did not know who wrote the affidavits. [208] at 340–48. On redirect, Lee's counsel read additional deposition testimony in which Lee explained (in response to questioning by Lee's counsel) that when he previously testified (at the deposition, in response to questioning by Respondent's counsel) that he did not know who wrote the affidavits, he misunderstood the question and meant that the witnesses told him that they had prepared the affidavits, but he had not personally seen them doing so. [208] at 459–61.

and told Lee that they would be willing to come to court to testify on Lee's behalf. [208] at 282, 286–302, 317.

The one exception is Byron Massenburg. As to Byron Massenburg, Lee communicated primarily or exclusively with Gayland Massenburg. Lee testified that Gayland and Byron were twins and spoke constantly. [208] at 322. Lee testified that he communicated with Gayland about Byron's affidavit, Gayland told Lee that Byron prepared Byron's affidavit at the same time Gayland prepared Gayland's affidavit, Gayland sent Lee both Gayland's and Byron's affidavits, Gayland told Lee that Gayland had sent Friedman copies of both affidavits, and Gayland told Lee that both Gayland and Byron would be willing to come to court to testify on Lee's behalf. [208] at 290–94, 297–98, 317, 398. Lee either did not talk to Byron at all, or at most had limited conversations with Byron, while Lee was in pretrial detention. [208] at 290–91, 397–98, 400.

As to pretrial discussions with Friedman about the five witnesses, Lee testified as follows: Lee spoke with Friedman about the affidavits that the five affiants (Pinkston, Elston, Parker, and the Massenburgs) had sent to Friedman. [208] at 308–09. The first time Lee spoke with Friedman about the affidavits was in January 1996, during one of the meetings in the bullpen in connection with a court appearance at the Markham courthouse. [208] at 309. During that meeting, Friedman had all five affidavits and "lined them up" and showed them to Lee. [208] at 309. Lee saw the photograph stapled to Parker's affidavit and the phone bill attached to Pinkston's affidavit. [208] at 309–10.[16] Friedman told Lee that he still had not been able to talk to the witnesses yet and had "just been busy." [208] at 310. However, he told Lee he planned to reach out to them.

(To place in the context of the record Lee's testimony to a January 1996 meeting with Friedman about the affidavits: Lee was arrested in July 1995 and trial occurred in July 1996, so a January 1996 meeting between Lee and Friedman would have occurred during the pretrial period. Five of the affidavits (one from each witness) are dated in either October or December 1995, i.e., before a January 1996 meeting would have occurred. Further, as discussed below, at a January 31, 1996 hearing, Friedman requested an extension of time to investigate unidentified witnesses. In short, Lee's testimony regarding a January 1996 meeting where Lee

---

[16] Respondent argues that Lee's testimony that he saw the photograph stapled to Parker's affidavit is incredible because the copy of the Parker affidavit in the record "has no holes or tears showing that a staple was ever removed from it." [222] at 51 n.12. But as discussed above, Lee testified that Parker sent the only copy of the picture to Friedman. The copy of the affidavit in evidence was sent to Lee, not Friedman, and Lee did not testify that any picture was attached to it. In any event, Lee argues that regardless of the availability of the picture, the Parker affidavit and Lee's testimony at the evidentiary hearing show that Parker would have testified that Lee and Manley were both in Dad's, leaving L.M. alone in the car.

and Friedman discussed the affidavits is consistent with the dates of the five affidavits and the timing of Friedman's request in court for an extension of time.)

Resuming with Lee's testimony: Lee and Friedman next spoke about the affidavits at another court hearing "a few months later." [208] at 310; *see also* [208] at 455–56 (on redirect, reading deposition testimony describing conversation a few weeks or a month or so before trial). At this meeting, Lee asked Friedman again whether he had spoken or reached out to any of the people who had sent Friedman the affidavits; Friedman again told Lee his caseload was "real heavy," that he had "been working hard on the other cases," and that he just had not "had the time to get to [the potential witnesses] yet." [208] at 310–11.[17] Friedman "kept telling" Lee that he planned to call the potential witnesses and would "eventually" get to it. [208] at 311.

Lee testified that he also sent Friedman a letter before trial, asking Friedman again whether he had spoken, reached out, or sent an investigator to the witnesses, but that Lee never received a response to the letter. [208] at 311–12.

Lee testified that he was not aware of Friedman using any investigator in connection with Lee's case. [208] at 318.

As to discussions with Friedman about the five witnesses at the trial itself, Lee testified as follows: On the first day of trial, right before the trial started, Lee and Friedman were discussing Lee's testifying, and Lee again asked Friedman about the witnesses and whether Friedman was going to call them. [208] at 313. Friedman told Lee "not to worry" about the witnesses, that he "hadn't talked to them," that he was not "going to call them," and that "all [Lee] was going to get was a battery, aggravated battery." [208] at 313. Friedman said that he had not reached out to, contacted, or made phone calls to the witnesses at all. [208] at 315–16. Friedman said that he had not reached out to the witnesses because of his "caseload" and he just hadn't had the time. [208] at 313. He also told Lee "not to mention anything that was in the affidavit or anything about the witnesses at all and just blank them out or redact them out" while testifying. [208] at 313–14. Friedman said that because he would not be calling the witnesses to testify at trial, there was no need for Lee to even mention them and Lee should leave them out of Lee's testimony. [208] at 314–16. Friedman said that he had not talked to the witnesses, so there was no need for Lee to mention them when Lee testified. [208] at 316; *see also* [208] at 465–66 (on redirect, Lee testified that Friedman "told me when I testify not to mention one word about the witnesses, any of them, and that

---

[17] Lee argues these statements are admissible under Federal Rule of Evidence 803(3) as a statement of intent or plan, as well as Rule 804(b)(3) as a statement against interest. The court does not reach the issue. Assuming for the sake of argument that these statements are admissible, Lee has not shown deficient performance, as discussed below.

all I was going to get was aggravated battery," and "I did what he told me to do.  I did not mention them.").

Lee testified that after trial, Lee was upset that Friedman had not called the witnesses and felt that Friedman had betrayed Lee by not calling the witnesses, that he wrote Friedman a letter conveying that, and that Friedman did not respond. [208] at 317–18.

Lee testified that he filed the *pro se* motion for new trial at his sentencing hearing, and Friedman was at the sentencing hearing, but Friedman did not make any objections to the motion or deny any of the allegations in the motion.  [208] at 318.

Lee testified that after Gayland Massenburg sent both Massenburg affidavits to Friedman, Gayland told Lee that Gayland had never heard from Friedman.  [208] at 320.  Gayland told Lee this once on the phone before trial and once at one of Lee's court dates after trial, when Gayland was in the bullpen across from Lee at the Markham courthouse.  [208] at 320–21.  Gayland told Lee that Gayland and Byron were wondering what happened to Lee's lawyer and Lee's case and why Gayland had not heard from Lee's lawyer, because Lee's lawyer never contacted Gayland. [208] at 321.  Lee never talked to Byron as to whether Friedman had ever contacted Byron; Lee did not have a number for Byron.  [208] at 321.  But Gayland told Lee that Friedman never contacted Byron either.  [208] at 321–22.  Gayland knew that because Gayland and Byron were twins and spoke constantly.  [208] at 322.

Lee testified that after Parker submitted her affidavit to Friedman, Parker told Lee on the phone both before and after trial that Parker had not heard from Friedman.  [208] at 322.

Lee testified that he only spoke to Elston maybe once or twice before trial, and could not reach Elston after trial.  Lee said that before trial, Elston told Lee that Elston had not heard from Friedman.  [208] at 322.  But Lee testified that he did speak with Elston in 2008, and at that point Elston told Lee that Friedman never contacted Elston.  [208] at 322–23.

Lee testified that after Pinkston submitted her affidavit to Friedman, Pinkston told Lee a few times before trial and a few times after trial that she had not heard from Friedman and did not understand that.  [208] at 323.

Lee submitted a letter from Lee to the trial judge, dated January 6, 2000, regarding Lee's postconviction petition.  Pet'r Ex. 47, [232-4] at 234–35.  Lee testified that he sent this letter to the judge.  [208] at 324.  In the letter, Lee wrote that the judge had assigned the Cook County Public Defender's office to his case in July 1999.  [232-4] at 235.  Lee wrote that the Public Defender's office was

"continuously having problems obtaining my trial file from" Friedman, which was "delaying the appointment of counsel to my case" and was "just another stall tactic by this Attorney" to keep the Public Defender's office from "showing the court his incompetence." [232-4] at 235. Lee requested that the judge subpoena Friedman and his trial files. [232-4] at 235.

### B. Richard Friedman

Friedman testified at the evidentiary hearing as follows. Friedman graduated from law school in 1989. [207] at 53. He then worked at the Cook County Public Defender's Office for three years, from 1989 to 1992, first in traffic court, then on municipal branch misdemeanors, and then on preliminary hearings. [207] at 53. He left the Public Defender's Office in 1992; since then, he has practiced criminal defense law, primarily in state court, as a solo practitioner. [207] at 53–55. By the time of Lee's trial in 1996, he had practiced criminal law for approximately seven years since graduating from law school. [207] at 74.

With respect to the case file for this case, Friedman testified that he had searched for the file when contacted by Lee's current counsel and the Attorney General's Office regarding this habeas case, but the file no longer existed. [207] at 60. He testified that the file would have contained all of the discovery in the case, notes, notes written on the file itself on what happened at every court date, communications to and from the client and the client's family—and that he believed there was all of that in this case, and the file was probably about the size of a Redweld. [207] at 58–61. He testified that he would have kept the file in storage for approximately ten years, but that it would have been destroyed (as a matter of general practice) either around that point (i.e., sometime around 2005, roughly—he "had no hard-and-fast rule"), or if not then, when he moved offices sometime around 2013. [207] at 59–60.

(Parenthetically, since the case file for this case was not available, it could not be consulted on questions such as whether Friedman received any, some, or all of the affidavits, received the photo referenced in the Parker affidavit or the phone bill associated with the Pinkston affidavit, knew of the witnesses (through the affidavits or otherwise), or contacted the witnesses; and Friedman's testimony was based on his recollection alone, not on review of the file.)

Friedman also testified that over the course of his career, appellate attorneys have reached out to him to discuss cases that he handled in the trial court. [207] at 75 ("It's absolutely -- happens all the time."). Friedman did not recall any attorneys who represented Lee on appeal contacting Friedman to discuss Lee's case, but "that's not to say it happened or didn't happen. I -- I would say that in Mr. Lee's case, it probably did happen." [207] at 75. Friedman testified (speaking generally, not about Lee's case specifically) that often as part of that process, an appellate

attorney would ask whether Friedman had materials that were not in the court file
or in the public record. [207] at 75–76. Friedman testified (again, this was a
general discussion, not about Lee's case specifically) that Friedman would
"absolutely," "always" send those items to the appellate attorney and was always
happy to discuss and answer questions about the case. [207] at 76.

Returning to Friedman's testimony as to Lee's case: Friedman was retained
counsel. [207] at 51. Friedman thought he was hired to represent Lee by Lee's
family, and his recollection was that the person with whom he was dealing was
Lee's brother. [207] at 51. While the case was "a long time ago," Friedman recalled
that he and Lee had a "good working relationship," and "discussed his case." [207]
at 70. Friedman agreed that Lee discussed "potential witnesses" with him. [207] at
70.

Friedman testified to his general practices, and what generally he "would
have" done in Lee's case. Friedman investigates potential witnesses when he is
"given names of witnesses by clients." [207] at 92. He would have done that in
1995 and 1996 in connection with Lee's case. [207] at 92. He could not say he did
that for "every client for 30 years. Maybe a case was going to be dismissed." [207]
at 92. But if he was preparing a case for trial, and he was given the names of
witnesses by a client, he would investigate those individuals, "[g]enerally speaking";
he would have done that in 1995 and 1996 in Lee's case, and there was no reason to
believe that he strayed from that normal practice to investigate names of witnesses
that he received, if he received the names of the witnesses. [207] at 92–93.

Friedman's investigation process involved speaking with the witnesses to
determine if "they were credible witnesses and their proffered testimony was
consistent with our defense." [207] at 93.

Friedman testified about his general approach regarding affidavits: "I get
asked about them all the time by clients. I get told about them all the time by
clients or a client's family. 'I've got affidavits' or 'I can get affidavits,' and I say I
can't use affidavits. Let's talk – you know, if you have witnesses, get names and
contacts of witnesses. I'll follow up on them, but I cannot use affidavits."
[207] at 82. However, Friedman testified that if he had received affidavits in Lee's
case, he "would have followed up." He would look into "any potential witnesses on
any case," but "certainly a case like this." [207] at 82.

Friedman has used "a few different investigators" on cases. [207] at 56.
During the time in question here, the mid-1990s, the only investigator Friedman
used was a "man named Mort Smith." [207] at 56.

As for the five affidavits here, Friedman "really" did not remember Parker's
affidavit. [207] at 65. Similarly, he had "zero familiarity or recollection" about

Elston. [207] at 66. As to Pinkston's affidavit, he acknowledged that at his deposition, he had testified that "it's possible" he received Pinkston's affidavit; but at the evidentiary hearing he seemed to qualify his deposition testimony, saying that he had "thought long and hard about that," and "[t]he more I've thought about that, . . . I cannot say I did not receive this," "but I don't have a strong recollection of receiving this one." [207] at 62–63. The Massenburgs' affidavits struck a "chord" in Friedman's memory: "I vaguely recall these two affidavits." [207] at 67. "Both the names -- the name of Massenburg and the two brothers, their affidavits, I have a vague recollection of them." [207] at 67. He did not recall their first names. [207] at 66–67. Friedman seemed to reference being given the affidavits by Lee's brother or whoever from Lee's family Friedman was dealing with, but did not recall receiving any information from that person other than the affidavits. [207] at 67–68. He later testified that "as I stated, the Massenburgs' affidavits strikes home. . . . . I remember the Massenburg affidavits. I don't remember receiving them, but there's a familiarity to the Massenburgs' affidavits." [207] at 81.

Although Friedman testified to his general practices (*i.e.*, as discussed above, speaking with witnesses to determine if "they were credible witnesses and their proffered testimony was consistent with our defense," [207] at 93), Friedman could not remember any details about any actions he took to investigate any of the five witnesses here. [207] at 63–69, 124–25. He did not recall whether he or private investigator Mort Smith spoke to the Massenburgs. [207] at 68. Having recalled the Massenburgs' affidavits, he said, "I don't recall speaking to them. . . . What I can say is given that I recall these affidavits, I believe that I would have pursued that." [207] at 68; *see also* [207] at 94 ("I have a vague recollection, impression, recollection of the affidavits. I don't recall speaking to the Massenburgs, but I'm sure I would have followed up on the affidavit by doing so."). But he did not recall any action he did to pursue that. [207] at 68. He did not recall why he did not call either Massenburg to testify at trial. [207] at 68. He believed that he "had a reason"; he believed that he "felt that either their testimony was inconsistent with my -- our defense, or . . . I didn't believe them." [207] at 68–69. He clarified that "that's my belief now. I have no recollection of that." [207] at 69. He did not remember anything about the contents of either Massenburg affidavit that he thought was untrue, nor could he identify anything in either Massenburg affidavit that was inconsistent with the defense he put on. [207] at 69. (As discussed below, he could not recall the case well enough to say whether or not there was anything in the affidavits inconsistent with the defense.)

As to Pinkston, Friedman did not recall speaking to Pinkston before trial, nor did he have a specific recollection about why he did not call Pinkston. [207] at 63. He would not call a witness if he thought the witness was not going to be truthful, or if he thought the witness was going to testify in a manner that was inconsistent with his theory of the case, but he did not recall anything untrue or inconsistent with Lee's trial defense in Pinkston's affidavit. [207] at 63–64. (Again, as discussed

below, he could not recall the case well enough to say whether or not there was anything in the affidavits inconsistent with the defense.) He also testified that he believed the conversation in Pinkston's affidavit (the telephone conversation between Manley and Pinkston) was hearsay and thus inadmissible in Lee's case, and agreed that in light of that fact, he did not "think" he still would have investigated Pinkston, although he would have explained to Lee why calling Pinkston as a witness at trial was not worth pursuing. [207] at 101.

As to Parker and Elston, Friedman did not remember the Parker or Elston affidavits or remember speaking with either of them. [207] at 64–66.

Friedman did not remember why he did not call any of the witnesses to testify at trial. [207] at 64–69, 121, 123. He stated that "I would have followed up with any potential witnesses that were provided to me, and if I didn't call any witnesses in his favor, it was because . . . I felt those witnesses were either going to perjure themselves or they were inconsistent with our theory of defense." [207] at 117. He could not confirm these were his actual reasons with respect to any particular witness; he could not actually say, for any of the five witnesses at issue, that they were going to perjure themselves, or that they were going to testify in a manner inconsistent with his theory of defense. [207] at 123. However, Friedman was not saying that he thought there were no problems with the affidavits (i.e., he was not saying that the affidavits were true or consistent with the defense); rather, he could not recall the case well enough to address those issues one way or another. He testified that he tried the case 25 years ago, the defense was Lee's testimony, and he did not recall Lee's testimony, so he could not say whether or not there was anything in the affidavits inconsistent with the defense. [207] at 121. In any event, he agreed that he "would have had a conversation with Mr. Lee about any witness that he [Lee] talked to you [Friedman] about calling at trial." [207] at 86.

Friedman requested an extension of time to file Lee's answer before trial in order to investigate potential witnesses. Specifically, the state court record contains a transcript of a brief January 31, 1996 hearing at which Friedman told the court that "discovery was completed on the last date," that today (i.e., January 31, 1996) had been set for the filing of an answer and motions, and that he (Friedman) would not be filing any motions. Pet'r Ex. 11, [232-1] at 30; *see also* [96-4]. As to the answer, Friedman told the court (again, at the January 31, 1996 hearing): "And I am not prepared to file my answer today, and here's why. There are several witnesses who have contacted me about testifying on behalf of Mr. Lee. A couple of them just within the past week. I just have not had time to meet with all these people, hear what they have to say, and determine whether or not they will testify and how they fit in. If I can please have one more month? Then I should certainly be able to do so at that time." [232-1] at 30–31. The court responded, "Can you give me a February date when you can do this?" [232-1] at 31. Friedman requested February 27, 1996, and the court set that date as the deadline for the answer and

pretrial motions and continued the case to that date. [232-1] at 31. During the January 31, 1996 hearing, no one identified the witnesses by name.

At the evidentiary hearing in this case, Friedman was questioned about the transcript of the January 31, 1996 state court hearing. Friedman testified that he could not recall who the witnesses he referenced at that hearing were. [207] at 128–29. Friedman testified that he would not have asked for an extension of time to investigate witnesses without actually doing so. [207] at 89. He testified that if he had needed further time to investigate, he would have asked for another extension. [207] at 93. Friedman also testified, however, that the judge was "a tough, non-nonsense judge" who "ran his courtroom very tightly." [207] at 57. Friedman agreed that the judge "ran a tight ship" and was "not big on extending deadlines." [207] at 128.

There is no apparent further discussion of these potential witnesses in the state court record. The next discussion of potential witnesses is Lee's *pro se* motion for new trial that he filed at the August 23, 1996 sentencing, which attached affidavits from at least some of the affiants at issue here. Some or all of the witnesses referenced in the *pro se* motion and the witnesses Friedman referenced at the January 31, 1996 hearing may be the same—but that is unclear one way or another (since, again, the January 31, 1996 hearing transcript does not identify the witnesses by name and Friedman testified at the evidentiary hearing in this case that he could not recall who they were, [207] at 128–29).

Friedman testified that he has had the financial "flexibility" to turn down certain cases. [207] at 73–74. As a result, he is "not the busiest lawyer in the world." [207] at 74. He also testified that he did not fail to contact any of the witnesses "simply because [he was] just too busy." [207] at 87–88.[18] He knew he would not have done that "for reasons both to protect Anthony's case and to protect [himself]." [207] at 87.

Friedman agreed that he would have spoken with Lee on the day Lee testified, since that was his (Friedman's) practice. [207] at 104. Regarding what he said to Lee, Friedman testified:

Q. When you were preparing Mr. Lee's testimony and meeting with him, did you tell him that you haven't had a chance to talk to any potential

---

[18] *See also* [207] at 88 (referencing January 31, 1996 hearing transcript: "And may I state that it came up at my deposition and in preparation for my deposition that there was a continuance hearing before Judge Baker that I asked for a continuance date specifically for that reason because -- that witnesses had come to my -- had just come to my attention, and I needed a date to -- to follow up on them. I -- I have no independent recollection of that, but that was brought to my attention by a transcript.").

witnesses and, therefore, he shouldn't mention any of the witnesses when he testifies?

A. I -- I -- I don't remember telling him that. I would not have said that to him.

Q. You would not have said that to him?

A. No.

Q. Did you tell Mr. Lee that he was only going to be convicted of aggravated battery, so he should not mention any witnesses when he testifies?

A. No.

Q. How do you know you didn't tell him that?

A. Because what you're describing there is me telling -- shaping Anthony's testimony to cover my [a**] on the record. There's no way I would do that.

[207] at 105. Friedman testified that instead, he "would have" prepped Lee to testify "consistent with our theory of defense in what he had told me what happened that night." [207] at 105.

Friedman recalled that he filed a post-trial motion for reconsideration, and "vaguely" remembered that Lee filed his own *pro se* motion. [207] at 70–71.[19] Friedman added: "that's the only time that's ever happened, that a client filed his own pro se post-trial motion in which both I filed one and the client filed one." [207] at 71. When asked whether he agreed that Lee raised "the issue of witnesses he wanted called" in that motion, Friedman answered that he did not remember. [207] at 72.

---

[19] As noted above, at the end of the August 23, 1996 sentencing, Lee filed a *pro se* motion for new trial alleging ineffective assistance because his trial counsel failed to interview witnesses and attaching at least some of the affidavits. Resp. Ex. 16, [231-16] at 1–7 (motion with attachments); Pet'r Ex. 18, [232-2] at 266–73 (motion with attachments); [96-9] at 29–30 (sentencing transcript); [208] at 281 (Lee's testimony at the evidentiary hearing that all five affidavits were attached to the version of the motion that he filed at sentencing). The judge denied the motion at the sentencing in a very brief discussion. [96-9] at 29–30 (sentencing transcript).

Friedman testified that the judge ran an "[e]xtremely tight" ship and that Friedman would not have interrupted the judge while the judge was speaking or ruling from the bench. [207] at 120, 122.

Friedman agreed in response to questions that the sentence of 100 years in this case was the largest sentence in any case he had handled, by a large margin; he also agreed that it had since been reduced. [207] at 58.[20]

Friedman testified credibly. Friedman was candid about what he could and could not recall. He was precise and careful to distinguish between what he actually recalled versus what would have been his general practice. The degree of his recollection (in many instances, limited) was consistent with the length of time (approximately 25 years) that had passed between the events at issue and his testimony at the evidentiary hearing. That Friedman could not recall every detail from that long ago was understandable and made his testimony more credible.

## C.    Mort Smith

At the evidentiary hearing, Lee also called Mort Smith, an investigator who worked for Friedman, to testify. Smith testified that during 1995 and 1996, he worked as a private investigator in Chicago. [207] at 135. Smith worked for Friedman during the 1980s and "some parts of the '90s as well"; he "probably" had some cases with him during the "1995-96 timeframe." [207] at 135. Smith would investigate potential witnesses that Friedman was considering using at trial. [207] at 135. However, Smith never did any work for Friedman, or investigated any witnesses or affidavits, in connection with Friedman's representation of Lee. [207] at 136. When asked whether he was saying he "didn't do it" or that he did not "recall doing the investigation," he said: "I'm saying I didn't do it." [207] at 137. Smith testified that he knew this because he was presented with the affidavits and "those type of witnesses would have been witnesses that I would have interviewed and received affidavits from, but those affidavits were not done by me"; he "didn't interview those witnesses or prepare those affidavits for those witnesses to sign." [207] at 137–38.

## D.    The Potential Witnesses

At the evidentiary hearing, the court heard testimony from two of the five potential witnesses: Byron Massenburg and Gaila Pinkston.[21] Gayland Massenburg

---

[20] It is not clear, but Friedman may have been referring to the same reduction addressed in Lee's post-hearing brief, [220] at 12, which explains that by operation of Illinois law, Lee's sentence will be reduced from 100 years to 50 years, assuming he maintains good conduct.
[21] This section addresses the aspects of Byron Massenburg's and Gaila Pinkston's testimony that relate to *Strickland*'s performance prong. Their testimony is discussed further in the separate analysis of *Strickland*'s prejudice prong later in this opinion.

and Charlene Parker were deceased and Phillip Elston was unavailable.  In lieu of Elston's testimony, Lee relies on the 2008 Elston affidavit.  The court heard testimony from Michal Sykes, the notary who notarized that affidavit; John Byrne, a private investigator who attempted to locate Elston before the evidentiary hearing; and John Rea, a private investigator who also attempted to locate Elston before the evidentiary hearing and who took notes during a 2014 interview of Elston.

### 1. Byron Massenburg

Byron Massenburg testified that no attorney representing Lee contacted him (Byron) in relation to Lee's trial or the underlying events.  [210] at 496.  To the best of Byron's recollection, Byron never met or spoke with Friedman.  [210] at 496.  Nor did Mort Smith ever communicate with Byron in any way.  [210] at 497.  Additionally, as far as Byron knew, Friedman never communicated with Byron's brother Gayland Massenburg either.  [210] at 497.

(As discussed above, Lee testified that with respect to Byron Massenburg and Byron's affidavit, Lee communicated primarily or exclusively with Gayland Massenburg.  Lee testified that Gayland and Byron were twins and spoke constantly.  [208] at 322.)

Byron Massenburg was reluctant to be involved in this case.  He was reluctant to participate in his deposition (in preparation for the evidentiary hearing), in part because he was concerned that he might be arrested; and he was arrested for a probation violation at the end of the deposition.  [210] at 497–98; [208] at 327–36.  At the evidentiary hearing, at first, he did not appear despite a subpoena, and the hearing had to be continued to another day.  [208] at 327–36, 473–79.  When he did appear at the evidentiary hearing, he testified that one reason that he did not want to participate in his deposition is that he was concerned he might be arrested, that was one reason among others, and "[n]o offense, I just don't like courts."  [210] at 497–98.  Nonetheless, his testimony was clear and direct.

### 2. Gaila Pinkston

Gaila Pinkston testified that the name Richard Friedman sounded familiar to her.  [207] at 151.  When asked whether she recalled communicating with Friedman, she testified: "I believe I went to his office one time.  I don't remember if this is when I signed the aff- -- I don't remember a lot."  [207] at 151.  She believed that she went to his office "to give him money."  [207] at 151.  She agreed that would have been "shortly after Mr. Lee was arrested," when "Mr. Friedman was hired to represent Mr. Lee."  [207] at 155.  However, she could not recall whether she chose Friedman as Lee's attorney.  [207] at 155.  Pinkston did not remember talking to Friedman about the affidavit, any phone calls with Manley, Manley at all, or her

potential testimony in Lee's case. [207] at 151–52. Nor did she recall speaking with an investigator or anyone else working on Friedman's behalf in 1995 or 1996. [207] at 152. When asked about her lack of recollection of any conversations with Friedman about the affidavit, she testified: "If I did, I don't remember. I can't say it didn't happen. I don't remember." [207] at 165–66. And "[i]t could be possible I did. I don't remember." [207] at 166.

Pinkston testified that she did not know who prepared or typed the affidavit, did not recall what happened to the affidavit after she signed it, and did not recall whether she sent or gave it to anyone. [207] at 163–64.

Pinkston testified that she could not remember much. She was reluctant to be involved in this case. She testified that she "d[id]n't remember a lot" and had suffered other, unrelated personal tragedies in the 1995-96 timeframe, so there was "a lot I don't remember." [207] at 151–52. She referred to her more recent involvement in this case (since her 2019 deposition in preparation for the evidentiary hearing) having negatively affected her life. [207] at 152, 157. She testified that "[w]e're talking 25 years ago," and "I've taken a lot of heavy medication since then. I have a lot going on. I have PTSD. I have a lot – it's been a long time." [207] at 162. She also testified, when asked about her deposition (in preparation for the evidentiary hearing), that as of the deposition she "was pretty much done with the whole situation," which had caused her personal problems. [207] at 157–58. Nonetheless, she was direct about her lack of memory, and it was understandable given the passage of substantial time.

### 3. Phillip Elston

Another of the five witnesses, Phillip Elston, was unavailable to testify at the evidentiary hearing, despite months of effort on Lee's behalf to locate Elston in preparation for the hearing (discussed below).

Given Elston's unavailability, in lieu of Elston's testimony on the topic of Friedman's investigation, Lee relies on the second (2008) Elston affidavit. As discussed above, Lee submitted five witnesses' affidavits dated in 1995, including an Elston affidavit dated October 2, 1995; but Lee also submitted a second Elston affidavit dated August 23, 2008. Pet'r Ex. 26, [232-3] at 78–79. Among other things, the 2008 Elston affidavit states (referring to the 1995 Elston affidavit):

> Also copies of my affidavit was sent to Anthony Lee Sr. and his attorney Mr. Richard B. Friedman, at 820 W. Jackson, suite #310, and I also wrote him a letter stating that I would not have a problem testifying on Mr. Lee's behalf. I was never contacted by attorney Richard Friedman after I sent him the affidavit & letter.

[232-3] at 79.

With respect to this affidavit (the 2008 Elston affidavit), the court heard testimony from Michal Sykes, a notary. [207] at 44. In 2008, Sykes worked as a notary at the New 87th and Stony Island Currency Exchange. [207] at 44. Sykes would require individuals to present identification and sign the document in her presence before notarizing it. [207] at 45. Sykes recognized her notary seal and signature on the 2008 Elston affidavit. [207] at 46. She did not clearly remember notarizing the 2008 Elston affidavit (having notarized hundreds of documents over time), nor did she know Elston, know whether the contents of the affidavit were true, have any way to verify the contents, or have any personal knowledge of the contents. [207] at 46–49.

Lee also testified that Elston created the 2008 affidavit to resolve the issue that the 1995 Elston affidavit lacked a date (an issue that had arisen during an appeal), but that in the 2008 affidavit Elston erroneously put April 15/16, 1995 as the date rather than April 14/15, 1995. [208] at 303–05. Lee testified that Elston sent Lee a copy of the 2008 affidavit and sent a copy to Lee's appellate counsel at the time (who would have been a different attorney from Friedman). [208] at 305–06. Lee testified that Elston told Lee that, as the 2008 affidavit states, after Elston sent Friedman the 1995 affidavit as well as a letter stating that Elston would not have a problem testifying on Lee's behalf, Friedman had not contacted Elston. [208] at 306–07.

Respondent objects based on hearsay to the admission of the 2008 Elston affidavit (and to the admission of all the affidavits) for the truth of the matters asserted in the affidavits. [224] at 1–2. Respondent argues that "Elston's second affidavit, notarized years after the conclusion of petitioner's trial," is not "admissible for the truth of its assertions that Elston sent Friedman the first affidavit or that Friedman never contacted Elston." [224] at 2.

It is not necessary to resolve this objection. Even if admitted, the 2008 Elston affidavit would carry very little weight for the truth of its assertions. The affidavit apparently was created in 2008 (8-plus years after the events it purports to describe, which happened in 1995-96), it was not subject to cross-examination, and Elston did not testify at the evidentiary hearing. These circumstances leave little basis to test the reliability of the affidavit one way or another, except for consistency with the testimony of witnesses who did testify at the hearing.

The court also heard testimony from John Byrne, a private investigator who worked on behalf of Lee. [207] at 139–44. Byrne testified to extensive but unsuccessful efforts to locate Elston during 2019 before the evidentiary hearing.

In addition, the court heard testimony from John Rea, a licensed private detective who worked on behalf of Lee. [207] at 190–91. After several months of effort in 2019 in advance of the evidentiary hearing, Rea was unable to locate Phillip Elston. [207] at 191–93.

However, Rea participated in an interview of a person named Phillip Elston on July 10, 2014. [207] at 193. Rea "didn't conduct the interview," but he did "take notes." [207] at 193–94. Rea authenticated a copy of those handwritten notes at the hearing. [207] at 198; Resp. Ex. 18, [231-18]. Rea testified that the notes were not "a verbatim transcript of what was said," and that he did not have an "independent recollection of the conversation described in the notes." [207] at 199.

Respondent seeks to impeach the 2008 Elston affidavit using Rea's 2014 notes. In particular, the notes say that Elston "thinks one of D's atty had him sign affidavit at atty's office." (Resp. Ex. 18, [231-18] at 1.) Respondent argues this is inconsistent with the claim in the 2008 affidavit that Elston "was never contacted" by Friedman after Elston sent Friedman Elston's 1995 affidavit.

Lee objects to the admission of Rea's 2014 notes; Lee argues that Rea's 2014 notes are not actually inconsistent with Elston's 2008 affidavit, since Elston apparently only *thought* one of Lee's attorneys had him sign the affidavit in his office.[22] Rea testified that, based on Rea's pattern and practice of notetaking, Elston "was telling me he thinks that he went to the attorney's office and did whatever he did. I mean, it's the witness telling me that he's, I guess, speculating is a word you used." [207] at 202. Rea did not take the notes as indicating that Elston "said he certainly went and met with Mr. Friedman." [207] at 202.

The court does not agree that the lack of certainty in Elston's statement to Rea is enough to eliminate the apparent inconsistency between Rea's 2014 notes and Elston's 2008 affidavit. Rea's 2014 notes do at least tend to undermine the credibility of Elston's 2008 affidavit. In any event, regardless of any potential inconsistency between the two documents, whether either or both documents are admitted for any purpose, neither Elston's 2008 affidavit nor Rea's 2014 notes

---

[22] Lee also objects that these notes constitute two levels of hearsay: they are Rea's out of court statements about Elston's out of court statements. *See* Fed. R. Evid. 805; *United States v. Severson*, 49 F.3d 268, 270–72 (7th Cir. 1995); *Jamsport Entertainment, LLC v. Paradama Productions, Inc.*, 2005 WL 14917, at *13 (N.D. Ill. Jan. 3, 2005). In response, Respondent clarifies that it seeks to admit the notes under Rule 806 to impeach the credibility of Elston's 1995 and 2008 affidavits, rather than as substantive evidence of how Elston might have testified at trial. [224] at 12–13. In any event, as discussed in the text, whether either or both documents are admitted, neither Elston's 2008 affidavit nor Rea's 2014 notes carries much weight for the truth of the matters asserted given each document's substantial distance from 1995-96 and the absence of testimony from (and cross-examination of) Elston.

carries much weight for the truth of the matters asserted (that Elston sent Friedman the first affidavit or that Friedman never contacted Elston) given each document's substantial distance from 1995-96 and the absence of testimony from (and cross-examination of) Elston.  In other words, neither document (Elston's 2008 affidavit or Rea's 2014 notes) significantly moves the needle on whether in 1995-96, before trial, Friedman knew of Elston or Elston's 1995 affidavit or reached out to Elston.

### E.    The Court's Findings

To prevail on the deficient performance prong of *Strickland*, Lee must show that Friedman's performance fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  "In assessing counsel's performance, courts are expected to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Winfield v. Dorethy*, 956 F.3d 442, 451 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 689).  And "a blank record cuts in favor of, not against, effective assistance." *United States v. Ashimi*, 932 F.2d 643, 649 (7th Cir. 1991).

"If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic.  An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." *Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) (quoting *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005)); *see also Blackmon*, 823 F.3d at 1103–04.  However, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him.  Instead, it simply obliges counsel to investigate the various lines of defense available in a given case." *United States v. Berg*, 714 F.3d 490, 499 (7th Cir. 2013) (internal quotation marks and citation omitted).  Put another way, Friedman had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Given that the underlying events occurred in 1995 and 1996, there is substantial uncertainty inherent in any factual findings.  Nonetheless, Friedman was likely aware of at least some of the five witnesses (especially the Massenburgs and Pinkston), and at least some of the corresponding affidavits, before Lee's trial.

Considering first the state court record:

Most significantly, the transcript of the January 31, 1996 court date—when Friedman asked for an extension of time before trial in order to investigate "several" potential witnesses who had contacted him about testifying on behalf of Mr. Lee, "[a] couple of them just within the past week," [232-1] at 30; *see also* [25-17] at 28–36—makes clear that Friedman learned of several potential witnesses before trial.

The transcript does not say who the witnesses were, how many there were, or whether they overlapped partially or entirely with the five affiants at issue here. But it is a reasonable inference that at least some of the witnesses Friedman was referring to overlapped with at least some of the affiants at issue here.

Further, Lee attached at least some of the five affidavits to his *pro se* post-trial motion for new trial, which Lee filed at the August 23, 1996 sentencing. Resp. Ex. 16, [231-16] at 1–7 (motion with attachments); Pet'r Ex. 18, [232-2] at 266–73 (motion with attachments); [96-9] at 29–30 (sentencing transcript). Although the copy of the motion that is in the record attaches some but not all of the affidavits (Pinkston's, Gayland Massenburg's, and Byron Massenburg's affidavits, but not Elston's or Parker's), Lee testified at the evidentiary hearing that all five affidavits were attached to the version of the motion that he filed at sentencing. [208] at 281. The affidavits were all notarized in October or December 1995. There is a theoretical possibility that one or more of the affiants could have sent their affidavits to Lee after the July 1996 trial and before the August 23, 1996, sentencing (as opposed to after the affidavits were notarized in October or December 1995 and before the July 1996 trial), but that is unlikely. It is also true that when Lee had the affidavits is a separate question from whether or when Friedman had the affidavits. But based on the state court record alone, Lee had at least the Massenburgs' and Pinkston's affidavits by the August 23, 1996 sentencing, and Lee would have had every incentive to show the affidavits to Friedman once Lee had them.

As to the testimony at the evidentiary hearing:

Friedman testified that he had a vague recollection of the Massenburgs' last name and their affidavits. [207] at 67. As to Pinkston's affidavit, he acknowledged that at his deposition, he had testified that "it's possible" he received Pinkston's affidavit; but at the evidentiary hearing he seemed to qualify his deposition testimony, saying that he had "thought long and hard about that," and "[t]he more I've thought about that, . . . I cannot say I did not receive this," "but I don't have a strong recollection of receiving this one." [207] at 62–63. He had no memory of the other affidavits (Parker and Elston). [207] at 64–66. However, he agreed he discussed "potential witnesses" with Lee generally. [207] at 70.

Lee testified that that he and Friedman discussed the potential witnesses and affidavits before trial, and that he observed Friedman in possession of the affidavits when they met before a court date in January 1996.[23]

---

[23] While Lee testified at the hearing that he told Friedman the witnesses' names during one of their meetings, [208] at 373, he testified at his deposition that he "only told [Friedman] there was some witnesses" and "didn't say any names," [208] at 374–75. However, Lee testified consistently at both the hearing and his deposition to the fact that Friedman

Lee's testimony and Friedman's testimony are consistent with the January 31, 1996 transcript (where Friedman requested an extension of time to investigate witnesses), although there is a difference between Lee's testimony (that Friedman had all five affidavits) and Friedman's testimony (he had a vague memory of only the Massenburgs' affidavits, did not have a strong recollection of receiving Pinkston's affidavit, and had no memory of Parker's or Elston's affidavit).

Considering all the evidence together, including the dates of the affidavits (October and December 1995), the January 31, 1996 hearing transcript (where Friedman requested an extension of time to investigate witnesses), and the fact that at least several affidavits (the Massenburgs' and Pinkston's) were attached to Lee's August 23, 1996 *pro se* motion for new trial, it is likely that at least the Massenburgs and Pinkston were among the witnesses Friedman referenced at the January 31, 1996 hearing, and that Friedman saw at least their affidavits before trial. *See U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 248 (7th Cir. 2003) (reasonable to infer that petitioner gave names of witnesses to attorney based on petitioner's testimony and a letter from the attorney indicating that "he and [petitioner] did discuss potential (unnamed)" witnesses). Whether Friedman knew of all five potential witnesses and affidavits, or only the Massenburgs and Pinkston, is unclear. The court assumes for the sake of argument that Friedman knew of all five potential witnesses and affidavits before trial.

The next question is what steps, if any, Friedman took to follow up. Respondent argues that Friedman's representation to the court in January 1996 that he needed more time to investigate witnesses shows that Friedman *planned on* actually investigating the witnesses. [222] at 22–23. On the other hand, as Lee points out, this is also evidence that Friedman did not investigate them *before* the January 1996 hearing. [223] at 21. While Friedman testified that he would have asked for another extension if he had needed one, he also testified that the trial judge was "not big on extending deadlines." [207] at 128. However, Friedman testified that he would not have asked for an extension of time to investigate witnesses and then not actually investigated the witnesses. [207] at 89. He also testified that he was not an especially busy lawyer and would not have failed to follow up simply because he was too busy. [207] at 73–74, 87. Ultimately, Friedman testified credibly, and the precision with which Friedman testified gave the impression that he is a careful lawyer. Thus, although the January 1996 transcript of course cannot definitively answer what Friedman did after that hearing, the fact that he requested an extension and his testimony, considered together, tend to support a weak inference that he did follow up.

---

received the affidavits. If Friedman received the affidavits, he would not have needed Lee to tell him the affiants' names to put him on notice of the potential witnesses.

On the other hand, Byron Massenburg testified clearly and directly that neither Friedman nor anyone working on Friedman's behalf contacted him (Byron Massenburg). [210] at 496–97.[24] When asked whether, as far as he (Byron) knew, Friedman ever communicated with Gayland Massenburg (Byron's twin brother) regarding Lee's trial, Byron testified, "[n]ot to my knowledge." [210] at 497. At the same time, there is a potential explanation, although there is no evidence in the record precisely on this point. Lee testified that when he was in pretrial detention and communicating with the witnesses about the affidavits, he spoke more with Gayland than Byron, and Gayland told him (Lee) that he (Gayland) had mailed both Gayland's and Byron's affidavits to Friedman. [208] at 287–94. In other words, as to Byron Massenburg, Lee communicated primarily or exclusively with Gayland Massenburg. Lee testified that Gayland and Byron were twins and spoke constantly. [208] at 322. Also, the content of Gayland's and Byron's affidavits was similar. Thus, in theory, it is possible to draw an inference that Friedman could have reached out to Gayland and at that point determined, without separately reaching out to Byron, not to investigate further, or call at trial, either Gayland or Byron. Again, that would only be an inference, there is no conclusive evidence in the record on this point, and such an inference is debatable; for example, it would not explain, if Gayland and Byron spoke constantly, why Gayland would not have told Byron that Gayland had heard from Friedman. But on this record the court is not prepared to conclude that Friedman entirely failed to follow up on Byron's potential testimony, including through Gayland.

Gaila Pinkston's testimony was inconclusive. Friedman's name sounded familiar to her, and she believed she went to Friedman's office once to give him money when he was hired shortly after Lee was arrested, but she did not recall talking to Friedman about her affidavit, any phone calls with Manley, Manley at all, or her potential testimony. [207] at 151–52, 155, 165–66. However (referring to having any conversations with Friedman about the affidavit): "If I did, I don't remember. I can't say it didn't happen. I don't remember." [207] at 165–66. "It could be possible I did. I don't remember." [207] at 166.

As to Elston: the signed 2008 affidavit states that Friedman never contacted him, but according to Rea's 2014 notes, Elston stated in his 2014 interview that he (Elston) thought Elston met with Friedman at Friedman's office. Elston's 2014 recollection (in Rea's notes) tends to impeach the overall credibility of the 2008 affidavit and illustrate the questions as to its reliability. In any event, regardless of any inconsistency between Elston's 2008 affidavit and Rea's 2014 notes, on the key questions—whether or not Friedman learned of Elston's 1995 affidavit in 1995-96 before trial, or otherwise learned during that timeframe that Elston was a potential witness, and if so, whether Friedman followed up with Elston before trial—neither

---

[24] Even Respondent states that "[t]he evidence does not show that Friedman failed to investigate any of the five witnesses, *with the possible exception of Byron*." [222] at 35 (emphasis added).

document (Elston's 2008 affidavit or Rea's 2014 notes) carries much weight. The 2008 affidavit, which purports to describe events that occurred in approximately 1995-96, is dated approximately 13 years after 1995; the 2014 notes are another six years later; and despite extensive efforts on Lee's behalf (by Byrne and Rea) to locate Elston, Elston could not be located to testify or be cross-examined at the evidentiary hearing. Unfortunately, due to no party's fault, there is not enough information to assess one way or another whether Elston would confirm the statements in Elston's 2008 affidavit or Rea's 2014 notes, or to assess one way or another the strength or reliability of Elston's recollection, either in 1995-96, 2008, 2014, now, or at any time.

Melody Jefferson, a notary, testified that that she recalled notarizing Elston's 1995 affidavit. [207] at 19–20. She testified that Elston said he was getting the affidavit notarized for a friend, and made clear that the friend was Anthony Lee. [207] at 26, 28–29. She also testified that when Elston first came in to get the affidavit notarized, there was no one with him, but then someone came in right behind him. [207] at 26. She then testified that she remembered notarizing Pinkston's affidavit, which is dated the same day as Elston's, October 2, 1995. [207] at 27. The combination of Jefferson's testimony and Pinkston's testimony raises questions; although the Pinkston and 1995 Elston affidavits are dated the same day, and although according to Jefferson's account, Pinkston came in right behind Elston, Pinkston testified that she did not know Elston and did not remember going with Elston to a currency exchange to have the affidavit notarized. [207] at 166. In any event, Jefferson testified that she did not know whether the contents of the Elston or Pinkston affidavits were true, the affidavits were already prepared when Elston and Pinkston brought them to be notarized, and Jefferson did not know who prepared the affidavits. [207] at 31–34. And beyond Jefferson's account, there is a lack of credible evidence about the creation of Elston's 1995 affidavit, and what Friedman did once he was aware of Elston's account, if he ever was aware of it.

Friedman could not recall reaching out to the witnesses. Friedman did testify, credibly, that it was his general practice to investigate potential witnesses. He testified that in Lee's case, he "would have followed up" on affidavits, and would have looked into "any potential witnesses." More specifically, he believed he "would have pursued" the Massenburgs. Although the court finds Friedman credible, his testimony regarding reaching out to witnesses was (understandably given the length of time since the underlying events) hypothetical and based on his general practices. And as to Pinkston, consistent with Friedman's testimony that his general practice of investigating witnesses was not without exception, he did not "think" he would have investigated Pinkston (since the telephone conversation between Manley and Pinkston was inadmissible hearsay), but would have explained to Lee why calling Pinkston as a witness at trial was not worth pursuing. As noted above, regarding the January 1996 hearing transcript, Friedman testified that he

would not have requested an extension to investigate witnesses and then not have investigated them; that transcript, together with Friedman's general but careful and credible testimony, tends to support a weak inference that he did follow up.

Mort Smith—the only investigator Friedman would have used at the time— testified that he conducted no investigation of the five witnesses. [207] at 135–37. While Friedman certainly could have investigated without employing Smith, Smith's uncontroverted and credible testimony tends to at least show that Friedman did not use an investigator.

Finally, Lee also testified that Friedman did not reach out to any of the witnesses; that Lee repeatedly asked Friedman about the witnesses before trial and at the trial itself; that Friedman kept telling Lee that he planned to contact them but had been busy and had not had time; and that ultimately, at trial, Friedman told Lee that he had not talked to the witnesses and was not going to call them, that Lee should not mention them at trial, and that all Lee would get was an aggravated battery. [208] at 309–18.[25] But Friedman credibly denied that he failed to contact any of the five witnesses simply because he was too busy (both to protect Lee's case and to protect himself). [207] at 87–88. Friedman also adamantly and credibly denied that he told Lee not to mention any of the witnesses when Lee testified or that Lee was only going to be convicted of aggravated battery. [207] at 104–06.

Lee also argues that when Lee filed his *pro se* motion for new trial at sentencing, contending that Friedman failed to interview witnesses, Friedman said nothing—implying that Friedman had not investigated the witnesses. But the judge denied the motion at the sentencing in a very brief discussion, [96-9] at 29–30 (sentencing transcript), and Friedman credibly testified that he would not have interrupted the judge while the judge was speaking or ruling from the bench, [207] at 120, 122.

Based on the totality of the evidence, it is difficult to draw conclusions with any confidence. The record is thin and nebulous. Three of the five affiants (Elston, Gayland Massenburg, and Parker) did not testify, Pinkston's testimony was inconclusive, and the testimony of Byron Massenburg, Pinkston, Lee, and Friedman concerned decades-old events. The January 1996 transcript and Friedman's general testimony tend to support a weak inference that Friedman did follow up. On the other hand, the strongest evidence that Friedman did not reach out to at least Byron Massenburg or Pinkston are (1) the clear and direct testimony of Byron Massenburg that Friedman did not reach out to him and (2) Friedman's testimony that although it was his general practice to investigate potential witnesses, and he believed he "would have pursued" the Massenburgs, he did not "think" he would have investigated Pinkston given that the conversation described in her affidavit was inadmissible hearsay (but would have explained to Lee why calling Pinkston at

---

[25] Again, the court need not decide whether Lee's testimony involved inadmissible hearsay.

trial was not worth pursuing). But as discussed above, on this record the court is not prepared to conclude that Friedman entirely failed to follow up on Byron Massenburg's potential testimony, including through Gayland Massenburg. And as to Gayland Massenburg, Elston, and Parker, the record does not warrant a finding either that Friedman reached out to them or that he did not. Lee testified that Friedman told Lee that Friedman had not followed up with the witnesses because Friedman was too busy, but Friedman credibly denied that claim. Overall, the evidence is too thin and inconclusive to warrant a finding either way—that Friedman either reached out to or failed to reach out to the witnesses. *Cf. Ashimi*, 932 F.2d at 649 ("a blank record cuts in favor of, not against, effective assistance"). This alone means that deficient performance has not been shown. Nonetheless, the court assumes for the sake of argument that Friedman had all five affidavits and did not reach out to any of the five witnesses.

"[A] failure to investigate can certainly constitute ineffective assistance." *Washington v. Smith*, 219 F.3d 620, 631 (7th Cir. 2000). However, as Respondent argues, the Constitution does not automatically require that counsel investigate all potential witnesses in order to render effective assistance. The court must assess "a particular decision not to investigate" for "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. To prevail on the deficient performance prong of his *Strickland* claim, Lee has the burden of showing that Friedman's decision not to investigate (or, to the extent Friedman may have done some investigation, not to investigate further) the witnesses was unreasonable.

Lee argues Friedman's failure to contact the witnesses was unreasonable under *Leibach*, 347 F.3d 219. There, the Seventh Circuit held that an attorney's "decision not to call exculpatory eyewitnesses in [the petitioner's] defense—if it was a decision at all—was necessarily one made after an incomplete investigation, for [the attorney] never spoke with such witnesses to find out what they had to say." *Id.* at 249. And given the potential value of the exculpatory eyewitnesses in question, "[a] decision that it was unnecessary to look for and contact such eyewitnesses cannot be described as reasonable." *Id.* at 251–52. If Friedman never spoke with the witnesses, some of whose affidavits offered potentially exculpatory eyewitness accounts, this case would be somewhat similar. However, the court is assuming that Friedman had the witnesses' affidavits, and if he did, he therefore had some knowledge of what the witnesses had to say.

Respondent argues that Friedman reasonably could have decided not to investigate the potential witnesses if he had already determined that the accounts in their affidavits were not credible or consistent with the theory of defense—which would have been heavily informed by the account Lee (who testified at trial as the only defense witness) gave to Friedman. If Friedman decided based on the information he had—including the affidavits and what Lee had told him—that a

potential witness was not worth pursuing or investigating further, that decision could be reasonable. *See Winfield*, 956 F.3d at 453 ("[T]he scope of an attorney's duty to investigate defenses is informed by the 'information supplied by the defendant.'") (quoting *Strickland*, 466 U.S. at 691). *Strickland* explained that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." 466 U.S. at 691.

Lee argues there is no evidence that Friedman in fact had such a strategic justification. *See Leibach*, 347 F.3d 219, 249 (affirming district court's finding that failure to investigate was not a strategic decision when there was "no evidence to support the notion that [the attorney] made a strategic decision not to look for exculpatory eyewitnesses."). True, Friedman could not recall why he made any decisions related to the five witnesses. He could not recall whether he investigated them, and regardless of whether he did, he could not recall why he did not call them at trial. However, Respondent's theory would be roughly consistent with Friedman's general practices, which included deciding whether particular witnesses were credible and whether "their proffered testimony was consistent with our defense." [207] at 93.

One good reason to believe Lee's account to Friedman did not line up with the affidavits is the fact that Lee's trial testimony did not include any reference to the five witnesses or the encounters their affidavits describe. As discussed above, at the hearing in this case, Lee testified that the affidavits and his trial testimony diverged because Friedman told him "not to mention anything that was in the affidavit or anything about the witnesses at all" while testifying. [208] at 313–14. According to Lee, Friedman told him not to mention the witnesses because Friedman did not have time to reach out to them. But again, Friedman strenuously and credibly contested this account. While Friedman could not remember exactly what he told Lee to prepare him to testify, he testified that he was not an especially busy lawyer. Further, he testified that there was no way he would have shaped Lee's testimony "to cover [his] [a**] on the record." [207] at 105.

Lee attacks Friedman's testimony as inconsistent. First, Friedman agreed that "covering" himself factors into "whether or not [he] will follow up and reach out to witnesses." [207] at 84. Second, Friedman similarly testified that he would not have instructed Lee to omit testimony due to his own failure to investigate "for reasons both to protect [Lee's] case and to protect [himself]." [207] at 87. Lee argues this testimony amounts to an admission that Friedman makes decisions to protect himself, contradicting his assertion that he would never have made a choice "to cover [his] [a**] on the record." [207] at 105. But ultimately, Friedman's testimony was credible, including his testimony that he would avoid professional negligence both for the sake of the client and in order to avoid professional consequences to himself, and that he would never instruct a client to testify in a

45

certain way in order to cover up professional negligence. The precision with which Friedman testified (throughout his testimony) increased the credibility of his testimony both generally and on this particular point—that he would not have shaped Lee's testimony to cover himself.

The more reasonable inference from the totality of the evidence (including Lee's trial testimony, the affidavits, and all the testimony at the evidentiary hearing) is that Lee's own account of events to Friedman did not include the encounters with the five witnesses described in the affidavits. Lee argues that "because Mr. Friedman instructed Mr. Lee not to mention the witnesses, it is clear Mr. Friedman was aware the witnesses *were* consistent with Mr. Lee's account of the night in question; otherwise his instruction would have been unnecessary." [223] at 35. This argument is unpersuasive. Rather, Friedman credibly testified that he would have instructed Lee to testify consistently with the theory of the case, which was based on Lee's account; thus, Friedman would only have discouraged Lee from mentioning the witnesses if they were *not* consistent with Lee's account.[26]

Lee relies on *Washington v. Smith*, 219 F.3d 620 (7th Cir. 2000). There, the Seventh Circuit held that an attorney was ineffective under *Strickland* because he had failed "even to attempt to contact any other witness besides [one]." *Id.* at 631. However, the court also acknowledged that the "failure to investigate a particular lead may be excused if a lawyer has made a 'reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). In *Washington*, the attorney "was simply too 'busy' and apparently gave no thought to the potential benefits of investigation." *Id.* Likewise, in *Adams v. Bertrand*, 453 F.3d 428 (7th Cir. 2006), on which Lee also relies, the defense attorney decided not to follow up with a witness despite knowing that the witness could resolve inconsistencies in the state's witness's stories in his client's favor. *Id.* at 437. The co-defendant's counsel admitted that the only strategic justification for this decision was the hope that "no defense would carry, would outweigh the advantages of a favorable witness." *Id.* The attorney thus "committed to a predetermined strategy without a reasonable investigation that could have produced a pivotal witness," and that was not a reasonable trial strategy. *Id.*

---

[26] Respondent also argues that Friedman's alleged instruction not to mention the witnesses does not explain why Lee failed to mention any of the witnesses in a July 1995 police interview (well before Friedman's alleged instruction). Lee testified that he "didn't think it was relevant to tell [the police] at that time about who was involved in this case and who knew anything about the case." [208] at 361. Additionally, Lee testified that the police "never asked me about witnesses in in this case. I probably would have, had they asked me. I don't know the law, and I didn't know it then"; "if they had asked me about witnesses, I probably would have told them, but they basically told me to sign this statement, you're going home." [208] at 369. For purposes of this issue, it is not necessary to reach whether it would be proper or reasonable to draw any inferences one way or another from the police interview.

Here, in light of Friedman's credible testimony that he was not an especially busy lawyer and would not have failed to investigate or call witnesses simply because he was busy, the court is not prepared to conclude that Friedman lacked a reasonable basis for not following up (or following up further) with the witnesses. Instead, it is more likely that Friedman determined based on the affidavits and Lee's account that following up (or following up further) would not have been fruitful. While it is a close call given the thin record, Lee has not shown constitutionally deficient performance.

## III. Prejudice

The court now turns to *Strickland*'s second prong: prejudice. In this regard, the Seventh Circuit remanded for development of the record on the question of "what the affiants would have said on the stand at trial." 922 F.3d at 774. "Only once that information has been gathered can the district court make a reliable decision about the ineffective-assistance claim." *Id.* at 774–75. At the evidentiary hearing, the parties presented testimony and evidence on the question of how the five affiants might have testified at Lee's trial.

The court evaluates whether, in light of all the evidence before the state court and the evidence presented at the evidentiary hearing on remand, there is a reasonable probability that the outcome of Lee's trial would have been different had Friedman investigated the five witnesses, or to the extent he did any investigation, investigated them further. The state court trial transcript has been discussed above. Before making findings, the court summarizes the additional pertinent evidence below. (Some of the summary repeats information already discussed, but it is necessary for complete context on the prejudice issue.)

### A. The Massenburgs

As discussed above, two of the five affidavits were signed under the names "Brian Massenburg" and "Gayland Massenburg."[27] Both affidavits are extremely similar. The "Affidavit of Brian Massenburg" states in full:

Brian Massenburg, being first duly sworn on oath, deposes and states as follows:

---

[27] Respondent argues that all five affidavits in question constitute inadmissible hearsay. Lee counters that they are admissible under Rules 803(3) and 807. The court, however, does not need to decide this question. As explained below, Lee has not shown prejudice even considering the five affidavits as some evidence of how the affiants might have testified at Lee's trial.

I remember the incident on or about April 16, 1995, at approximately 12:30 A.M. - 1:00 A.M., my brother's car broke down on us three blocks from my brother Greg's house at 425 East Garfield, in Calumet City.

We were pushing the car on State Street, when two men in a blue cadillac asked if we needed some help; we said no.

They turned the car around and started talking to a white woman and she then got into the rear of the car, and they drove off going east on State Street.

[232-1] at 25. The affidavit's signature line says "Brian Massenburg," as does the signature itself. [232-1] at 25.

The "Affidavit of Gayland Massenburg" states that "me (Gayland) and Brian were pushing my vehicle on State Street," and recounts the same details. [232-1] at 27.

Gayland Massenburg passed away in 2018, before the hearing. [210] at 484. However, the court heard testimony from Gayland's twin brother Byron.

Byron Massenburg testified that although he has been called "Brian" in the past, "Byron" is his legal name. [210] at 499. In 1995, he would have had a state ID that would have listed the name "Byron." [210] at 499. Moreover, he called himself "Byron," not "Brian," and signed his name as "Byron" on documents. [210] at 499–500. However, his brother Gayland called him "Brian." [210] at 500. Lee called him "Byrd." [210] at 500. (Lee testified that "friends call him Byron, but his real name is Brian." [208] at 219.)

In 1995, Byron had known Lee for seven or eight years. [210] at 500. Lee lived in the house right behind the house both Massenburgs lived in, and Byron saw Lee on "almost a daily basis." [210] at 501. (On the other hand, Byron testified, back then, Gayland did not see Lee on almost a daily basis, "because Gayland was a come-and-go person." [210] at 501.) Byron knew Lee's family. [210] at 501. Byron considered Lee a "very close friend." [210] at 502.

Byron did not recall signing the "Affidavit of Brian Massenburg." [210] at 486. He further testified that he did not prepare or type the affidavit, own or have access to a typewriter, or ask somebody else to prepare or type the affidavit for him. [210] at 502–03. It was "clear" to him that he was not even sure that it was his signature on the affidavit, "because if I signed something, I would have signed it Byron." [210] at 503–04. The signature was "pretty darn close, but I wouldn't put

Brian." [210] at 504.[28]  When asked, "Would you sign an affidavit if it was not true?", he answered, "No, I wouldn't." [210] at 485.  When asked, "Would you read an affidavit before you signed it?", he answered "Yes." [210] at 485.  But in 1995, he would not have known what an affidavit was.  [210] at 503.

Moreover, Byron had no recollection of the events described in the affidavit occurring.  [210] at 486.  He did not recall everything he did 25 years ago.  [210] at 486.  He did not remember what he specifically did on April 15, 1995.  [210] at 486.  When asked on cross, "Would you agree with me, sir, that the contents of that affidavit are not accurate?", he answered, "Yes, I would say they're not accurate." [210] at 507.  He recalled that he was not "on State Street pushing a car" between 12:30 a.m. and 1:00 a.m. on either April 15 or 16, 1995.  [210] at 508.  Byron knew that because he "was never in Calumet City at that time at night pushing a car.  Something of that nature I would remember, but . . . I never pushed a car, had car trouble at night . . . because back then," Byron testified, an "African-American would not be allowed in Indiana State Street at that time of night without an incident, so I made sure that I never was out there at that time."  [210] at 508–09.  When asked, "And that's how you know, even though it's 25 years ago, that's how you know for sure that this did not happen?", he answered, "Yes, with me, no, it did not happen."  [210] at 509.  "I was not out in Calumet City at that time.  I never had pushed a car, had car trouble at that time of night, and, no, I didn't see anything."  [210] at 510.  However, Byron confirmed that his brother Greg used to live at 425 East Garfield in Calumet City, and he went to his brother Greg's house "on occasion in the mid 1990s."  [210] at 517.

If he had been called to testify at Lee's trial, he would have told the truth.  [508] at 510.  Contrary to the statements in the affidavit, he would not have testified that he saw a white woman get into a blue Cadillac driven by Mr. Lee; he "would have testified, no, I didn't see that incident."  [210] at 510–11.  He would not have testified to anything contained in the affidavit as being true.  [210] at 511.  He

---

[28] Other than the first name, the signature "Brian Massenburg" on the 1995 affidavit is remarkably similar in style to the signature "Byron Massenburg" on an affidavit that Byron Massenburg executed in 2019 during discovery in preparation for the evidentiary hearing.  *Compare* Pet'r Ex. 9, [232-1] at 24–25 (1995 affidavit) *with* Pet'r Ex. 36, [232-4] at 110–11 (2019 affidavit).  The signatures are so similar in style that they raise the question whether Byron Massenburg in fact did sign the 1995 affidavit.  Indeed, as noted in the text, Byron Massenburg acknowledged that the signature on the 1995 affidavit was "pretty darn close" to his signature, but he still said it was not his signature and "he wouldn't put Brian." [210] at 503–04.  In addition, notary Diana Myles recognized and authenticated her signature and notary seal on both Massenburg affidavits, recalled that the Massenburgs were customers of the currency exchange where she worked, and testified that both Massenburgs were present when she notarized both of the affidavits.  Nonetheless, even if, contrary to Byron Massenburg's testimony, he actually did sign the 1995 affidavit of "Brian Massenburg," the totality of his testimony at the evidentiary hearing seriously undermined any possibility that he would have testified consistently with that affidavit at trial.

was not present for any of the events that Lee was arrested for. [210] at 515. Similarly, if Friedman had contacted him, he would have told Friedman that the contents of his affidavit were not true, and that he had "[n]o personal knowledge whatsoever" about the events Lee was arrested for. [210] at 515.

As to the affidavit bearing his brother Gayland Massenburg's name, Byron testified that he recognized Gayland's signature. [210] at 495–96. He was not present when Gayland's affidavit was signed and did not see Gayland sign the affidavit. [210] at 512. After reviewing Gayland's affidavit—which likewise described Gayland and "Brian" pushing a car on State Street late at night—Byron denied that Byron was ever pushing a vehicle with Gayland at approximately 12:30 a.m. to 1:00 a.m. on April 16th, 1995 on State Street. [210] at 512–14.

Finally, Byron testified that he had not wanted to appear for his deposition in this case. [210] at 497. At the deposition, he was arrested for a probation violation. [210] at 497. When asked if part of the reason he did not want to participate in the deposition was concern that he might be arrested, Byron said: "That and plus others. No offense, I just don't like courts." [210] at 498. However, he testified that he told the truth at his deposition. [210] at 516. As noted earlier, he was reluctant to be involved in this case. But his testimony was clear and direct.

Additionally, a former notary named Diana Myles testified. [207] at 35. Myles testified that before notarizing documents, she would routinely require individuals to present ID, sign the document in her presence, and compare the signatures on the ID and document. [207] at 36. Myles recognized and authenticated her signature and notary seal on both Massenburg affidavits. [207] at 37–39. She did not participate in the creation of either affidavit, but she knew both Massenburgs as customers of the currency exchange where she worked at the time. [207] at 38–39. She testified that both Massenburgs were present when she notarized both of the Massenburg affidavits. [207] at 41.

Finally, at the hearing, Lee provided his own account of the events on April 14 and 15, 1995—an account that included meeting the Massenburgs. Lee contends that the Massenburgs (and the other affiants) were in close proximity to Lee, so Lee's account of the events at the evidentiary hearing is evidence of how the affiants would have testified. Lee testified as follows.

At around 11 p.m. on April 14, Lee was at a "friend's house, apartment" in East Chicago, Indiana. [208] at 217–18. Burlmon Manley, whom Lee "had considered a friend," was there as well. [208] at 218. While he was at his friend's place, Gayland Massenburg called Lee on his cell phone, told him his car had broken down, and asked if Lee could "come to where he was at and maybe look at it, because [Lee] work[ed] on cars and stuff, and see what was wrong with it." [208] at 218. Gayland said he would "probably be on State Street," and was "going toward

his brother Greg's house in Calumet City." [208] at 218–19. Gayland was with his brother Brian Massenburg, whom Lee and other friends called "Byron," "but his real name is Brian." [208] at 219.

After getting off the phone, Lee said goodbye to the others at the gathering and told Burlmon Manley—whom Lee called "Manny"—that he would "drop him off at home en route to going to check on [the Massenburgs]." [208] at 219–20. With Manley as a passenger, Lee drove a blue Cadillac Seville "through Hammond into Calumet City," and turned and drove west on State Street. [208] at 220, 223. When they "first came onto State Street, [they] noticed a young lady walking" on their left (the south side of the street). [208] at 223. She was a "white lady," who Lee ultimately learned was L.M. [208] at 223. Lee rolled down his driver-side window, and Manley spoke out the window to L.M. "across" Lee. [208] at 224.

After speaking with L.M., they "drove down State Street going west," and "ran into Gayland Massenburg and Brian Massenburg pushing their car . . . going east." [208] at 237. Lee did not recall "specific blocks that anybody was on" or a "specific distance" between L.M. and the Massenburgs' car. [208] at 237–38. However, Lee agreed the Massenburgs' car would have been facing L.M. [208] at 238. "Brian Massenburg was in the back pushing on the trunk part of the car," and Gayland was outside the car pushing it with one hand "on the steering wheel" through the rolled-down driver's window. [208] at 238. Lee pulled up alongside them and asked Gayland Massenburg if they needed help, and he "basically said no." The Massenburgs were three blocks away from their brother Greg's house, and they could "make it from there." [208] at 240.

According to Lee, State Street—including the areas surrounding L.M. and the Massenburgs' car—was well lit. [208] at 240; [208] at 273 ("There were very bright street lights."). There were no objects obstructing the view between L.M. and the Massenburgs' car, and Lee could see L.M. while he was "very close" to the Massenburgs. [208] at 240–41. Before pulling off, Lee pointed to L.M. and said they were "going down there to talk to the young lady." [208] at 241. According to Lee, Gayland Massenburg saw "exactly what [Lee] was pointing at," and Lee did not observe anything blocking Byron Massenburg's view either. [208] at 241–42.

Lee then pulled off and drove back to L.M. Lee "pulled alongside of her, and Manley let the passenger window down." [208] at 242. Manley told her they were "looking for a liquor store," and L.M. responded that she "knew of a liquor store that was close to her house that she could show us where it was at." [208] at 245. L.M. then voluntarily entered the car, without any "kicking or screaming." [208] at 245–46. At that point in time, Lee could see the Massenburgs still pushing the car towards them. [208] at 246. After L.M. got in, they drove off along State Street, headed "east into Hammond, Indiana." [208] at 247.

Lee testified about the Massenburgs' affidavits as well. Lee testified that Gayland grew up in the house behind where Lee was living in 1995, but Gayland was not living there in 1995. [208] at 401. Lee had known Gayland for quite a while. [208] at 401. Lee testified that Gayland was someone that Lee saw "[n]ot that frequently, but I -- I would see him occasionally, I would say." [208] at 401. When asked, "He was somebody that you socialized with?", Lee answered, "At one time, I did. But in '95, I wasn't around him as much." [208] at 401. (Lee testified at his deposition that before his arrest in 1995, he would see Gayland "frequently." [208] at 401–02.)

Lee testified about the creation of the Massenburgs' affidavits. Lee spoke with Gayland Massenburg over the phone while in jail. [208] at 287. Gayland asked Lee about "being arrested and all that," and Lee "told him it was about the incident – I mean about the night that we were – came to help him with his car." [208] at 288. Gayland "said he had no problem putting together an affidavit of what he witnessed from that night." [208] at 288, 402–03. Lee then received a copy of Gayland's affidavit in the mail. [208] at 288, 402–03. In a subsequent conversation, Gayland and Lee spoke about sending the affidavit to Friedman. [208] at 289. Lee gave Gayland the address, and Gayland told Lee "he would be sending it off that next day." [208] at 289. Gayland later confirmed that he had sent the affidavit to Friedman. [208] at 290, 402–03. Moreover, Gayland told Lee "he had no problem at all coming to court." [208] at 289.

Lee either did not talk to Byron Massenburg about an affidavit or at most had limited conversations with Byron. [208] at 290–91.[29] However, Gayland told Lee that he (Gayland) had spoken to Byron about creating an affidavit. [208] at 292. Gayland told Lee "Brian had said that he had no problem putting together an affidavit, nor coming to court for [Lee] to testify." [208] at 292. Lee received a copy of the "Affidavit of Brian Massenburg" in the mail and understood that Byron Massenburg created it. [208] at 293. After receiving the affidavit, Lee spoke more with Gayland than with Byron at that time. [208] at 293. Gayland asked Lee whether Lee had received the two affidavits, Byron's and Gayland's, and Lee told Gayland yes. [208] at 293. Gayland reported to Lee that both Massenburg

---

[29] At the hearing, when asked on direct whether while he was in jail prior to his trial, did he have any conversations with Byron Massenburg, Lee responded, "No. We didn't have too many conversations after that." [208] at 290–91. Later, on cross-examination, Lee testified, "I think I testified I spoke to him [Byron] once or twice" but was "not sure." [208] at 397. At his deposition, Lee was asked if he spoke "with Brian Massenburg about the affidavit before it was prepared," and responded "No, not really." [208] at 397. When this deposition testimony was read, Lee testified, "I believe that would be the answer. It must have been Gayland that I spoke to. I'm not sure. I thought I spoke to him maybe once or twice. Maybe it was just Gayland. I'm not sure. It's been a long time." [208] at 397–98. When asked on cross, "you never spoke with Byron Massenburg about testifying at your trial, did you?", Lee answered, "Not that I can remember at this -- right now." [208] at 400.

affidavits "were placed in the same envelope," which Gayland mailed to Friedman. [208] at 293–94.[30]

As to the date in the Massenburg affidavits, both affidavits say "on or about April 16th, 1995." Lee testified that the date in the affidavits was incorrect—that the incident described in the affidavits referred to the incident on the night of April 14 / 15. [208] at 319. Lee testified that he spoke to Gayland or Brian about the date being incorrect, and they said that it was an honest mistake and they were confused about the day changing from one day to the next. [208] at 320.

### B.    Charlene Parker

Next in the chronology of the events of that night, Lee relies on the potential testimony of Charlene Parker. Parker passed away in 2016, before the hearing. *See* Pet'r Ex. 28, [232-3] at 96–97. The December 12, 1995 Parker affidavit states:

> Charlene D. Parker, being first duly sworn on oath, deposes and states as follows:
>
> I was at Dad's Lounge and Package Goods in Hammond, Indiana on April 15, 1995- and that I took the photo attached to this affidavit on that night.
>
> The attached picture show's Anthony Lee, Berlman Manley, and Keith Adams, I took this picture of the three of them around 1:00 a.m.-1:30 a.m. in the lounge part of Dad's Lounge.
>
> I will testify in open court under oath that all three of these gentlemen were in Dad's Lounge at the same time on the night of April 15, 1995.

[232-1] at 23. The notary who stamped this affidavit is deceased. *See* [220] at 27 n.17; Pet'r Ex. 42, [232-4] at 217–19. The photo referenced in the affidavit is not in the record.

As relevant to Parker's potential testimony, Lee testified about the portion of the night beginning when Lee, Manley, and L.M. arrived at Dad's Liquor Store. [208] at 247. When they arrived, Dad's looked like it was closed, and Manley got

---

[30] On cross-examination, Respondent's counsel read deposition testimony where Lee testified that he did not know who wrote the affidavits. [208] at 340–48. On redirect, Lee's counsel read additional deposition testimony in which Lee explained (in response to questioning by Lee's counsel) that when he previously testified (at the deposition, in response to questioning by Respondent's counsel) that he did not know who wrote the affidavits, he misunderstood the question and meant that the witnesses told him that they had prepared the affidavits, but he had not personally seen them doing so. [208] at 459–61.

out of the car to check to see if it was open because it was dark. [208] at 247. Dad's turned out to be open, and Manley "opened the door and waved for [Lee] to come in." [208] at 247. Lee "turned my ignition back, left the radio on, and I asked [L.M.] let me see your ID." [208] at 247–48. L.M. showed Lee her driver's license. [208] at 248. Lee then got out of the car and went inside Dad's, while L.M. waited in the car. [208] at 248. Lee left the keys in the ignition since he "left the radio on so she'd have some music to listen to." [208] at 248. That is, Lee and Manley went into Dad's together, while L.M. remained in the car by herself with the keys in the ignition and could have driven away. [208] at 248–51.

Lee and Manley stayed inside Dad's for "quite a while," longer than a "few minutes," although Lee could not approximate how long. [208] at 248–49. Part of Dad's was a liquor store where you could purchase carryout goods, and another part was a lounge. [208] at 252. Lee and Manley "talked to the bartender about getting some packaged goods to carry out," and the bartender responded "that she had a line of customers, that it would be a few minutes, and we [Lee and Manley] left it – from the bar area and started to walk around the lounge." [208] at 251–52. While there, they ran into Keith Adams, a "friend from the neighborhood" whom Lee and Manley knew. [208] at 252.

At Dad's, Lee and Manley also met Charlene Parker, who was "walking around taking pictures of couples and stuff like that." [208] at 252. This was the first time Lee had met Parker. [208] at 254. Parker was taking Polaroids, and "she sold them to people who wanted to buy them." [208] at 253. Lee agreed that around 1995, it was common for "individuals like Ms. Parker to go around taking Polaroid pictures and selling them" "in . . . similar kinds of bars and lounges." [208] at 253. As L.M. waited outside in the car, Parker took a picture of Lee, Manley, and Keith Adams inside Dad's Lounge. [208] at 253. Parker "pulled the picture out [of] the camera and set it there for it to develop," and then sold it to Lee for $5. [208] at 254.

After that, they "started to mingle and stuff, and eventually the bartender told us that she was free to sell us the alcohol on the carryout side." [208] at 253. Lee paid for the liquor and gave it to Manley, who then "went out to the car." [208] at 254. Lee, however, stayed inside Dad's for another "15, 20 minutes, somewhere around there." [208] at 254. During this time, Lee spoke with Parker "generally" about "her life," and Parker eventually "gave me [Lee] her phone number." [208] at 254. Lee next spoke "with the barmaid for a minute," and then left Dad's. [208] at 255. Back at the car, Lee showed Parker's picture to Manley and L.M., and then put it in his glove compartment. [208] at 255.

When Lee got home later that night (he was living with his mother at the time), he brought Parker's picture inside. [208] at 255. Lee kept the picture in his room until "maybe a few days later," when the picture was "put in a frame and set

on her [Lee's mother's] mantel" where she had her pictures. [208] at 255–56. The picture remained on the mantel until after Lee's arrest in July 1995. [208] at 256.

Lee testified that he communicated with Charlene Parker over the phone and in person while in jail before trial. [208] at 298. Lee told Parker he thought "it might be a good idea to prepare an affidavit for what she witnessed at Dad's and the picture that she took." [208] at 299. Parker responded that "she had no problem doing that," and agreed to create an affidavit. [208] at 299. Moreover, she also "said that she had no problem coming to court and giving a statement about what she wrote in her affidavit and testifying on [Lee's] behalf," and that she would be at the trial. [208] at 299, 302. Lee's understanding was that she agreed to testify "basically about, you know, her taking the picture of us guys and probably more on the line of me and her communicating that night and exchanging a number and stuff." [208] at 300.

Once Lee found out that Parker was willing to make an affidavit, he had his mother or one of his family members send Parker the picture, which was still in his mother's living room. [208] at 258–60. Lee's mother told him that she had sent Parker the picture. [208] at 258–60.

Parker sent a copy of her affidavit to Lee. [208] at 301. When Lee and Parker subsequently spoke, Parker told Lee she had sent Friedman a copy of the affidavit along with the original Polaroid picture (there were no other copies of the picture), and Lee knew that Friedman received the affidavit and photograph because he saw them in Friedman's possession at a January court appearance. [208] at 259–61, 301–02. As noted above, the photo is not in the record.

Lee testified on cross-examination that "some days later" between April 15, 1995, when he first met Parker, and when he was arrested on July 27, 1995, he began dating Parker, that he became very close to her, and that he helped her raise her three children until the time of arrest. [208] at 348–49. He agreed that in December of 1995 (the Parker affidavit is dated December 12, 1995), he was still friends with Parker, and that the father-daughter relationship that he had with her children still existed in December of 1995 and as of the evidentiary hearing. [208] at 350.

## C. Phillip Elston

The next potential witness is Phillip Elston. As discussed above, Elston could not be located despite substantial efforts on Lee's behalf and was unavailable to testify at the hearing. The October 2, 1995 Elston affidavit reads:

Phillip Elston, being first duly sworn on oath, deposes and states as follows:

I was driving pass Merrill Park when I notice Anthony Lee's car between 3:30-4:00 a.m.;

Anthony Lee was sitting on a curb, 3'-4' away from his car, drinking beer;

I noticed a man and a woman entering the rear door of Anthony Lee's car;

Anthony then walked up to my car with three (3) beers and got in;

I asked him what was going on, and he replied, "His friend Jr. pulled this female.";

I then asked Anthony to ride with me to get a pack of cigarettes, and we proceeded to a store;

When we returned to Anthony's car, Anthony got into his car and drove north, and I drove south;

I make this affidavit of my personal knowledge.

[232-1] at 17.

Melody Jefferson authenticated her signature and stamp on the 1995 Elston affidavit—which, as discussed above, has the same date (October 2, 1995) as the Pinkston affidavit. [208] at 19. As with Pinkston's affidavit, Jefferson testified she could recall notarizing the Elston affidavit and following her normal procedures while doing so. [208] at 19–20. Jefferson agreed that while she was notarizing the affidavit, Elston told her he was getting the affidavit notarized for a friend: "Yes he did say it was a friend. He knew him." [207] at 25–26. While Jefferson was reading the affidavit, Elston made clear that friend was Anthony Lee, [207] at 28–29, who was mentioned in the affidavit. Jefferson also testified that when Elston first came in to get the affidavit notarized, there was no one with him, but then someone came in right behind him. [207] at 26. (Yet, as discussed earlier, Pinkston testified that she did not know Elston and did not remember going with Elston to a currency exchange to have the affidavit notarized. [207] at 166. In any event, Jefferson testified that she did not know whether the contents of the Elston or Pinkston affidavits were true, the affidavits were already prepared when Elston and Pinkston brought them to be notarized, and Jefferson did not know who prepared the affidavits. [207] at 31–34.)

Again, there is a second Elston affidavit dated August 23, 2008, which was authenticated by notary Michal Sykes. The 2008 Elston affidavit purported to clarify that the events described in the 1995 Elston affidavit took place "after 12am on the 15th which would have made it the 16th day of April because it was 3:30 to 4am in the morning." [96-3] at 6. As noted by Respondent, the events for which Lee was charged and convicted instead took place across the night of April 14 and the early morning of April 15.

At the hearing, Lee testified about a portion of the night during which Lee, Manley, and L.M. were at Merrill Park. [208] at 262. Lee was "sitting on a stump" that was located "to the east of 97th Street." [208] at 262. The stump was close to the curb and "fairly close" to Lee's car, which was parked to the west along 97th Street. [208] at 263. While Lee was sitting on the stump, Manley and L.M. were "still inside the car." [208] at 263. At this point, "Phillip Elston drove up." [208] at 263. Elston was a friend Lee had known "since grammar school." [208] at 263–64; [208] at 403–04 ("We went to grammar school together" and "were friends for a length of time").

When Elston arrived, Lee was "sitting on the stump with three beers." [208] at 264. Elston stopped and "let his passenger window down," and Lee "got up, grabbed the beers," and "walked toward his [Elston's] car." [208] at 265. While the two were speaking, L.M. left Lee's car and went to urinate "by the playground area." [208] at 265. Manley then got out of Lee's car, waved for Lee to come over to where Manley was, and asked if Lee had any condoms. [208] at 265–66. Lee went over to Manley, gave Manley two condoms from Lee's trunk, and returned to continue speaking with Elston at Elston's car. [208] at 265–66. From where Lee was positioned directly next to Elston's car, Lee could see Manley and L.M. get in the back seat of Lee's car. [208] at 266. Elston also was able to see Manley and L.M. when they entered Lee's car. [208] at 267; *id.* (the lighting around Lee's and Elston's cars was well lit by the very bright park lights and nothing was blocking Lee's or Elston's view of Lee's car, Manley, and L.M.). Lee knew Elston was able to see Manley and L.M. when they entered Lee's car because Elston asked Lee who they were (i.e., asked about them specifically), and Lee said that "Manley had pulled this white female." [208] at 267–69. Lee explained that phrase was "like getting a phone number from a woman. It's, like, I pulled her, I got this phone number from this young lady, and it's a nature like that." [208] at 271. Lee testified that the phrase did not connote any coercion. [208] at 271.

After that, Lee and Elston got into Elston's car and rode to a "convenience store or some type of store like that." [208] at 272. They talked for a few minutes, and "eventually after he [Elston] purchased what he went to the store to get, we [Lee and Elston] sat in the car, spoke for a minute," and then drove back to Merrill Park. [208] at 272. Elston dropped Lee off at the park, and Lee reentered his own car and drove off. [208] at 272.

Lee testified that he spoke with Elston before trial over the phone about creating an affidavit. [208] at 294. Lee told Elston "that people were putting together affidavits from what they witnessed, and he suggested that he had no problem putting one together either." [208] at 294. Elston also told Lee he would "gladly come to court and testify on my [Lee's] behalf." [208] at 294. Later on, Elston sent a copy of his affidavit to Lee. [208] at 295. After Lee received the affidavit, the two spoke again and Elston told Lee he had sent a copy to Friedman. [208] at 295.

### D.    Gaila Pinkston

The court heard testimony from Gaila Pinkston, who confirmed that the signature on the October 2, 1995 Pinkston affidavit was hers. [207] at 150. That affidavit reads as follows:

> Gail Pinkston, being first duly sworn on oath, deposes and states as follows:
>
> On August 4, 1995, I received and accepted a collect call from Burrell Manny, who was in a jail in Memphis, Tenn.;
>
> Burrell stated in that conversation to me about the incident that happened in April, 1995 regarding some white female;
>
> Burrell stated further that he had sex with that white female in the back seat of Anthony's car, and that Anthony was no where around during that sexual encounter with that white female;
>
> Burrell made the statement to me, "that if he (Burrell) goes down on this case that he would take Anthony down with him."
>
> I make this affidavit of my personal knowledge and conversation with Burrell Manny.

Pet'r Ex. 6, [232-1] at 18–19. Lee also testified that a phone bill—the page before the Pinkston affidavit in the attachments to Lee's *pro se* motion for new trial, [231-16] at 3–4, [232-2] at 269–70, [232-4] at 230–31—was attached to the Pinkston affidavit. [208] at 287. (Lee contends, and Respondent disputes, that the phone bill corroborates the call. This dispute is discussed further below.)

At the evidentiary hearing in this case, Pinkston testified that she currently goes by "Gaila," that "Gaila" is her legal name, that she has previously been known

by the abbreviated version "Gail," and that her legal name, "Gaila," would have been on her identification in 1995.  [207] at 145, 153.

While Pinkston confirmed that the signature on the affidavit was hers, her testimony on whether she recalled signing the affidavit was inconsistent.  [207] at 150.[31]  She was "sure" she did not type the affidavit, since her "typing wasn't that good."  [207] at 163.  She did not remember whether she had someone else prepare the affidavit for her.  [207] at 163.  She did not think she would have asked someone to type the affidavit for her, but she did not remember.  [207] at 163.  She did not know who prepared or typed the affidavit, recall what happened to the affidavit after she signed it, or recall whether she sent or gave it to anyone.  [207] at 163–64.

When asked whether she understands that "signing a sworn affidavit is the equivalent of making a statement under oath," Pinkston responded: "Now I do." [207] at 149.  While now she normally would first read the statement and confirm it was accurate before signing a sworn affidavit under oath, "25 years ago, I probably wouldn't have."  [207] at 149; *see also* [207] at 163 (when asked whether in 1995, would she even have known what an affidavit was, responding that she "probably wouldn't have known . . . the seriousness of it"); [207] at 164–65 (in 1995, she was very young and probably would not have reviewed the affidavit first to make sure it was accurate before signing it).  However, she also testified that she believed that at a February 2019 meeting with Lee's counsel and private investigator John Rea, she said that she would have read the affidavit and verified that it was true before signing it.  [207] at 187–89.

Pinkston first met Lee in "1994, '95-ish."  [207] at 146.  She and Lee "kind of dated.  We were friends though, but we dated and then we didn't, and then we were friends."  [207] at 146.  When Lee was arrested, Pinkston and Lee "were friends I think at that point.  I don't know if we were still dating or not."  [207] at 148. Pinkston spoke with Lee over the phone more than once while he was in jail awaiting trial.  [207] at 148–49, 154–55.

Around 1995 and 1996, Pinkston also knew Burlmon Manley as a friend of Lee's.  [207] at 147.  Manley also "very briefly" dated one of her friends.  [207] at 147.  However, Manley was really a friend of Lee's and "wasn't my [Pinkston's] friend," and she did not socialize or hang out with him.  [207] at 155–56.  When asked, "Is it fair to say he was a person that you weren't comfortable around?", she answered, "Well, I don't -- I didn't really know him well enough to be comfortable or

---

[31] [207] at 150, lines 14–15 (when shown the Pinkston affidavit, she did not recall signing the affidavit); [207] at 150, lines 19–20 (when shown the Pinkston affidavit, she did not remember the content of the affidavit but did remember signing it); *see also* [207] at 149, lines 11–18 (she did have a specific recollection of signing a sworn affidavit at some point in her life; she did not recall when, but she did have a general recollection of signing a sworn affidavit, "because it was presented to me").

uncomfortable around him, so I don't – you know." [207] at 156. But at her deposition, Pinkston said she "didn't feel comfortable" around Manley. [207] at 158. At the hearing, she testified that he was "not a person I would tell anything personal to." [207] at 162. When asked, "he's not a person that you would have given your phone number to back in 1995, is he?", she responded that she did not know. [207] at 162.

Pinkston did not recall any of the events described in the affidavit. [207] at 164. She did not remember the phone call, or Manley making the statements: "I just don't remember. No matter how [sic] times you show it to me, I just don't remember." [207] at 150, 164.

Pinkston also did not remember whether either the phone number handwritten on the affidavit immediately below her signature (312-918-0535)[32] or a different phone number (312-221-1993) that appears on the phone bill that is among the attachments to Lee's pro se motion for new trial (on the page immediately before the Pinkston affidavit) was her phone number in 1995. [207] at 165, 168. She could not recall whether either of these phone numbers was or was not her phone number. [207] at 186–87. She has "had a million phone numbers." [207] at 186.

As noted earlier, Pinkston testified that she could not remember much. She was reluctant to be involved in this case. But she was direct about her lack of memory, and it was understandable given the passage of time.

As discussed above, the court also heard testimony from Melody Jefferson, a notary. Jefferson believed that in October 1995, she was working at a currency exchange on 114th and Michigan. [207] at 17. Her "normal procedure" included matching the signature on the affidavit with the signature on the individual's ID and matching the ID to the individual. [207] at 17–18. She never notarized a document without requiring ID or having the individual sign the affidavit in front of her. [207] at 18. Jefferson authenticated her signature and notary seal on the Pinkston affidavit. [207] at 27. She also testified that she recalled notarizing the affidavit and following her "normal procedures." [207] at 27.

As discussed earlier, Jefferson also testified that she recalled notarizing the 1995 Elston affidavit on the same day, October 2, 1995, before she notarized the Pinkston affidavit. [207] at 19–20, 26–27. Jefferson testified that when Elston first came in to get the affidavit notarized, there was no one with him, but then someone came in right behind him. [207] at 26. Jefferson then testified that she remembered notarizing Pinkston's affidavit. [207] at 27. As discussed above, the combination of Jefferson's testimony and Pinkston's testimony raises questions;

---

[32] Some copies of the affidavit in the record include the handwritten phone number; others do not. [231-16] at 4, 7; [232-1] at 19; [232-2] at 270, 273; [232-4] at 231. There is no explanation in the record for the existence of these two different versions.

although the Pinkston and 1995 Elston affidavits are dated the same day, and although according to Jefferson's account, Pinkston apparently came in right behind Elston, Pinkston testified that she did not know Elston and did not remember going with Elston to a currency exchange to have the affidavit notarized. [207] at 166. In any event, Jefferson testified that she did not know whether the contents of the Elston or Pinkston affidavits were true, the affidavits were already prepared when Elston and Pinkston brought them to be notarized, and Jefferson did not know who prepared the affidavits. [207] at 31–34.

Lee also testified about a conversation he had with Gaila Pinkston after his arrest. Lee testified that in 1994 and 1995, he was "friends" with Pinkston. [208] at 274. He knew her as "Gaila," but she also went by "Gail." [208] at 274–75. Pinkston knew Manley "somewhat," and she knew him through Lee. [208] at 275. Manley had a relationship with one of Pinkston's friends; Lee asked Pinkston "could she introduce him [Manley] to one of her friends, and she introduced him to Tina Gowers." [208] at 275. The four of them went out together "a few times." [208] at 275. Lee "gave Manley Pinkston's number, and – for whenever he couldn't reach me on my cell phone to probably get in touch with her, and she could probably contact me." [208] at 275–76. According to Lee, Manley tried to reach him by calling Pinkston "a number of times." [208] at 275.

After Lee's arrest, Lee and Pinkston continued to communicate; Pinkston may have visited Lee a couple times, but they mostly spoke over the phone. [208] at 276. During one of these conversations, Pinkston told Lee that she "had received a collect phone call from Mr. Manley from out of state." [208] at 276. She said Manley was "in Dyer, Tennessee, a jail, prison or one of them." [208] at 276. Pinkston told Lee that during this call, Manley "told her something about that if he goes down on this case or whatever, that he was going to take [Lee] down with him." [208] at 277. Manley also told Pinkston that "he had sex with this white female in my [Lee's] car." [208] at 277. After reviewing the Pinkston affidavit, Lee agreed that Pinkston told him that Manley also said that Lee was "nowhere around during that sexual encounter with that white female." [208] at 278.

Lee also testified that he spoke to Pinkston about creating an affidavit. [208] at 283–84. Pinkston told Lee she would describe her conversation with Manley in an affidavit. [207] at 286. Lee told Pinkston "about sending a copy to my lawyer and sending a copy to me." [208] at 286. Lee later received a copy of the Pinkston affidavit in the mail, and when they subsequently spoke again, Pinkston told him that she had sent a copy to Friedman as well. [208] at 286–87. According to Lee, before sending the affidavit, Pinkston "also stated that she had no problem coming to court to testify what she witnessed – I mean what she spoke with Manley about." [208] at 290. Lee testified that after he received the affidavit from Pinkston, "[w]e talked about her coming to court, and we also talked about her speaking to my lawyer." [208] at 290.

Lee testified that the copy of Pinkston's affidavit he received had an attached phone bill, and that he included the phone bill with his *pro se* motion for new trial. [208] at 281–82; *see also* [231-16] at 3–4, [232-2] at 269–70, [232-4] at 230–31. According to Lee, Pinkston said she sent the phone bill along with Friedman's copy of the affidavit as well. [208] at 282, 287.

Lee testified about the copy of the phone bill found in Petitioner's Exhibit 46, [232-4] at 230. *See* [208] at 281–82. The phone bill shows an 8-minute August 4, 1995 call from 901-285-9544 to 312-221-1993. [232-4] at 230. The phone bill also appears to have other phone calls blocked out or redacted immediately above and below that call; it is not clear why. [232-4] at 230. Lee testified that the phone number 312-221-1993 was associated with Pinkston's residence, and that she told Lee that she included the phone bill to show that she had received this call from Manley while he was in jail. [208] at 282–83, 393.[33]

The phone bill lists the location of the 901-285-9544 number as Dyersburg, Tennessee. [232-4] at 230, [208] at 283. The Pinkston affidavit says that Manley was in a jail in Memphis. Dyersburg is almost 75 miles from Memphis, but the mention of Memphis in the affidavit could have been an approximation. Lee presented evidence that the phone number 901-285-9544 belonged to a Tennessee jail at the time of the phone call (considering an intervening area code change). *See* [178], [183], Pet'r Exs. 53 and 55, [232-4] at 257–58, and [232-4] at 262–63. Lee also presented evidence (a transcript of Manley's bench trial) that a detective investigating this matter interviewed Manley at the Dyersburg County Jail in Dyersburg, Tennessee on August 2, 1995 (two days before the date given in the Pinkston affidavit for the call from Manley to Pinkston—August 4, 1995). *See* Pet'r Ex. 15, [232-2] at 17–18.

## E.    The Court's Findings

The court evaluates whether Lee has shown a reasonable likelihood that, but for any errors by Friedman, the result of Lee's trial would have been different. In doing so, the court considers all of the evidence in the record, including the evidence elicited at the evidentiary hearing on remand. Lee "does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case. He must show only a reasonable likelihood that the outcome would have been different—that is, a likelihood that is substantial, not just

---

[33] On cross-examination, Lee admitted that at his deposition, he testified that did not remember whose number it was, but explained that he knew whose it was now (at the evidentiary hearing), [208] at 393–94. Lee argues that his testimony "likely stemmed from confusion, not deceit," and points out that he "*knew* the phone number had to belong to Ms. Pinkston because it was attached to her affidavit, though he might not have *recognized* the number after all these years." [223] at 25 n.4.

conceivable." *Blackmon*, 823 F.3d at 1107 (citations and internal quotation marks omitted). For the following reasons, Lee has not established prejudice.

First, Lee is not entitled to a presumption of prejudice.[34] "In certain Sixth Amendment contexts, prejudice is presumed." *Strickland*, 466 U.S. 668, 692 (1984). In particular, "no showing of prejudice is necessary 'if the accused is denied counsel at a critical stage of his trial.'" *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)). Likewise, "prejudice is presumed 'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Id.* (quoting *Cronic*, 466 U.S. at 659).

Lee argues that a presumption of prejudice is warranted since Friedman completely failed to conduct any investigation during the pretrial phase of the case. While Respondent points to various actions Friedman took during trial, Lee argues that the period of pretrial investigation was a "critical phase" of Lee's case and Friedman's inaction during that phase amounted to denial of counsel. *See Woods v. Donald*, 575 U.S. 312, 315 (2015) (noting that a "critical stage" is one that holds "significant consequences for the accused") (quoting *Bell v. Cone*, 535 U.S. 685, 696 (2002)); *Mitchell v. Mason*, 325 F.3d 732, 742–43 (6th Cir. 2003) ("Because Mitchell was denied the presence of counsel during the critical pre-trial stage, Mitchell's claim should be reviewed under *Cronic*. . . . The pre-trial period constitutes a 'critical period' because it encompasses counsel's constitutionally imposed duty to investigate the case.").

Even accepting the premise of this argument—that a complete failure to investigate the case before trial warrants a presumption of prejudice regardless of what the attorney does at trial (an issue unnecessary to reach)—no presumption of prejudice is warranted here. As explained above, Lee has not shown that Friedman's pretrial investigation was constitutionally deficient. Moreover, even if Friedman's investigation with respect to one or more of the witnesses was deficient, Lee would need to show more than that for prejudice to be presumed. Lee would need to show "constructive denial of the assistance of counsel altogether." *Strickland*, 466 U.S. 668, 683 (1984). Lee has not done so.

Lee relies on *Patrasso v. Nelson*, 121 F.3d 297 (7th Cir. 1997). There, the Seventh Circuit held that it was appropriate to presume prejudice under *Cronic* since the attorney "effectively abandoned his client" at the sentencing phase. *Id.* at 305. The attorney "made no effort to contradict the prosecution's case or to seek out mitigating factors." *Id.* at 304. He "barely spoke with his client and performed no investigation; he had no information and so could not have reasonably considered

---

[34] Respondent argues that since Lee failed to raise a distinct claim under *Cronic* in the state courts, he has procedurally defaulted any such claim. Since no presumption of prejudice is appropriate here, the court does not need to decide whether Lee has procedurally defaulted a claim under *Cronic* as opposed to a claim under *Strickland*.

his available strategies." *Id.* at 305. The Seventh Circuit distinguished this complete "inaction" from the attorney's performance at the conviction phase, where prejudice could not be presumed because "the attorney did take some action on his behalf." *Id.* at 302. As discussed above, Lee has not shown that Friedman failed to take reasonable steps to investigate witnesses based on the information he received from Lee and the affiants. The court therefore cannot conclude that Lee was constructively denied counsel during the pretrial investigation stage of the case.

The court thus evaluates whether Lee has shown prejudice under *Strickland*. Again, Lee "does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case. He must show only a reasonable likelihood that the outcome would have been different—that is, a likelihood that is substantial, not just conceivable." *Blackmon v. Williams*, 823 F.3d 1088, 1107 (citations and internal quotation marks omitted). The court evaluates prejudice cumulatively, meaning that it considers the impact of potential testimony from the five witnesses together rather than in isolation. *See United States v. Simpson*, 864 F.3d 830 (7th Cir. 2017). For the following reasons, Lee has not shown prejudice under this standard.

To start, the state's case against Lee at trial was relatively strong. Lee argues that the case came down to L.M.'s and Lee's credibility, and one or more of the five witnesses would have corroborated his account, while no other witnesses directly corroborated L.M.'s account. *See Adams v. Bertrand*, 453 F.3d 428, 438 (7th Cir. 2006) (finding prejudice in "a very close case" in which the outcome "was highly contingent on the credibility" of the victim). Lee contends that the only eyewitnesses to testify at trial were L.M. and Lee; the prosecution presented "no physical evidence—no DNA evidence, no medical evidence or testimony, no seized gun, and no fingerprint or forensic evidence—as well as no testimony from any hospital personnel or medical professional to corroborate L.M.'s story"; Friedman presented no evidence in Lee's defense other than Lee's own testimony; and Lee's and L.M.'s trial testimony conflicted on nearly every relevant issue. Am. Petition, [96] ¶¶ 2, 17–18, 65; [220] at 8–9.[35] Lee cites the trial judge's statement that "[t]he

---

[35] Lee contends that the State had access to a Criminal Sexual Assault Kit ("Rape Kit"), collected from L.M. at the hospital on the morning of April 15, 1995, but the State chose not to use evidence from the Rape Kit at trial; that if the DNA evidence had corroborated L.M.'s allegations, the State would have used it at trial; and that Lee attempted to obtain the Rape Kit in connection with state court postconviction proceedings, but the State refused to produce it and thereafter destroyed it. [220] at 8–9. For these contentions, Lee cites his Motion for Hearing on Destruction of DNA Evidence filed February 20, 2004 by the Cook County Public Defender in state postconviction proceedings. Pet'r Ex. 24, [232-3] at 34–59 (Cir. Ct. of Cook County, No. 95 CR 24818, Post Conviction 7455, filed Feb. 20, 2004). However, Lee does not describe the resolution of this motion by the state court, nor does he develop this argument as an independent ground for habeas relief apart from the ground he has asserted, namely, ineffective assistance of counsel for failure to investigate potential witnesses.

case does come down to credibility. The Court finds [L.M.] very credible." [96-8] at 166.

But although credibility certainly was very important, the evidence also included photos of L.M.'s injuries. Immediately after the latter statement ("[t]he case does come down to credibility. The Court finds [L.M.] very credible," [96-8] at 166), the trial judge cited a photo of L.M.'s injuries and found that "the picture itself shows the sex was not consensual." [96-8] at 166. The judge then found that the defendants' testimony in court was "incredible." [96-8] at 167. Later, during the finding of guilt as to the aggravated kidnapping count, the judge again cited both L.M.'s credibility and the same picture of L.M.'s injuries. [96-8] at 171. As the prior district judge explained: "the trial did *not* just boil down to a 'swearing contest' between Lee and L.M., despite Lee's argument to the contrary." [114] at 16–17; *Lee v. Lamb*, 2017 WL 5989775, at *7. "L.M.'s story was backed up by strong circumstantial evidence . . . Teresa Baragas, a disinterested witness with no motive to lie, testified that L.M. banged on her door at three in the morning, naked, bloody, bruised, and screaming that she had been raped. . . . This behavior is utterly inconsistent with Lee's tale of a consensual encounter. L.M.'s testimony was also backed up by extensive evidence of her injuries, including photographs showing bruises to her face, head, back, and arms. These injuries are not at all likely to have been caused by consensual sex, and are too extensive to be explained by the scuffles that Lee described." [114] at 17 (citations omitted); *Lee v. Lamb*, 2017 WL 5989775, at *7.

The record does not warrant a conclusion that there is a reasonable likelihood that the outcome of trial would have been different if one or more of the five witnesses had been called to testify.

Of the five witnesses, two (Byron Massenburg and Gaila Pinkston) testified at the evidentiary hearing, two (Gayland Massenburg and Charlene Parker) were deceased, and one (Phillip Elston) could not be located.

The testimony of the two witnesses who did testify at the hearing significantly undermined (in the case of Byron Massenburg) or at least did not create (in the case of Gaila Pinkston) any prospect that if they had testified at trial, their testimony would have affected the outcome.

Byron Massenburg testified that he did not recall signing the "Affidavit of Brian Massenburg," that if he signed something, he would have signed it "Byron," that he had no recollection of the events described in the affidavit, and that he would not have testified to anything contained in the affidavit as being true. As to Gayland Massenburg's affidavit (which described similar events as the "Brian Massenburg" affidavit), Byron testified that he recognized Gayland's signature, but

did not see Gayland sign the affidavit, and denied that he (Byron) was ever pushing a vehicle with Gayland at the date, time, and place described in Gayland's affidavit.

Gaila Pinkston recognized her signature, but could not recall signing the affidavit. She testified that while now she would first read a sworn affidavit and confirm it was accurate before signing, 25 years ago she probably wouldn't have. She did not recall any of the events described in the affidavit.

The remaining affiants (Gayland Massenburg, Charlene Parker, and Phillip Elston) were not available to testify at the evidentiary hearing and were not subject to cross-examination, so there is not enough information to test the reliability of any of their affidavits for the truth of the matters asserted. At most, the content of their affidavits can be compared to the rest of the record. But there is not enough reliable corroborating evidence in the record to draw conclusions about what they would have said (either on the topics addressed in their affidavits or otherwise) if they had testified at trial. Without their testimony, the Gayland Massenburg, Parker, and Elston affidavits are at most extremely weak evidence of how those witnesses would have testified at trial, and are not enough to raise a reasonable probability that they would have testified consistently with their affidavits or that they would have testified beyond the affidavits in a manner favorable to the defense.

None of the evidence that the parties have now presented changes these assessments.

Beginning with the Massenburgs, Lee argues that if either Massenburg had testified at trial, either Massenburg would have testified to seeing L.M. enter Lee's car voluntarily. The court disagrees. At the hearing, Byron Massenburg credibly denied the account of events in his affidavit (with which Lee's account of his encounter with the Massenburgs corresponded).[36] While Lee argues that Byron's recollection is not reliable, Byron's testimony at the hearing was credible and clear.

---

[36] Lee argues that Byron Massenburg's testimony was shaped by fear of the state, noting that he was arrested for a probation violation at the end of his deposition in this case. However, his deposition testimony (given before the arrest) was consistent with his testimony at the hearing. And again, the court found Byron's hearing testimony credible.

The parties also dispute whether Byron Massenburg signed the "Affidavit of Brian Massenburg." Byron had no memory of signing the affidavit, and testified that if he signed something, he would have signed it "Byron," although the style of the signature "Brian Massenburg" on the affidavit is very similar to the style of the signature on a 2019 affidavit that Byron signed "Byron Massenburg," and although notary Diana Myles recognized and authenticated her signature and notary seal on both Massenburg affidavits, recalled that the Massenburgs were customers of the currency exchange where she worked, and testified that both Massenburgs were present when she notarized both of the affidavits. It ultimately does not matter one way or another. Since Byron clearly and credibly denied

In addition, Lee's account of his encounter with the Massenburgs does not raise a reliable or sufficient likelihood that the Massenburgs would have testified similarly at trial. Lee offered his own testimony of what he saw and heard throughout the evening. Lee argues that he observed those events while the affiants (the Massenburgs and others) were in close proximity to him, and that the surrounding circumstances would have allowed the affiants to see the same events. For example, Lee testified that State Street—including the areas surrounding L.M. and the Massenburgs' car—was well lit, Lee himself could see L.M. while he was next to the Massenburgs, Lee pointed at L.M. and told Gayland Massenburg that Lee and Manley were going to go talk to L.M., there was nothing blocking the Massenburgs' view, the Massenburgs were pushing their car towards L.M., and the Massenburgs were in a position where they would have been able to see L.M. voluntarily enter Lee's car. Lee contends that therefore reasonable inferences can be drawn that the Massenburgs and other affiants would have had knowledge of the same events to which Lee testified and likely would have testified to those same events. But these inferences are too attenuated. To the extent that Lee's testimony could in principle provide some evidence of what the affiants would have perceived, it is too remote from the affiants' actual personal knowledge and observations to carry much weight as to what the affiants actually observed or how they actually would have testified.

Further, there were other reasons that at least raise questions about the reliability of Lee's testimony. At trial, Lee testified that he left the gathering where he was to take Manley home, while at the hearing he testified that he left after the Massenburgs called asking for help. More importantly, Lee did not mention any encounter with either Massenburg in connection with encountering L.M. on State Street. Lee argues that "impeachment by omission" is only proper if the omission "ought to have come up." *United States v. Useni*, 516 F.3d 634, 652 (7th Cir. 2008). But the presence of two eyewitnesses to a crucial portion of L.M.'s and Lee's competing stories satisfies that standard. As discussed above, Friedman credibly denied Lee's explanation for the discrepancy (that Friedman told Lee not to mention the Massenburgs at trial because Friedman had no time to investigate them).

Respondent also argues that Lee's hearing testimony about where on State Street he encountered L.M. was inconsistent with his 1998 *pro se* postconviction petition. The postconviction petition attached photos that, according to the petition, depicted the alleged crime scene; those photos are of an area along State Street between Exchange and Burnham, west of Burnham and bordering the Calumet City Prairie and Marsh Nature Preserve. [25-18] at 56–63. The postconviction petition used the photos (which show shrubbery and trees but no homes) to argue that L.M.'s trial testimony describing the alleged crime scene (that she was walking

that the events in the affidavit occurred, Lee has not established prejudice from the absence of Byron's testimony, regardless of whether Byron signed the affidavit.

close to homes in a residential area) was incredible. But those photos do not portray the location that Lee described at the hearing—an area along State Street east of Burnham. [232-4], [208] at 222, 224.

At the hearing, Lee testified that the photos attached to the postconviction petition depicted the wrong location and explained that his "mother and 17-year-old daughter took these pictures. She's not an investigator. She assumed that this was the area where this happened, but it was further down, so she took pictures of the wrong place." [208] at 434. Lee acknowledged that he attached the pictures to his postconviction petition and filed it. [208] at 434. But he explained that at the time, he did not realize the pictures depicted the wrong location since he was "not allowed maps inside of the prison." [208] at 434.

Respondent argues that Lee would not have needed a map to recognize that the pictures were of the wrong location, while Lee argues that the pictures portray a location that would not have been obviously wrong. Respondent also notes that Lee's postconviction petition used the pictures to impeach L.M.'s trial testimony because L.M. testified to being near homes, while there were no homes in the pictures. [208] at 434. According to Respondent, that shows that Lee was aware that the pictures depicted a nonresidential block, undermining his argument that he did not realize the pictures were wrong. Lee responds that the location from which L.M. claimed she was abducted was not necessarily the location where Lee recalled picking up L.M.

Lee's arguments notwithstanding, this discrepancy undermines Lee's hearing testimony about the events on State Street to some degree. At the hearing, Lee testified that he remembered significant details about the positioning of individuals who were present and the lighting and visibility of their surroundings. The fact that Lee did not recognize (several years after the events occurred) that the photographs depicted the wrong location at least raises a question regarding the credibility of Lee's detailed hearing testimony.

Further, Lee testified at the hearing that while Gayland Massenburg specifically called him to ask for help, he refused help when Lee arrived because the Massenburgs were able to push the car the remaining blocks. Lee argues this makes internal sense since "[i]n the time it took Mr. Lee to have the conversations at the party and then drive to the Massenburgs' location, the Massenburgs easily could have pushed their car far enough that they no longer required Mr. Lee's help." [223] at 16. But even if this is true, the account is at least slightly strange. Gayland allegedly requested that Lee, who worked on cars, come "see what was wrong" with the car. Even if the Massenburgs could have made it the final few blocks, Lee does not explain why they were no longer interested in finding out what was wrong with the car. This account is also in significant tension with the wording of the Massenburg affidavits, which both say that "two men in a blue Cadillac"

asked if they needed help, making no reference to requesting help beforehand. And *that* description is strange for a different reason: both Massenburgs knew Lee well and would not have just described him as one of "two men."

The evidence as a whole does not support a reasonable likelihood that at trial either Massenburg would have testified consistently with the Massenburg affidavits or testified beyond the affidavits in a manner favorable to the defense.[37] It follows that there is no reasonable probability that the absence of either Massenburg's testimony would have changed the outcome of the trial. Nor could Lee establish prejudice based on a theory that either Massenburg would have falsely testified about this encounter. *See Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (1986), and explaining that "as a matter of law," a failure to "cooperate in presenting perjured testimony" cannot establish prejudice under *Strickland*: "Sheer outcome determination, however, was not sufficient to make out a claim under the Sixth Amendment.").

Nor is there a reliable basis to conclude that Pinkston testifying would have changed the trial's outcome. Pinkston confirmed that she signed her affidavit but could not remember any of the events described in it. Nor could she provide any support for the affidavit's statements through her general practices, since she testified that in 1995 she might well have signed an affidavit without reading it. Lee argues that notary Melody Jefferson testified that Pinkston "entered the currency exchange on her own" to have the affidavit notarized. [223] at 26. But that testimony alone does not provide clarity about Pinkston's knowledge of and intent to testify to the events in the affidavit or to testify beyond the affidavit.

Pinkston's testimony at the hearing offered no basis to draw any conclusions about what Pinkston would have said at trial or whether her trial testimony would have been consistent with or gone beyond her affidavit. Thus, Pinkston's testimony at the hearing does not indicate a reasonable probability that if Pinkston had testified at trial, that would have changed the outcome.

---

[37] Even if either Massenburg had testified consistently with their affidavits, those affidavits stated that the event they witnessed occurred on or about April 16, "when the crime in fact happened on April 15." [114] at 13; *Lee v. Lamb*, 2017 WL 5989775, at *5. They also "do not clearly identify L.M., Lee, or Manley." [114] at 13; *Lee v. Lamb*, 2017 WL 5989775, at *5. As the Seventh Circuit noted, "At trial the Massenburgs may have avoided the date error and positively identified L.M., Lee, or Manley. Yet there are many blue Cadillacs in the world, so the Massenburgs also might have stated that they did not see L.M., Lee, or Manley." 922 F.3d at 774. It is true, as Lee argues, that "on or about" April 16 could mean April 15; and standing alone, a relatively minor date error could be explained if the account in the affidavits was otherwise reliable. But based on Byron Massenburg's testimony, the Massenburgs would not have testified to seeing any variant of the events the affidavits described. At the very least, Lee has not shown that they would have testified in a way that would have resolved the problems with the affidavits.

In the absence of confirmation from Pinkston at the hearing, Pinkston's affidavit does not carry much weight for the truth of the matters asserted (that Manley called Pinkston and told her the statements in the affidavit). The parties debate various reasons why the affidavit may or may not be reliable, even absent confirmation by Pinkston; the court addresses them below. But ultimately, without confirmation by Pinkston at the hearing, the affidavit is not reliable on its face, nor does the record offer a sound basis to find the affidavit reliable.

For one thing, the parties debate whether Manley would have called Pinkston. Respondent relies on Pinkston's testimony that she knew Manley primarily through Lee; they were not friends who socialized together independently. Further, Pinkston did not feel comfortable around Manley. In Respondent's view, Pinkston's testimony about her relationship with Manley tends to undermine the account in the Pinkston affidavit that Manley called her, provided details about the incident, and expressed his intent to take Lee down with him. Lee responds that Manley intended to convey a threat to Lee that Pinkston would presumably relay. It is true that that interpretation is quite plausible and, if correct, would explain Manley's calling Pinkston even though they were not friends—although it would not explain how Manley still had Pinkston's number while in jail in Tennessee. There could be possible explanations (e.g., perhaps Manley was still in touch with Gowers and Gowers had Pinkston's number), but nothing in the record speaks to them and the question illustrates the uncertainty about the reliability of the affidavit.

In any event, the phone bill does not provide sufficient evidence that this call was to Pinkston. The bill shows a call to a number, 312-221-1993, as to which Pinkston could not remember whether it was or was not hers. Lee testified that the phone number 312-221-1993 was associated with Pinkston's residence, and that she told Lee that she included the phone bill to show that she had received this call from Manley while he was in jail. [208] at 282–83, 393.[38] But the phone number on the bill, 312-221-1993, is different from the handwritten phone number on the affidavit, 312-918-0535. Again, there could be possible explanations (e.g., perhaps both phone numbers were Pinkston's). Pinkston could not recall whether either of these phone numbers was or was not her phone number. [207] at 186–87. She has "had a million phone numbers." [207] at 186. Perhaps both phone numbers were

---

[38] On cross-examination, Lee agreed that at his deposition, he testified that did not remember whose number it was, but explained that he knew whose it was now (at the evidentiary hearing), [208] at 393–94. Lee argues that his testimony "likely stemmed from confusion, not deceit," and points out that he "*knew* the phone number had to belong to Ms. Pinkston because it was attached to her affidavit, though he might not have *recognized* the number after all these years." [223] at 25 n.4. Even accepting this explanation, as noted in the accompanying text, the phone number on the bill, 312-221-1993, is different from the handwritten phone number on the affidavit, 312-918-0535. At the least, Lee does not explain that discrepancy.

hers. But again, the question illustrates the uncertainty about the reliability of the affidavit.

Even if the affidavit were sufficient evidence that the call occurred as described, Respondent argues that any testimony about the call from Manley would have been hearsay. Lee responds that Manley would have been unavailable to testify since he would have exercised his Fifth Amendment privilege, so his statement to Pinkston would have been an admissible statement against penal interest made by an unavailable witness. *See People v. Rice*, 247 Ill. App. 3d 415, 417 (1993), *rev'd on other grounds*, 166 Ill. 2d 35 (1995). Respondent counters that in his severed trial, Manley did in fact testify about Lee's proximity during Manley's sexual encounter with L.M., *see* [96-8] at 36–37, so there is no reason to think he would have exercised his Fifth Amendment privilege with respect to that topic at Lee's trial.

Lee alternatively argues that Manley was unavailable to testify at Lee's trial under *Bruton v. United States*, 391 U.S. 123 (1968).[39] Under *Bruton*, "[t]he Confrontation Clause renders the confession of a non-testifying codefendant altogether inadmissible in a jury trial if it implicates the defendant." *United States v. King*, 910 F.3d 320, 328 (7th Cir. 2018)) (citing *Bruton*, 391 U.S. at 135–37). But "'[t]he Constitution as construed in *Bruton* . . . is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for "full and effective" cross examination.'" *United States v. Chrisman*, 965 F.2d 1465, 1469 (7th Cir. 1992) (quoting *Nelson v. O'Neil*, 402 U.S. 622, 627 (1971)); *see also Chrisman*, 965 F.2d at 1469 ("[O]rdinarily, any *Bruton* problem is avoided if the maker of the confession testifies at trial.") (quoting W. LaFave & J. Israel, Criminal Procedure § 17.2, at 365*).* The "blanket rule of *Bruton*" is also inapplicable to bench trials, as Lee's trial was. *King*, 910 F.3d at 328 ("Martin . . . had a bench trial—and we have held that the blanket rule of *Bruton* 'is simply inapplicable' in that context.") (quoting *Faulisi v. Pinkney*, 611 F.2d 176, 178 (7th Cir. 1979)). Nonetheless, "the bedrock rule" is "that absent an opportunity for cross-examination, the Confrontation Clause prohibits the use of out-of-court testimony as substantive evidence against the accused." *King*, 910 F.3d at 328–29 (discussing *Lee v. Illinois*, 476 U.S. 530 (1986)). But again, as noted above, Respondent contends that given Manley's testimony at his own trial, there is no basis to conclude that Manley would have been unavailable to testify at Lee's trial.

Even assuming that Pinkston would have testified consistently with her affidavit and could have properly testified over a hearsay objection to the call between her and Manley, it is not clear that Manley's alleged statement that Lee was "no where around" during his sexual encounter with L.M. would have assisted

---

[39] As Lee notes, the trial court granted a motion (filed by Friedman) to sever Lee's trial from Manley's, citing *Bruton*. But nothing in *Bruton* appears to prevent a defendant in a severed bench trial from testifying live at a co-defendant's trial.

Lee's defense. Lee contended in his amended petition that Pinkston's testimony (regarding Manley's alleged statement that Lee was "no where around") "would have supported Mr. Lee's defense that he remained outside his car while Mr. Manley and L.M. had consensual sex in the car at Merrill Park" and "contradicted L.M.'s testimony that Mr. Lee held a gun to L.M.'s he[a]d while Mr. Manley raped her." [96] at 15. In the posthearing reply brief, Lee contends that L.M.'s physical injuries "presumably, resulted from a violent assault by Mr. Manley which occurred while Mr. Lee was outside the car." [223] at 37. Lee contends that Pinkston "could have testified that Mr. Manley had a sexual encounter with L.M." and Elston "could have testified Mr. Lee was outside the car while Mr. Manley was presumably assaulting L.M. inside the car." [223] at 38. According to Lee, "[i]f Mr. Lee had been provided adequate legal representation, Mr. Lee almost certainly would have had a factual basis to argue at trial that Mr. Manley had assaulted L.M. without Mr. Lee's involvement." [223] at 38.

However, Respondent contends that "[u]nder Illinois law, accountability liability arises from aiding another in the commission of an offense, not proximity," [222] at 46; and Lee does not dispute that "proximity is not the touchstone of accountability liability under Illinois law," [223] at 44. Indeed, L.M. testified at trial that Lee first tore off her clothes, beat her, and forced her to perform oral sex on Manley (one of the counts against Manley), then Lee left the car and was not physically present in the car when Manley raped her (the other count against Manley), and then Lee returned to the car, continued beating her, and threatened her. [96-6] at 30–39. Nonetheless, the trial court found Lee guilty on an accountability theory for both counts against Manley, even though Lee was not physically present for Manley's rape of L.M., because Lee's prior use of force (striking L.M. and forcing L.M. to perform oral sex on Manley) helped bring about Manley's rape of L.M. [96-8] at 169–71. Testimony by Pinkston that Manley told her that Lee was "no where around" would not have undermined the court's conclusion.[40]

Lee argues that Pinkston's testimony would not have stood alone, but would have been considered with Elston's (which, if Elston had testified consistently with the 1995 Elston affidavit, would have been that Lee was not only outside the car, but left the area entirely to go to a store with Elston). Lee argues that, together, these witnesses would have created a reasonable probability that the court would

---

[40] As the prior district judge noted, Lee testified at trial that he drove (on returning to the car, he started the car) while Manley was lying on top of L.M. in the back seat. [114] at 16 (citing [96-8] at 70–71); *Lee v. Lamb*, 2017 WL 5989775, at *6. While, as Lee argues, Manley's alleged statement to Pinkston appears to have been referencing the separate time, before Lee returned to his car, when Lee testified he was away from the car (sitting outside the car on a stump, speaking with Elston next to Elston's car, and going with Elston to a store), the "uncertainty does detract from the probative value of the proposed testimony." [114] at 16; *Lee v. Lamb*, 2017 WL 5989775, at *6.

have believed Lee, disbelieved L.M., and acquitted Lee entirely, or at least concluded that Lee did not contribute to Manley's assaults and acquitted Lee on the two counts of accountability for Manley's assaults (which resulted in 40 years of the 100-year sentence). But as discussed below, the record does not support drawing any conclusions about the content of Elston's potential trial testimony.

Finally, Respondent also argues that testimony from Pinkston about Manley's statement would have opened the door for the state to rebut Pinkston's account with Manley's testimony about Lee's role in the encounter. Manley testified (during Manley's testimony, which the judge declined to consider against Lee) that during Manley's sexual encounter with L.M., Lee was sitting on the curb, within visible distance of the car. [96-8] at 36–37. He also testified that after using the washroom, he came back to the car and found Lee "on top of" and "beating" L.M., who was "hollering." [96-8] at 15, 36–37. Lee argues that any rebuttal testimony would have been limited in scope, and with Pinkston's corroboration, the court would have believed Lee over Manley. [223] at 43–44 n.9. Nonetheless, it is difficult to predict how the court would have ruled on any request to limit the scope of rebuttal; and the introduction of any of Manley's testimony on this issue would not have supported Lee's defense.

In sum, considering all the available evidence, Lee has not shown prejudice from the absence of Pinkston's testimony at trial.

Next, Lee argues that it is reasonably probable that testimony from Elston would have led to acquittal on all counts or at least the two counts based on accountability for Manley's crimes. While L.M. testified at trial that Lee drove to a location outside a "crack house," Lee argues that Elston would have testified to that portion of the night occurring at Merrill Park. Likewise, he argues that while L.M. described a violent and coercive encounter involving both Manley and Lee, Elston would have testified that Lee was not involved in the sexual encounter between Manley and L.M.—at least for the portion of the night that Elston witnessed. Rather, according to the 1995 affidavit, Elston would have testified that, while Manley and L.M. were in the car, Lee was outside the car and went with Elston to a store. Further, two of Lee's convictions (which contributed 40 years to Lee's sentence) were based on accountability for Manley's assaults. *See* Pet'r Ex. 20, [232-2] at 302 (sentencing transcript).

Lee argues that the injuries depicted in the photographs introduced at trial could have "resulted from a violent assault by Mr. Manley which occurred while Mr. Lee was outside the car." [223] at 37. Lee argues that if Elston had testified that Lee was outside and away from the car while Manley and L.M. were inside, Lee could have avoided accountability liability for Manley's alleged assaults. But ultimately, the record does not warrant a finding of a reasonable probability that Elston's testimony would have changed the outcome of Lee's trial.

73

Since Elston was unavailable to testify at the hearing, Lee argues that he would have testified consistently with the 1995 Elston affidavit. But the 1995 Elston affidavit is not inherently reliable, and its contents could not be tested through testimony by, or cross-examination of, Elston at the hearing. While the contents can be compared with the rest of the record, including Lee's testimony at the hearing as to what both he and Elston saw, ultimately there is no convincing basis to draw any conclusions about what Elston would have said at trial or whether his trial testimony would have been consistent with or gone beyond his affidavit. Thus, there is no basis to find a reasonable probability that if Elston had testified at trial, it would have changed the outcome.

That issue alone is dispositive. But even setting it aside, there are problems with the account in the 1995 Elston affidavit. For example, the affidavit states that Elston "noticed a man and a woman entering the rear door of Anthony Lee's car." However, Rea's notes from the 2014 interview state that Elston could not "recall who else was there." [231-18] at 3; *see also* [231-18] at 5 (according to the notes, after Lee and Elston returned from the store, they pulled up by Lee's car and Elston "can't recall seeing anyone else by cars"). This inconsistency somewhat undermines the account in the affidavit.

Even if Elston had credibly testified consistently with his affidavit, that testimony would have created additional problems. First, Elston's second (2008) affidavit, which attempted to correct the absence of a date in the 1995 affidavit, references the wrong night (April 16 rather than April 15). Second, as the prior district judge noted, there is a "problem with the timeline: Elston stated that he saw Lee around 3:30 or 4:00 a.m., but Teresa Baragas testified at trial that L.M. knocked on her door around 3:00 a.m." [114] at 15 (citing [96-6] at 15–16); *Lee v. Lamb*, 2017 WL 5989775, at *6. And "the state could have argued that Baragas was the more reliable witness, both because she did not know Lee (so had no bias one way or the other) and because she described a harrowing experience that would be more likely impressed on her memory." [114] at 15; *Lee v. Lamb*, 2017 WL 5989775, at *6. On the other hand, Elston had known Lee since grade school, which could have been a potential issue for Elston's credibility. Lee is correct that the trial court could have reconciled the timeline by inferring that one or more of Elston or Baragas provided an inaccurate or approximate time estimate, but the timeline problem reduces the likelihood that Elston's testimony would have moved the needle at Lee's trial. Standing alone, relatively minor date and time discrepancies would not warrant entirely discounting the 2008 affidavit (or the 1995 affidavit) if they were otherwise reliable. But since Elston did not testify at the evidentiary hearing and was not subject to cross-examination, there is not enough information to test the reliability of either affidavit for the truth of the matters asserted. Likewise, the record does not support drawing conclusions on whether Elston would have testified at trial, what the content of his testimony would have been, or

whether his testimony would have been consistent with or gone beyond his affidavits.

Finally, Lee's hearing testimony about encountering Elston at Merrill Park (as well as the account in the 1995 Elston affidavit) is again in tension with Lee's trial testimony. At trial, Lee's account of the events at Merrill Park omitted all mention of Elston and did not include any trip to a convenience store. This inconsistency makes it less likely that Elston encountered Lee at Merrill Park, and therefore less likely that Elston would have described such an encounter. Again, Friedman credibly denied Lee's explanation for the inconsistency. For all these reasons, there is not a reasonable probability that Elston testifying would have changed the outcome of Lee's trial.

The same is true of Parker's affidavit. Lee argues that Parker would have corroborated his version of events at Dad's liquor store. At trial, Lee testified that both he and Manley entered Dad's, leaving L.M. alone in the car. L.M. testified to the contrary that only Lee went in and Manley stayed in the car. Lee argues that Parker would have testified consistently with her affidavit that she saw both Lee and Manley inside Dad's, corroborating Lee's account. As Lee argues, "the idea that kidnappers would leave their victim unattended in a parking lot, free to leave, with the keys to the car, is not believable." [220] at 46.

But as with Elston, without testimony from Parker, Parker's affidavit (even considered along with all the other evidence at the hearing, including Lee's hearing testimony) is not a convincing basis to draw any conclusions about what Parker would have said at trial or whether her trial testimony would have been consistent with or gone beyond her affidavit. There is no reliable basis, either in the affidavit itself or in the rest of the evidence presented, to find a reasonable probability that if Parker had testified at trial, it would have changed the outcome.

That alone is dispositive. But even if there were reason to conclude that Parker would have testified consistently with her affidavit, the testimony would have had limited value. Parker's testimony would have been evaluated in light of her close romantic relationship with Lee.[41]

_____

[41] In addition, Lee testified at trial (as noted above) that both he and Manley entered Dad's, leaving L.M. alone in the car. However, Lee's written statement to the police—which was introduced at trial—stated that Lee remained in the car with L.M. at the liquor store. [96-7] at 14. Respondent argues that any corroboration by Parker of Lee's trial testimony (that both Lee and Manley went into the store, leaving L.M. alone in the car) would have had limited value given Lee's internal inconsistency on this point. On the other hand, Lee testified that he did not read more than a few lines of the statement before signing it, because the police told him that if he signed the statement, he could go home. He argues that "[e]specially with Ms. Parker's corroborating testimony," the trial court could have believed that he did not read the statement before signing. [223] at 40. Although this

In any event, it is also unclear that the description of events in Parker's affidavit was in fact inconsistent with L.M.'s trial testimony. Even assuming that Parker would have testified that she saw both Lee and Manley inside Dad's at the same time, L.M. testified that Manley said he had just left a club in Hammond. [96-6] at 28. Parker's affidavit states that she saw Lee and Manley in Dad's around 1:00-1:30 a.m.; L.M.'s trial testimony reflected that she was abducted at approximately 1:00 a.m. or so. [96-6] at 20. Since the timeframes were approximate, "Parker might have seen Lee and Manley together in Dad's *before* they abducted L.M." [114] at 14 (emphasis in original); *Lee v. Lamb*, 2017 WL 5989775, at *6.

To resolve this problem, Lee again relies on his own hearing testimony. He argues that he testified that he only went to Dad's *after* meeting L.M., and Parker would have corroborated this account. But Lee's testimony introduced new problems for his argument that Parker would have provided exculpatory testimony. For example, Lee testified at the hearing that he had an extended conversation with Parker at Dad's. Yet at trial, Lee only mentioned talking to "a guy that was sitting at the bar," who he later said was named "Simon something." [96-6] at 62, 81–82. Again, Friedman credibly denied Lee's explanation that Lee omitted his encounter with Parker (and the other affiants) because of Friedman's alleged instruction. The record does not support a reasonable likelihood that Parker would have corroborated Lee's account.

Respondent also argues that even if the court credited an account in which L.M. voluntarily got into the car and remained there until leaving Dad's, Lee would nonetheless have been held liable for later holding her against her will and sexually assaulting her. Of course, if (contrary to the record) Parker had credibly contradicted L.M.'s testimony about the liquor store stop, that might have reduced L.M.'s credibility with respect to subsequent events. But in light of the other problems with Parker's affidavit, this point still reduces the potential value of Parker's testimony.

Considering cumulatively the potential impact of testimony from the Massenburgs, Pinkston, Elston, and Parker, Lee has not shown "a reasonable likelihood that the outcome would have been different—that is, a likelihood that is substantial, not just conceivable." *Blackmon*, 823 F.3d at 1107 (citing *Strickland*, 466 U.S. at 688, 694). There is no reliable basis to conclude that either Massenburg would have testified to witnessing anything on the night in question. The record is obscure as to what if anything the other three witnesses (Pinkston, Elston, and Parker) might have said at trial, there are questions as to the accounts in each of

---

would have been one available option for the trial court in weighing the competing evidence, overall, the inconsistency weighs against Lee's argument for prejudice based on the absence of Parker's testimony.

their affidavits, and none of the affidavits is sufficiently reliable to carry much weight as to their truth. Lee's hearing testimony about his encounters with the Massenburgs, Elston, and Parker that night diverged from his trial testimony, which did not include any encounter with any of these individuals; and Friedman credibly denied Lee's explanation for the discrepancy.

Finally, Lee had romantic involvements with Pinkston and Parker, Elston was a childhood friend, and Lee had also known the Massenburgs for quite a while (Byron considered Lee a "very close friend"). The cumulative effect of testimony from multiple witnesses open to attacks for bias—especially in light of the problems with their testimony—may well have hurt Lee's defense. At the least, Lee has not shown a reasonable likelihood that the testimony would have helped.

As neither prong of *Strickland* has been met, the habeas petition is denied.

## IV. Certificate of Appealability

Since the court is entering a final order adverse to Lee, Habeas Rule 11(a) requires the court to either issue or deny a certificate of appealability. The court will issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The question is whether "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner." *Slack v. McDaniel*, 529 U.S. 473, 475 (2000).

This case remains, in the words of the prior district judge, a "close call." [114] at 18; *Lee v. Lamb*, 2017 WL 5989775, at *7. The court has now evaluated Lee's ineffective assistance claim without deference to a state court decision and based on an expanded factual record. The record is complex and there are things to be said for both parties on a range of points. The court concludes that Lee has not shown constitutionally ineffective assistance, but reasonable jurists could disagree. The court issues a certificate of appealability on whether Lee received ineffective assistance of counsel under the Sixth Amendment.

### Conclusion

For the reasons above, the habeas petition is denied, but the court issues a certificate of appealability.

Date: February 27, 2023              /s/ Martha M. Pacold